**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LOLCOW LLC,                                     )
                                                )
     Plaintiff,                              )
                                                )
v.                                              )          Case No. 1:26-cv-02059-KPF
                                                )
ZHEN ELIZABETH FONG-JONES,                      )
                                                )
     Defendant.                              )

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF AND SUBPOENA RECIPIENT LOLCOW LLC'S MOTION TO QUASH**
**SUBPOENAS, OR IN THE ALTERNATIVE FOR A PROTECTIVE ORDER,**
**AND FOR ATTORNEYS' FEES AND COSTS**

---

**TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** ....................................................................................1

**STATEMENT OF FACTS**..........................................................................................3

    A.  Lolcow LLC and the Kiwi Farms Platform ...................................................3

    B.  Procedural History..........................................................................................3

    C.  The May 14 Conferral and Subsequent Correspondence..................................4

    D.  The Pattern of Retaliatory Conduct .................................................................5

**ARGUMENT** ............................................................................................................9

    I.  THE SUBPOENAS EXCEED THE STATUTORY PURPOSE OF § 512(h) ...................10

    II.  THE SUBPOENAS ARE MOOT AS TO REMOVED CONTENT ................................13

    III.  THE SUBPOENAS ARE PROCEDURALLY DEFECTIVE UNDER RULE 45 AND § 512(h)............................................................................................................14

        A.  Service Does Not Comply With Rule 45(b)(1)........................................14

        B.  Section 512(h) Does Not Authorize the Manner of Service Used ........................15

    IV.  THE SUBPOENAS IMPROPERLY SEEK PRE-RULE 26 DISCOVERY FROM A PARTY ........................................................................................................16

    V.  THE ARISTA / SONY MUSIC FACTORS WEIGH DECISIVELY AGAINST DISCLOSURE..................................................................................................17

    VI.  THE FAIR USE DEFENSE IS APPARENT ON THE RECORD .................................18

    VII.  THE SUBPOENAS IMPROPERLY REACH SEPARATE LEGAL ENTITIES AND MATERIALS OUTSIDE LOLCOW LLC'S CONTROL ...............................................24

    VIII.  THE RECORD DEMONSTRATES COPYRIGHT MISUSE AND IMPROPER PURPOSE ..................................................................................................25

    IX.  THE SUBPOENAS IMPOSE AN UNDUE BURDEN ..................................................27

    X.  ANY PRODUCTION MUST BE LIMITED AND GOVERNED BY A STRICT PROTECTIVE ORDER..........................................................................................29

    XI.  LOLCOW LLC IS ENTITLED TO ATTORNEYS' FEES AND COSTS.....................31

    XII.  LOLCOW'S OBJECTIONS ARE TIMELY, SUBSTANTIVE, AND NOT WAIVED32

**CONCLUSION** ......................................................................................................33

## TABLE OF AUTHORITIES

**Cases**

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) .................21, 22

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ................................................ passim

*Barnes v. YouTube, Inc.*, No. 25-cv-05901-VKD, 2026 U.S. Dist. LEXIS 30862 (N.D. Cal. Feb. 13, 2026) ................................................................................................................................10

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ......................................................23

*Coleman v. ESPN, Inc.*, 764 F. Supp. 290 (S.D.N.Y. 1991)......................................................25

*Concepts NREC, LLC v. Xuwen Qiu*, No. 5:20-cv-133, 2021 U.S. Dist. LEXIS 252822 (D. Vt. Sep. 20, 2021) .........................................................................................................................14

*Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44 (S.D.N.Y. 1996) ................................28

*Dhillon v. Doe*, 2014 U.S. Dist. LEXIS 24676 (N.D. Cal. 2014)......................................21, 22, 23

*Doe v. 2TheMart.com Inc.*, 140 F. Supp. 2d 1088 (W.D. Wash. 2001) .......................................31

*Doe v. Megless*, 654 F.3d 404 (3d Cir. 2011) ...........................................................................30

*Exec. Lens LLC v. Rapkin*, 2026 U.S. Dist. LEXIS 58448 (N.D. Cal. Mar. 19, 2026) ................27

*Fischer v. Forrest*, 2017 WL 773694 (S.D.N.Y. Feb. 28, 2017)....................................................33

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) (en banc) ....................................................12

*Hachette Book Group, Inc. v. Internet Archive*, 115 F.4th 163 (2d Cir. 2024) ...........................23

*Hannley v. Mann*, 2023 U.S. Dist. LEXIS 40022 (C.D. Cal. 2023)...............................................22

*Highfields Capital Mgmt., L.P. v. Doe*, 385 F. Supp. 2d 969 (N.D. Cal. 2005) ...........................20

*Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148 (9th Cir. 1986)..........................22

*In re Charter Commc'ns, Inc.*, 393 F.3d 771 (8th Cir. 2005).......................................................10

*In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868 (N.D. Cal. 2022).12, 27, 31

*In re DMCA Section 512(h) Subpoena to YouTube (Google, Inc.)*, 581 F. Supp. 3d 509 (S.D.N.Y. 2022) ................................................................................................................................17, 20

*In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875 (N.D. Cal. 2020)............................12

*In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179 (S.D.N.Y. 2007) ......................................................25

*In re Subpoena of Internet Subscribers of Cox Commc'ns, LLC*, 2025 WL 2371947 (9th Cir. 2025) .........................................................................................................................................11

*Katz v. Chevaldina*, 2014 U.S. Dist. LEXIS 88085 (S.D. Fla. 2014)...........................................22

*Korman v. Free Beacon LLC*, 2026 U.S. Dist. LEXIS 69029 (E.D. Va. 2026) ............................22

*Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970 (4th Cir. 1990)..................................................25

*Lenz v. Universal Music Corp.*, 815 F.3d 1145 (9th Cir. 2016) ....................................................27

*Maximized Living, Inc. v. Google, Inc.*, 2011 U.S. Dist. LEXIS 147486 (N.D. Cal. 2011)......1, 13

*MCM Grp. 22 LLC v. Perry*, 818 F. Supp. 3d 623 (S.D.N.Y. 2026)............................................22

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995)...........................................................19

*Rapid Relief Team (RRT) Ltd. v. Bawtinheimer*, No. 4:25-cv-10864-JST (N.D. Cal.) .................12

*Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229 (D.C. Cir. 2003) ...................................................................................................................................10, 13

*Savage v. Council on Am.-Islamic Rels., Inc.*, 2008 U.S. Dist. LEXIS 60545 (N.D. Cal. 2008) ..24

*Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984).....................................................................30

*Sedlik v. Von Drachenberg*, 2026 U.S. App. LEXIS 12 (9th Cir. Jan. 2, 2026)............................24

*Shaykhoun v. Daily Mail*, 2026 U.S. Dist. LEXIS 40950 (S.D.N.Y. 2026) .................................22

*Sony Music Entm't Inc. v. Does 1–40*, 326 F. Supp. 2d 556 (S.D.N.Y. 2004)..................17, 18, 19

*Talley v. California*, 362 U.S. 60 (1960) .....................................................................................19

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131 (2d Cir. 1991).....25

**Statutes**

17 U.S.C. § 107..............................................................................................................17, 20, 22, 24

17 U.S.C. § 512.......................................................................................................................... passim

**Rules**

Fed. R. Civ. P. 26......................................................................................................................... passim

Fed. R. Civ. P. 34......................................................................................................................... passim

Fed. R. Civ. P. 45......................................................................................................................... passim

**PRELIMINARY STATEMENT**

Plaintiff and subpoena recipient Lolcow LLC ("Lolcow") respectfully moves to quash three subpoenas purportedly issued under 17 U.S.C. § 512(h) (ECF Nos. 13, 15, and 17), or, in the alternative, for a protective order and an award of attorneys' fees and costs. The subpoenas seek identifying information for anonymous Kiwi Farms users who criticized Defendant Zhen Elizabeth Fong-Jones ("Fong-Jones" or "Defendant"). They should be quashed because they convert a narrow DMCA pre-suit identification mechanism into premature merits discovery and witness discovery in an existing civil action.

The statutory defect is dispositive. Section 512(h) permits a copyright owner to obtain "information sufficient to identify the alleged infringer," 17 U.S.C. § 512(h)(3), and then only for the purpose of "protecting rights under this title," *id.* § 512(h)(2)(C). Defendant appears to be seeking these subpoenas for an entirely different purpose: to identify *witnesses* in this litigation, or to obtain general purpose discovery. That admission removes the subpoenas from § 512(h)'s ambit. The statute "does not authorize issuance of a subpoena" for any purpose other than identifying an alleged infringer. *Maximized Living, Inc. v. Google, Inc.*, 2011 U.S. Dist. LEXIS 147486, at *13 (N.D. Cal. Dec. 22, 2011). If Defendant wants discovery from a party in this case, Defendant must wait for the Rule 26(f) conference and use the discovery tools authorized by the Federal Rules. Alternatively, if Defendant claims that the users are alleged infringers, the subpoenas still fail because the asserted uses are critical, transformative commentary protected by the fair use doctrine and because several targeted posts had already been removed before the corresponding subpoenas issued.

The subpoenas also fail for independent procedural reasons. They were issued on Form AO 88B (the standard federal subpoena form commanding production under Fed. R. Civ. P. 45)

1

but demand Rule 34-style document production, and invoke Rule 34 definitions. Additionally, Defendant did not serve them as Rule 45(b)(1) requires. Defendant cannot invoke the Federal Rules when demanding compliance and then disclaim those same Rules when service and timing defects are raised.

Finally, the requested production is overbroad, invasive, and burdensome. Kiwi Farms is designed to minimize retained user-identifying information. Declaration of Joshua Moon ("Moon Decl.") ¶¶ 7–14.[1] IP logs are short-lived, historical data exists only incidentally in encrypted backups, and financial records are not maintained in a way that reliably maps payments to accounts. *Id.* ¶¶ 16–30. The subpoenas nevertheless demand subscriber information, IP information, and transactor information spanning years, and they purport to reach records of separate corporate entities which are not affiliated with the subpoena recipient (Mad at the Internet LLC and the United States Internet Preservation Society) through a definitions clause. Rule 45 does not permit that.

The evidence is also overwhelming that Defendant seeks the subpoenas out of a motive other than good-faith pursuit of copyright claims, and both Defendant and defense counsel have a history of using information obtained to "doxx" disfavored speakers or threaten non-copyright litigation.[2] This is not a legitimate purpose for DMCA subpoena. The attached declarations of

---

[1] This declaration was provided to Defendant on May 18, 2026, after defense counsel claimed a declaration would be required to support any claim of hardship arising from the subpoenas. Plaintiff has not heard from Defendant with any objection to the specific claims in this declaration, nor has the Defendant attempted to rebut it. Exhibit D at 13.

[2] Lolcow LLC respectfully requests an evidentiary hearing on this motion, at which the declarants and Joshua Moon, custodian of records for Lolcow LLC, can testify in support of the factual issues raised in this motion.

2

Kevin Crawley[3] and Thomas Hahn[4] further demonstrate that Defendant's actual purpose is not copyright enforcement but retaliation against anonymous critics. That's the very purpose the First Amendment forbids. Lolcow respectfully requests that this Court quash the subpoenas, or in the alternative enter a protective order limiting any disclosure, and award Lolcow its reasonable attorneys' fees and costs under Fed. R. Civ. P. 45(d)(1).

**STATEMENT OF FACTS**

**A.        Lolcow LLC and the Kiwi Farms Platform.**

Lolcow LLC is a West Virginia limited liability company that operates the Kiwi Farms website, a pseudonymous discussion forum. Moon Decl. ¶ 4. The platform is designed to facilitate pseudonymous speech and criticism. Users register under pseudonyms, are warned during the registration process to separate their site identity from their real-world identity, and are encouraged to use privacy-preserving access methods including VPN and Tor. *Id.* ¶¶ 7–9, 13–14. These design choices are not incidental. Kiwi Farms has previously been compromised (in 2019 and again in 2022) resulting in exfiltration of user email addresses and substantial harm to user trust. *Id.* ¶¶ 10–11. The platform's data-minimization architecture is a direct response to those incidents and to the ongoing risk that adversarial actors will target user data. *Id.* ¶ 12.

Lolcow retains minimal identifying information by design. IP logs are ordinarily retained for approximately two weeks. Moon Decl. ¶ 16. Other server, firewall, and reverse-proxy logs may be retained for as little as 24 hours. *Id.* ¶ 17. Direct messages auto-delete after 30 days of inactivity. *Id.* ¶ 21. Financial information is not maintained in a manner that reliably associates any particular

---

[3] Defendants incorporate the content of this declaration by reference here, and attach it as Exhibit E.

[4] Defendants incorporate the content of this declaration by reference here, and attach it as Exhibit F.

3

payment with any particular user account: users may pay for others, cryptocurrency payments do not identify a real-world payor, and mail-in payments are not preserved in account-linked form. *Id.* ¶¶ 24–30.

**B.      Procedural History.**

This action is a declaratory judgment action brought by Lolcow seeking a declaration that certain Kiwi Farms posts constitute fair use of a copyrighted photograph. Defendant has not answered the complaint. No Rule 26(f) conference has occurred. No issues have been joined. The parties stipulated to extend Defendant's time to respond through June 29, 2026. ECF No. 11.

On March 23, March 27, and April 2, 2026, Defendant sought issuance of three subpoenas purportedly under § 512(h), directed to Lolcow, seeking identifying information for anonymous users. ECF Nos. 12, 14, & 16. The subpoenas were issued on AO 88B forms titled as "Subpoena to Produce Documents, Information, or Objects," attach Rule 45 text, and define "Document" by reference to Fed. R. Civ. P. 34. The subpoenas request not merely "information sufficient to identify the alleged infringer" (the only information for which the DMCA provides statutory authorization) but also broad categories of "Subscriber Information" and "Transactor Information" spanning years of financial and account records. That's not all: these subpoenas also define "Kiwi Farms" to include Mad at the Internet LLC and the United States Internet Preservation Society. But these are separate legal entities that are not parties to these subpoenas and over whose records Lolcow has no control. Moon Decl. ¶¶ 5–6.

**C.      The May 14 Conferral and Subsequent Correspondence.**

Lolcow timely served written objections to each subpoena. See Exs. A—C (Written Objections to ECF Nos. 13, 15, & 17); Ex. D (Supplemental Written Objections dated May 18,

4

2026).[5] On May 14, 2026, counsel conferred by videoconference. During that conferral, Defendant's counsel, Lane A. Haygood of Kamerman, Uncyk, Soniker & Klein P.C. ("KUSK") proffered general discovery-related goals for the subpoenas at issue, and requested additional information pertaining to Lolcow's objections. Lolcow complied, proving supplemental detailed written objections and a declaration from Lolcow's records custodian on May 18, 2026.

On May 19, 2026, Mr. Haygood emailed that Lolcow's supplemental objections "still do not conform to the 2015 amendments to Rule 34" and that Defendant was "in no way waiving [its] right to assert claims directly against the Doe parties." Exhibit G. That shifting posture (invoking § 512(h) when convenient, demanding Rule 34 compliance when convenient, claiming the users are witnesses at the conferral but reserving infringement claims afterward) confirms the problem: Defendant is using § 512(h) as a litigation shortcut while simultaneously demanding the benefits of ordinary civil discovery.

**D.      The Pattern of Retaliatory Conduct.**

Defendant has a well-documented history of targeting Kiwi Farms and its users. Defendant authored software (a tool called "tor-fetcher") which is specifically designed to bypass security mechanisms associated with Kiwi Farms, including a custom system called "Tartarus" whose deployment is generally limited to Kiwi Farms. Moon Decl. ¶¶ 36–41. Defendant has organized campaigns to deplatform Kiwi Farms, has personally appeared at efforts to persuade service providers to terminate the site, and has delivered a public presentation at Oxford addressing litigation against persons associated with the forum. *Id.* ¶ 39.

---

[5] The written objections are attached hereto as Exhibits C through E. Each is incorporated by reference here.

"Doxxing" is Internet vernacular for publicly revealing a pseudonymous user's real-world identity. Fong-Jones has publicly and repeatedly threatened to doxx Kiwi Farms users. In a representative post, Defendant wrote: "Sure would be a shame if someone unmasked their real *names* so that their friends and coworkers might know what they do in their spare time . . ."



*Fong-Jones's public threat to unmask anonymous Kiwi Farms users.*

Defendant has acknowledged that Fong-Jones' campaign against Kiwi Farms has spanned years and has employed every available tool. In October 2022, Fong-Jones posted: "Look, I've been trying to get KF taken down for almost 6 years. I've tried literally everything else in the book… 6 years, numerous people filing lawsuits, complaining to cops."[6] The § 512(h) subpoenas at issue here are the latest instruments in that long-running effort.

The declarations submitted herewith establish that Fong-Jones's doxxing threats are not rhetorical. Kevin Crawley, a software engineer formerly employed at Meta, attests that in November 2024, he was identified as the person behind his pseudonymous Kiwi Farms account through a formal investigation conducted by Kamerman, Uncyk, Soniker & Klein, P.C. ("KUSK") That's the very same law firm that represents Fong-Jones in this action and that signed the DMCA

---

[6] This was shared with Defendant in April 7, 2026 written objections to the March 24, 2026 Subpoena in this matter. ECF No. 13.

takedown notices and § 512(h) subpoena applications at issue. Crawley Decl. ¶¶ 8–9. The investigation was conducted by Kathryn Tewson, a KUSK paralegal. That's the same individual who participated in the May 14, 2026 meet-and-confer in this case. *Id.* ¶ 9.

Tewson's report, titled "Kevin Crawley a/k/a 'Mailfrawd'—Summary of Identity and Activity," describes how she identified Crawley by analyzing conference speaker lists, cross-referencing personal details he had disclosed pseudonymously on Kiwi Farms with publicly available information, and matching ten biographical data points. These "biographical points" included the age of Mr. Crawley's minor child, medications Mr. Crawley takes, hobbies, employment history, and family details. Fong-Jones and her law firm used this data to narrow the pool to a single candidate. Crawley Decl. ¶ 10. The report was "Prepared for Liz Fong-Jones" and produced in connection with the professional relationship between Fong-Jones and KUSK. *Id.* But the report was not used for internal or litigation purposes: it was published to the entire Internet.

After Tewson identified him, Fong-Jones launched a public campaign to destroy Crawley's career. On November 18, 2024, Fong-Jones posted on LinkedIn: "Mailfrawd is Kevin Crawley, Staff Engineer at Meta," publicly associating his real name, employer, and job title with his pseudonymous Kiwi Farms account. Crawley Decl. ¶ 11. On the same date, Fong-Jones posted on Bluesky that Crawley "may pose a safety risk to his colleagues, or even to his employer." *Id.* Crawley's employment at Meta was terminated in or around December 2024. *Id.* ¶ 12.

On December 27, 2024, Fong-Jones publicly celebrated Crawley's termination, posting: "Being a member of Kiwi Farms and engaging in racist and transphobic tirades is bad for one's career." Crawley Decl. ¶ 13.



*Fong-Jones's post celebrating Crawley's termination from Meta (December 27, 2024).*

The very next day, Fong-Jones publicly thanked KUSK and Tewson by name. Fong-Jones

also issued a warning to other anonymous Kiwi Farms users:



*Fong-Jones thanking KUSK and Tewson and threatening further identifications (December 28, 2024).[7]*

---

[7] The message posted by Fong-Jones above allows individual Kiwi Farms users to input their name into a software tool to determine whether Fong-Jones has doxxed them.

Fong-Jones's statement that "this is not the only positive ID we have on tech employees who use KF" confirms that the identification effort is ongoing and targets a class of people, not a class of infringers. Fong-Jones' use of the pronoun "we" confirms that KUSK is acting in concert with Fong-Jones in this identification campaign.

Thomas Hahn attests to a parallel pattern. KUSK has sent Hahn threatening correspondence arising from what Fong-Jones asserts are posts on Kiwi Farms—yet Hahn's posts "do not involve any material ostensibly connected by copyright." Hahn Decl. ¶ 4. Fong-Jones has threatened Hahn "solely due to written commentary" and has attempted to doxx Hahn using his name and address. *Id.* ¶¶ 4–5. Based on his experience, Hahn believes that Fong-Jones's purpose in seeking personally identifying information is "not related to any claim of copyright, but is an attempt to eliminate critical speech from the internet or to publicly doxx individuals." *Id.* ¶ 6.

The declarations thus establish a systematic pipeline: KUSK identifies anonymous Kiwi Farms users on Fong-Jones's behalf; Fong-Jones publicly reveals their identities; and the identified individuals face real-world consequences including job loss. Copyright is not the driver of this process. It is, in Crawley's words, "the pretext, not the purpose." Crawley Decl. ¶ 16. The § 512(h) subpoenas at issue in this case are another iteration of the same pattern: KUSK seeks identifying information ostensibly for copyright purposes, but the declarations establish that the actual purpose is identification of and retaliation against Internet critics.

## ARGUMENT

A court must quash or modify a subpoena that "requires disclosure of privileged or other protected matter, if no exception or waiver applies" or "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii)–(iv). Where a subpoena seeks to pierce anonymous online speech, the Court must apply First Amendment scrutiny through the five-factor balancing test established in

*Arista Records, LLC v. Doe 3*, 604 F.3d 110, 118–19 (2d Cir. 2010). Section 512(h) subpoenas remain subject to Rule 45 "to the greatest extent practicable." 17 U.S.C. § 512(h)(6); *see also Barnes v. YouTube, Inc.*, No. 25-cv-05901-VKD, 2026 U.S. Dist. LEXIS 30862, at *4 (N.D. Cal. Feb. 13, 2026) (collecting cases).

## I.    THE SUBPOENAS EXCEED THE STATUTORY PURPOSE OF § 512(h).

Section 512(h) authorizes a subpoena only "for identification of an alleged infringer." 17 U.S.C. § 512(h)(1). The request for the subpoena must include "a copy of a notification described in subsection (c)(3)(A)," *id.* § 512(h)(2)(A), and "a proposed subpoena," *id.* § 512(h)(2)(B), together with "a sworn declaration to the effect that the purpose for which the subpoena is sought is to obtain the identity of an alleged infringer and that such information will only be used for the purpose of protecting rights under this title," *id.* § 512(h)(2)(C) (emphasis added). Those requirements are substantive, not ceremonial. They cabin an *ex parte* procedure that otherwise lacks the adversarial testing, proportionality limits, and judicial supervision characteristic of ordinary discovery.

The structure of § 512 confirms this limitation. Section 512(h) does not exist in isolation; it is embedded in a comprehensive statutory scheme governing the obligations of online service providers. As the D.C. Circuit recognized in *Recording Industry Ass'n of America, Inc. v. Verizon Internet Services, Inc.*, 351 F.3d 1229 (D.C. Cir. 2003), the subpoena power of § 512(h) is "structurally linked" to the notice-and-takedown regime. *Id.* at 1233–35. The statute's procedural requirements all assume that the subpoena will be used to identify someone against whom a copyright infringement action will be brought. *Id.* The Eighth Circuit reached the same conclusion in *In re Charter Communications, Inc.*, 393 F.3d 771, 776–77 (8th Cir. 2005), holding that Congress linked the § 512(h) subpoena to the § 512(c) notification and takedown provisions. The

Ninth Circuit recently reaffirmed the same structural point. *In re Subpoena of Internet Subscribers of Cox Communications, LLC*, No. 24-3978, 2025 WL 2371947 (9th Cir. Aug. 15, 2025).

Defense counsel's May 14 admission is therefore fatal (no wonder he tried to walk it back afterwards). The users were described as witnesses. Witness identification is not the statutory purpose of § 512(h). The statute does not allow a copyright owner to identify critics, potential witnesses, or litigation opponents merely because copyright allegations supply a convenient hook. If Defendant wants discovery in this action, Defendant must use the discovery tools the Federal Rules provide. And that must take place after the Rule 26(f) conference occurs and the case management framework is established.

The declarations confirm what the "witness" admission implied. Thomas Hahn attests that KUSK (the same firm that signed the subpoena applications) has sent him threatening litigation correspondence based on anonymous Kiwi Farms posts that "do not involve any material ostensibly connected by copyright." Hahn Decl. ¶ 4. Kevin Crawley attests that the KUSK investigation that identified him "had nothing to do with copyright" and that his posts "were alleged to consist entirely of written criticism." Crawley Decl. ¶¶ 7, 14. If KUSK threatens legal action and conducts investigations against users whose posts contain no copyrighted material, then the firm's § 512(h) subpoenas in this case cannot genuinely be directed at "protecting rights under [Title 17]." 17 U.S.C. § 512(h)(2)(C). The subpoenas are tools of identification deployed for purposes that have nothing to do with copyright enforcement.

Defendant's later reservation of rights against the Doe users does not cure the defect. If the true purpose is witness discovery, the subpoenas are *ultra vires*. If the true purpose is to pursue infringement claims, then Defendant's shifting explanation underscores why the Court should require a concrete, claim-specific showing before anonymous speakers are unmasked. Either way,

11

the subpoenas cannot rest on conclusory statutory declarations that are contradicted by counsel's own statements and by the posture of this litigation. *See In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875, 883 (N.D. Cal. 2020) (holding that "[t]he only authorized purpose for the subpoena under the DMCA was to discover [the] identity [of] an alleged copyright infringer to protect [the copyright owner's] copyrights").

Courts that have scrutinized the purpose behind DMCA subpoenas have expressly considered whether the information will actually be used for copyright enforcement. In *In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868 (N.D. Cal. 2022), the court quashed a § 512(h) subpoena where the evidence suggested that unmasking would expose the anonymous speaker to "economic or official retaliation" rather than serve any copyright purpose. *Id.* at 876–78. Here, the doxxing declarations establish precisely such retaliation: Defendant has previously used identifying information to target Kiwi Farms users in their real lives, not to pursue copyright claims. Kevin Crawley Decl. ¶¶ 5–8; Thomas Hahn Decl. ¶¶ 5–8.

This case fits a now-familiar pattern in which copyright is conscripted as a censorship tool. In *Rapid Relief Team (RRT) Ltd. v. Bawtinheimer*, No. 4:25-cv-10864-JST (N.D. Cal.), the defendant alleges that the copyright plaintiff, a charity affiliated with a religious organization, used DMCA takedown notices and a copyright infringement suit over a clip-art logo to suppress *YouTube* videos criticizing it, and has brought a § 512(f) counterclaim against both the plaintiff and the attorneys who signed the takedown notices. As the Ninth Circuit has warned, "a weak copyright claim cannot justify censorship in the guise of authorship." *Garcia v. Google, Inc.*, 786 F.3d 733, 736 (9th Cir. 2015) (en banc). That warning applies with full force here, where Defendant's own counsel has admitted that the users are sought as witnesses rather than as alleged infringers.

## II.    THE SUBPOENAS ARE MOOT AS TO REMOVED CONTENT.

Section 512(h) is part of the notice-and-takedown regime of § 512. A subpoena request must include "a copy of a notification described in subsection (c)(3)(A)," 17 U.S.C. § 512(h)(2)(A), which in turn must identify "the material that is claimed to be infringing . . . and information reasonably sufficient to permit the service provider to locate the material," *id.* § 512(c)(3)(A)(iii). The entire structure presupposes *ongoing* infringement — material that the service provider can "remove[] or disable[] access to." *Id.* § 512(c)(1)(C).

Where the allegedly infringing material has already been removed, the statutory mechanism no longer serves its intended function as to that material. *Maximized Living, Inc. v. Google, Inc.*, 2011 U.S. Dist. LEXIS 147486, at *13–14 (N.D. Cal. Dec. 22, 2011), squarely held that "512(h) does not authorize issuance of a subpoena to obtain the identifying information as to past infringement in light of the plain language and purpose of the DMCA." The court reasoned that the statutory purpose is prospective — to enable removal and to identify those responsible for ongoing infringement — not retrospective. *See also Verizon*, 351 F.3d at 1235 (explaining that § 512(h) is tied to the storage and notice-and-takedown functions, which presuppose material the provider can remove or disable).

Here, at least three targeted posts — those associated with the users "Sexy Senior Citizen," "Diggus Bickus," and "GettrGrifter" — were removed before the relevant subpoenas issued. *See generally* Supplemental Declaration of Joshua Moon. The posts by Sexy Senior Citizen and Diggus Bickus were removed pursuant to Defendant's March 20, 2026 takedown notice; GettrGrifter's post was removed pursuant to the March 25, 2026 takedown notice. *Id.* The removals pre-date the respective subpoena applications. Because there was no remaining "material . . . claimed to be infringing" on the site as to those users at the time the subpoenas issued, the

13

subpoenas are moot as to them and should be quashed. The mootness defect applies with particular force here because Defendant does not contend that these users are engaged in ongoing infringement. Defendant seeks their identities as witnesses. Removal therefore eliminates any legitimate purpose the § 512(h) subpoenas could serve.

### III.    THE SUBPOENAS ARE PROCEDURALLY DEFECTIVE UNDER RULE 45 AND § 512(h).

Defendant did not properly serve the three DMCA subpoenas at issue here.  Fed. R. Civ. P. 45(b)(1). Instead, Defendant emailed two subpoenas[8] and relied entirely on the Court's ECF system to purport to serve the third.[9] That's not what the DMCA calls for. Defendant's procedural position is internally contradictory, and the subpoenas are defective under either theory Defendant has advanced.

#### A.    *Service Does Not Comply With Rule 45(b)(1).*

The subpoenas at issue were issued on Rule 45 forms and accompanied by the text of Rule 45. They are issued on Form AO 88B — "Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action" — and attach Rule 45 text. Rule 45(b)(1) provides that "[s]erving a subpoena requires delivering a copy to the named person." Fed. R. Civ. P. 45(b)(1). The prevailing interpretation requires personal service. *See Concepts NREC, LLC v. Xuwen Qiu*, No. 5:20-cv-133, 2021 U.S. Dist. LEXIS 252822 (D. Vt. Sep. 20, 2021) (interpreting "delivering a copy" as requiring personal service); *see also* 9A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2454 (3d ed.).

---

[8] Exhibits I and J.
[9] Exhibit K.

Matthew D. Hardin is Lolcow's counsel and DMCA-designated agent. He is not Lolcow's registered agent for general service of process and did not consent to accept service of compulsory process (as compared to service of filings in this case through the electronic filing system). Service by ECF entry or by email to a DMCA agent is not "delivering a copy to the named person" within the meaning of Rule 45(b)(1). The subpoenas were not personally served on Lolcow LLC or on any agent authorized to accept service of compulsory process.

### B.      *Section 512(h) Does Not Authorize the Manner of Service Used.*

If § 512(h) supplies the delivery mechanism, Defendant still did not comply. Section 512(h)(4) directs the clerk to "expeditiously issue and sign the proposed subpoena and return it to the requester *for delivery to the service provider*." 17 U.S.C. § 512(h)(4) (emphasis added). Section 512(h)(3) provides that the subpoena "shall authorize and order the service provider receiving the notification . . . to expeditiously disclose" the information, and Section 512(h)(5) directs that, "[u]pon receipt of the issued subpoena, either accompanying or subsequent to the receipt of a notification described in subsection (c)(3)(A)," the service provider shall disclose it. *Id.* § 512(h)(5).

Two points follow. First, the statute directs delivery to "the service provider" — not to the service provider's DMCA-designated agent. A designated agent receives takedown notifications under § 512(c)(2) with limited procedural safeguards; a subpoena is not a takedown notification. Second, the requester must actually *deliver* the subpoena after the clerk returns it. A clerk's ECF docket entry returning an issued subpoena to the requester is the step *before* delivery. It is not delivery itself.

15

The April 3, 2026 subpoena is especially defective. Defendant's counsel admitted in an April 21, 2026 email[10] that he relied *entirely* upon the clerk's ECF entry as proof of "service." But an ECF filing of the subpoena application (directed to the clerk) is not delivery of the subpoena to the service provider. Fong-Jones made no effort to deliver that subpoena to Lolcow or to anyone else after the clerk returned it.

## IV.    THE SUBPOENAS IMPROPERLY SEEK PRE-RULE 26 DISCOVERY FROM A PARTY.

Lolcow is not a stranger to this case; it is the plaintiff. Defendant's subpoenas therefore function as document discovery from an opposing party before the Rule 26(f) conference. Rule 26(d)(1) prohibits discovery "before the parties have conferred as required by Rule 26(f), except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B) or when authorized by these rules, by stipulation, or by court order." Fed. R. Civ. P. 26(d)(1). None of those exceptions applies here. Defendant has not moved for early discovery under Rule 26(d)(2) or sought leave of Court.

This defect is not mere formalism. Party discovery carries procedural safeguards that § 512(h) does not: pleadings frame the issues, Rule 26(f) requires a discovery plan, Rule 26(b)(1) imposes proportionality limits, Rule 34 governs party document requests and requires specific responses, and Rule 26(c) provides for protective conditions. Defendant's use of § 512(h) bypasses all of these safeguards while seeking the same information (account data, IP data, and financial data) that party discovery would regulate. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case").

---

[10] Exhibit K.

Defendant cannot avoid Rule 26(d) by labeling the demand a DMCA subpoena while simultaneously insisting on Rule 34 compliance. If the information is sought for this action (as Defendant's "witness" characterization confirms) it is premature discovery that this Court should not permit the rules to be evaded.

## V.    THE *ARISTA*/*SONY MUSIC* FACTORS WEIGH DECISIVELY AGAINST DISCLOSURE.

The Second Circuit requires courts to balance five factors before enforcing a subpoena that would identify anonymous internet speakers:

> (1) [the] concrete[ness of the plaintiff's] showing of a prima facie claim of actionable harm, . . . (2) [the] specificity of the discovery request, . . . (3) the absence of alternative means to obtain the subpoenaed information, . . . (4) [the] need for the subpoenaed information to advance the claim, . . . and (5) the [objecting] party's expectation of privacy.

*Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010) (adopting framework from *Sony Music Entm't Inc. v. Does 1–40*, 326 F. Supp. 2d 556, 564–65 (S.D.N.Y. 2004)). Moreover, where the subpoena subject can "defeat a prima facie showing of infringement . . . by proving that the doctrine of fair use permits his or her employment of the plaintiff's work," the subpoena "must be quashed" regardless of the remaining factors. *In re DMCA Section 512(h) Subpoena to YouTube (Google, Inc.)*, 581 F. Supp. 3d 509, 517–18 (S.D.N.Y. 2022). Each factor here independently favors quashing, and the fair use defense precludes disclosure altogether.

**Factor 1: Concreteness of the *prima facie* claim.**

Defendant has not made a concrete showing of actionable infringement. The first factor requires "a concrete showing of a prima facie claim of actionable harm." *Sony Music*, 326 F. Supp. 2d at 565. A registration and screenshots are not enough where the asserted uses are facially critical

17

and transformative. *YouTube*, 581 F. Supp. 3d at 517–18 (quashing § 512(h) subpoena where "the fair use inquiry demonstrates that [the movant] is not an infringer"). The uses here (critical commentary on a public figure's conduct, using cropped and altered versions of a professional headshot as raw material for mockery) fall squarely within § 107's enumerated purposes of "criticism" and "comment." 17 U.S.C. § 107.

Where, as here, a valid fair use defense is apparent on the record, the plaintiff cannot make the concrete prima facie showing of actionable infringement that the first factor demands, and the first factor weighs against disclosure.

**Factor 2: Specificity of the discovery request.**

Section 512(h)(3) authorizes only "information sufficient to identify the alleged infringer." 17 U.S.C. § 512(h)(3). Defendant's subpoenas go much further. They demand broad "Subscriber Information" (defined to include name, address, email, IP address, telephone number, and account information) and "Transactor Information" (defined to include payment records, financial account information, and donation records). They also purport to reach records of multiple entities, despite being served only on undersigned counsel and only then dubiously. That is not tailoring; it is a dragnet. A subpoena that seeks far more than what is needed to identify the alleged infringer exceeds the authorization of § 512(h). *See Sony Music*, 326 F. Supp. 2d at 565 (specificity requires that the discovery request be narrowly tailored).

**Factor 3: Absence of alternative means.**

Defendant argues that because users are pseudonymous, there is no alternative means to obtain identifying information. But this factor is not a rubber stamp. Where the purpose is not to pursue infringement claims but to identify witnesses (as Defendant's own counsel stated) ordinary discovery mechanisms are the appropriate alternative. Those mechanisms will be available after

18

the Rule 26(f) conference. The fact that ordinary discovery is not yet available is a product of the litigation's early stage, not a justification for bypassing the Rules. *See* Fed. R. Civ. P. 26(d)(1). Courts evaluating this factor do not treat the current unavailability of premature discovery as establishing "absence of alternative means." *See Arista*, 604 F.3d at 119.

**Factor 4: Need for the subpoenaed information to advance the claim.**

This factor asks whether there is a "need for the subpoenaed information to advance the claim." *Arista*, 604 F.3d at 119. Defendant's counsel's characterization of the users as witnesses defeats this factor. Information sought for witness identification  or generalized discovery-style purposes (rather than to advance a copyright claim against the person being identified) does not satisfy this element. *See also Sony Music*, 326 F. Supp. 2d at 565. Defendant is not pursuing copyright claims against these Kiwi Farms users (and is certainly not pursuing certain of these users for active, ongoing infringement as described above); Defendant wants their names for other reasons.

**Factor 5: Expectation of privacy.**

The users' privacy and First Amendment interests are substantial. "Anonymity is a shield from the tyranny of the majority." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995). "Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind." *Talley v. California*, 362 U.S. 60, 64 (1960). In the Second Circuit, "to the extent that anonymity is protected by the First Amendment, a court should quash or modify a subpoena designed to breach anonymity." *Arista*, 604 F.3d at 118.

Here, the speech at issue is critical commentary on a public figure. This is precisely the category of anonymous speech that receives the strongest First Amendment protection. The users chose a platform specifically designed to protect pseudonymity. Most are now represented by

19

counsel who entered an appearance for the express purpose of opposing disclosure. ECF No. 21. Their privacy expectations are reasonable, concrete, and legally protected.

Defendant may claim that the Kiwi Farms Terms of Service are evidence that users have waived their privacy expectations. This argument will fail. A platform's reservation of the right to moderate content or employ anti-abuse tools is not a blanket waiver of the right to anonymous speech. Every major internet platform reserves similar rights. If such language extinguished anonymity, no user of any internet service would enjoy First Amendment protection. No court has endorsed that proposition.

The doxxing declarations transform this analysis from theoretical to concrete. Kevin Crawley was doxxed through a KUSK "investigation" that exploited his child's age, his medications, and his employment history. Mr. Crawley was then subjected to a public campaign that cost him his job. Crawley Decl. ¶¶ 10–13. Thomas Hahn has been subjected to doxxing attempts and litigation threats from KUSK for posts containing no copyrighted material whatsoever. Hahn Decl. ¶¶ 4–5. And Fong-Jones has publicly stated that "this is not the only positive ID we have on tech employees who use KF" in a direct warning that the identification campaign targets a class of users, not a set of infringers. These are not hypothetical harms. They are documented consequences inflicted on actual people who exercised their right to speak anonymously. The declarations establish precisely the kind of concrete, harmful consequences that make the privacy interest dispositive. *See Highfields Capital Mgmt., L.P. v. Doe*, 385 F. Supp. 2d 969, 980 (N.D. Cal. 2005).

## VI.    THE FAIR USE DEFENSE IS APPARENT ON THE RECORD.

The asserted uses are paradigmatic criticism and commentary. When "the fair use inquiry demonstrates that [the movant] is not an infringer," the § 512(h) subpoena "must be quashed."

*YouTube*, 581 F. Supp. 3d at 517–18. The Court need not resolve the merits of every claim; it is sufficient that the fair use defense is apparent on the present record. *Id.*

The Copyright Act provides that "the fair use of a copyrighted work, including such use by reproduction in copies . . . for purposes such as criticism, comment, news reporting . . . is not an infringement of copyright." 17 U.S.C. § 107. The statute enumerates four factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id.* Each factor favors fair use.

*Factor 1: Purpose and character.* As shown in the attached Written Objections pertaining to each subpoena, the original photograph is a professional headshot. This image was created for identification or favorable depiction. The challenged posts transform that image into raw material for mockery, criticism, and commentary about the depicted person and her public conduct. That is a "different purpose" under *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023) ("[c]riticism of a work, for instance, ordinarily does not supersede the objects of, or supplant, the work. Rather, it uses the work to serve a distinct end."). *Warhol* does not defeat fair use where the secondary use has a genuinely different purpose from the original. A hostile editorial purpose directed at the subject of a professional headshot is materially different from the flattering depiction for which the photograph was created.

The factual parallel to *Dhillon v. Doe*, No. C 13-01465 SI, 2014 U.S. Dist. LEXIS 24676 (N.D. Cal. Feb. 25, 2014), is striking, and the result should be the same. In *Dhillon*, the California Republican Party Vice Chairman sued an anonymous blogger for using a campaign headshot in a

21

critical blog post. The court held that the use was "paradigmatic fair use" and was "transformative because it served the purpose of criticism, rather than identification." *Id.* at \*14–15. The photograph was "intended to be more informational than creative" (a professional headshot designed to identify the subject, not an expressive work at the core of copyright protection). *Id.* at \*15. The blog post repurposed that headshot to criticize the subject's conduct rather than to promote the subject. *Id.* at \*14. That is precisely what happened here. Defendant's professional headshot was created for self-promotion. The targeted Kiwi Farms posts repurpose it (cropping it, altering it, placing it in critical contexts) to comment on Defendant's public conduct and statements regarding allegations of sexual assault. If the use in *Dhillon* was paradigmatic fair use, this one is too. And *Dhillon* remains good law post-*Warhol*: it was cited favorably this year in *Korman v. Free Beacon LLC*, No. 1:25-cv-2076, 2026 U.S. Dist. LEXIS 69029, at \*14–18 (E.D. Va. Mar. 30, 2026), a case involving a news outlet's use of a congresswoman's headshot for critical commentary.

Other recent authority reinforces the point. In this District, *MCM Group 22 LLC v. Perry*, 818 F. Supp. 3d 623, 631 (S.D.N.Y. Feb. 3, 2026), dismissed copyright claims on fair use grounds where a copyrighted image was repurposed for commentary, reasoning that a reasonable observer would understand the use as critique rather than as a market substitute. The body of authority is substantial and growing: courts consistently hold that using a person's copyrighted image to criticize that person is transformative. *See also Hannley v. Mann*, 2023 U.S. Dist. LEXIS 40022, at \*13–14 (C.D. Cal. Mar. 8, 2023) (use of copyrighted photos to criticize subject was transformative "because they were used for negative criticism, and not identification and positive development of [subject's] internet presence"); *Katz v. Chevaldina*, 2014 U.S. Dist. LEXIS 88085, at \*18–19 (S.D. Fla. June 17, 2014) (cropping copyrighted photo into unflattering images with

22

critical captions was fair use); *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1152–53 (9th Cir. 1986) (reprinting copyrighted material to criticize it was fair use, even assuming a commercial purpose).

Moreover, this very District has recently confirmed that embedding copyrighted content in critical commentary satisfies all four § 107 factors. In *Shaykhoun v. Daily Mail*, No. 1:24-cv-09978 (ALC), 2026 U.S. Dist. LEXIS 40950 (S.D.N.Y. Feb. 26, 2026), Judge Carter dismissed copyright claims arising from news articles that reported on a plaintiff's viral tweet and the public controversy it generated. One of those articles embedded the tweet. The court found fair use on every factor. It held the use transformative because the articles reported on the tweet and the surrounding controversy, a purpose different from the original post; it treated the published, factual nature of the tweet as weighing little against fair use; and it applied the Second Circuit's market-harm standard, asking whether the use "usurps the market for the first by offering a competing substitute" (quoting *Hachette Book Group, Inc. v. Internet Archive*, 115 F.4th 163, 189 (2d Cir. 2024)), not whether the criticism caused reputational harm. The uses here are noncommercial, critical, and published on a discussion forum with no advertising revenue or commercial motive. If news organizations may embed a plaintiff's copyrighted photographs in their critical coverage without liability, anonymous forum users engaged in the same kind of commentary enjoy at least as much protection.

*Factors 2 and 3: Nature of the work and amount used.* The copyrighted work is a professional headshot (an informational, factual work "intended to be more informational than creative."). *Dhillon*, 2014 U.S. Dist. LEXIS 24676, at *15. Factor 2 thus favors the Kiwi Farms users. As to factor 3, commentary on a person's image often requires use of the image being criticized, and the users generally used cropped or altered versions rather than the full original. *See*

23

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 588 (1994) ("the parody must be able to 'conjure up' at least enough of [the] original to make the object of its critical wit recognizable").

*Factor 4: Market effect.* There is no plausible market substitution. Anonymous Internet forum posts criticizing a public figure do not compete with licensed uses of a professional portrait. No reader would seek out a Kiwi Farms post as a substitute for licensing the original photograph. *Cf. Sedlik v. Von Drachenberg*, No. 24-3367, 2026 U.S. App. LEXIS 12 (9th Cir. Jan. 2, 2026) (affirming jury's fair-use finding where the altered use was unlikely to substitute for the original photograph). To the extent Defendant claims harm from the criticism itself (rather than from market substitution) that harm is not cognizable under the Copyright Act. "[T]here is no protectible derivative market for criticism," and harm to a copyright holder "by force of its criticism, rather than by supplying the demands of the market" does not weigh against fair use. *Savage v. Council on Am.-Islamic Rels., Inc.*, 2008 U.S. Dist. LEXIS 60545, at *22–23 (N.D. Cal. July 25, 2008). Defendant has not claimed the image is for sale and has freely published it on social media. Factor 4 strongly favors fair use.

Lolcow incorporates by reference the detailed post-by-post fair use analysis in the Subpoena Subjects' own Memorandum of Law, which demonstrates with specificity how each individual use satisfies all four § 107 factors.

## VII.    THE SUBPOENAS IMPROPERLY REACH SEPARATE LEGAL ENTITIES AND MATERIALS OUTSIDE LOLCOW LLC'S CONTROL.

The subpoenas define "Kiwi Farms" to include Lolcow LLC, Mad at the Internet LLC, and the United States Internet Preservation Society. Rule 45 does not permit a subpoenaing party to impose obligations on unserved entities by definition. A subpoena commands the person or entity

24

to whom it is directed to produce materials within that person's "possession, custody, or control." Fed. R. Civ. P. 45(a)(1)(A)(iii).

Mad at the Internet LLC and the United States Internet Preservation Society are distinct legal entities. Moon Decl. ¶¶ 5–6. Mad at the Internet LLC is a separate limited liability company that "is not a subsidiary of Lolcow, LLC or in any way associated with Lolcow, LLC. The two entities are separately managed and maintain separate corporate records." *Id.* ¶ 5. The United States Internet Preservation Society is a South Dakota 501(c)(4) nonprofit corporation that "cannot be controlled by a for-profit entity or serve for-profit purposes." *Id.* ¶ 6.

The Second Circuit respects corporate separateness absent a showing of alter ego. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991). The "possession, custody, or control" framework requires at a minimum that the subpoena recipient have either a "legal right . . . to obtain the materials sought upon demand" from an affiliated entity, or, under the Second Circuit's broader formulation, the "practical ability" to do so. *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007). Defendant can make no such showing. The Moon Declaration establishes that these entities maintain separate records, are separately managed, and that Lolcow has no right to demand or produce their documents. Moon Decl. ¶¶ 5–6.

If Defendant wants documents from those entities, Defendant must serve them separately, in compliance with Rule 45(b)(1), and afford each entity the opportunity to raise its own objections under Rule 45(d)(2)(B). Fong-Jones cannot do so through a definitions clause in subpoenas directed to Lolcow.

25

## VIII.  THE RECORD DEMONSTRATES COPYRIGHT MISUSE AND IMPROPER PURPOSE.

"[T]he copyright misuse defense . . . forbids the use of the [copyright] to secure an exclusive right or limited monopoly not granted by the [Copyright] Office and which it is contrary to public policy to grant." *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 978 (4th Cir. 1990). Courts in this District have recognized the defense. *See Coleman v. ESPN, Inc.*, 764 F. Supp. 290, 295 (S.D.N.Y. 1991). When copyright is wielded not to protect creative works but to silence speech, the doctrine applies.

The record here shows a broader effort to use copyright law as a tool to unmask and pressure anonymous critics rather than to vindicate any legitimate copyright interest. Defendant has targeted Kiwi Farms' infrastructure (Moon Decl. ¶¶ 36–41, Ex. A), supported deplatforming efforts (Moon Decl. ¶ 39), and developed tools to bypass security measures associated with the forum (Moon Decl. ¶¶ 37–38). The tor-fetcher software targets "Tartarus" (a security system associated exclusively with Kiwi Farms (Moon Decl. ¶ 38)), further confirming that Defendant's activities are specifically directed at this platform.

The declarations submitted with this motion transform the copyright misuse defense from doctrine to demonstrated fact. Fong-Jones retained KUSK to investigate Kevin Crawley (an alleged Kiwi Farms user whose posts "did not involve any copyright claim" and "were alleged to consist entirely of written criticism." Crawley Decl. ¶¶ 7, 14). KUSK identified Crawley through an investigation that matched biographical details to conference speaker lists with no copyright nexus whatsoever. *Id.* ¶ 10. After identification, Fong-Jones publicly doxxed Crawley, characterized him as a "safety risk," and celebrated when he was fired. *Id.* ¶¶ 11–13. KUSK simultaneously sent threatening litigation correspondence to Thomas Hahn based on posts that "do

26

not involve any material ostensibly connected by copyright." Hahn Decl. ¶ 4. The § 512(h) subpoenas cannot be viewed in isolation from this broader pattern; they are the latest tool in a campaign that deploys copyright as a pretext for identifying and retaliating against anonymous critics.

Courts considering DMCA subpoenas have treated improper motive as relevant to whether a subpoena should be enforced. *Reddit*, 441 F. Supp. 3d at 883 (holding that the subpoena's "only authorized purpose . . . was to discover [the] identity [of] an alleged copyright infringer"); *Twitter*, 608 F. Supp. 3d at 876–78 (quashing where disclosure created retaliation risk). Those concerns are acute here. The doxxing declarations demonstrate that Defendant has *already* used identifying information to retaliate against Kiwi Farms users in their real lives. Kevin Crawley Decl. ¶¶ 5–8; Thomas Hahn Decl. ¶¶ 5–8. The requested information would identify critics to the very person who has already demonstrated a willingness to use such information for retaliatory purposes.[11]

The § 512(f) exposure here is real. Section 512(f) imposes liability on "[a]ny person who knowingly materially misrepresents under this section . . . that material or activity is infringing." 17 U.S.C. § 512(f). The word "any" is not limited to copyright owners — it reaches attorneys and agents who sign takedown notices and subpoena declarations without forming a good-faith belief that infringement has occurred. *See Exec. Lens LLC v. Rapkin*, No. 25-cv-06048-NC, 2026 U.S. Dist. LEXIS 58448 (N.D. Cal. Mar. 19, 2026) (denying a motion to dismiss a § 512(f) claim against an attorney who signed a DMCA counter-notification as the responding party's agent). Under *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1154–55 (9th Cir. 2016), a party cannot avoid § 512(f) liability merely by "pay[ing] lip service to the consideration of fair use by claiming [they] formed

---

[11] Because KUSK was also involved in publishing Kevin Crawley's personal details and those of his minor child to the entire Internet, Lolcow does not foresee that a protective order requiring information to be held as "attorneys eyes only" will alleviate the harm that is easily foreseeable if Fong-Jones' counsel obtains such information going forward.

27

a good faith belief when there is evidence to the contrary." Willful blindness to fair use satisfies the statute's "knowingly" standard. *Id.* at 1155.

The combination of retaliatory motive, an admission that the targeted users are witnesses rather than infringers, and sworn declarations asserting the contrary raises serious questions about the good faith of Fong-Jones's pursuit of the instant subpoenas.

## IX.    THE SUBPOENAS IMPOSE AN UNDUE BURDEN.

Rule 45(d)(3)(A)(iv) requires the Court to quash a subpoena that "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). Whether a subpoena imposes an "undue burden" depends upon "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 49 (S.D.N.Y. 1996). Here, the burden is extreme and the value of the information (especially given the fair use defenses and the witness-discovery purpose) is minimal.

*Historical IP data.* Kiwi Farms ordinarily retains IP logs for approximately two weeks. Moon Decl. ¶ 16. Historical information, to the extent it exists at all, exists only incidentally inside encrypted database snapshots. *Id.* ¶ 18. Restoring those backups would require "substantial technical work, including downloading, decrypting, and restoring large database snapshots" containing "hundreds of millions of rows" and occupying "hundreds of gigabytes" of storage. *Id.* ¶ 19. This type of restoration has never been performed except to replace a broken production copy of the site. *Id.* It would also require "either building new custom software specifically for that purpose or expanding existing hardware infrastructure." *Id.*

*Transactor information.* Financial records are not maintained in a manner that links payments to individual user accounts. Moon Decl. ¶¶ 24–30. Users frequently pay on behalf of

28

others. *Id.* ¶ 24. Cryptocurrency payments do not identify a real-world person. *Id.* ¶ 29. Mail-in payments are not scanned, photographed, or indexed to user accounts. *Id.* ¶ 27. Searching financial records "would be burdensome, unreliable, and likely to expose unrelated donors and supporters." *Id.* ¶ 30. It would be a manual operation likely requiring hundreds of hours of time from a single-member LLC with no employees, and the result would likely be unfruitful or unreliable in any event.

*Single-person dependency.* Joshua Moon is the only individual with access to the necessary internal systems. Moon Decl. ¶ 30. He estimates that historical restoration and searching could require "tens or possibly hundreds of hours" of his time. *Id.* ¶¶ 30, 35, 50. That burden is disproportionate to the limited statutory purpose of § 512(h), the facial fair use issues, and Defendant's admitted witness-discovery objective.

Moreover, restoration would "create new sensitive copies of user data, including unrelated user data, thereby increasing the very security risks Kiwi Farms' retention practices are designed to avoid." Moon Decl. ¶ 20. This is not a case where the requested information is sitting in an accessible database. Compliance would require reconstructing systems at enormous expense and risk — all to produce information that is unlikely to identify any user because of the lack of reliable connections between payments and accounts. *Id.* ¶ 30.

## X.    ANY PRODUCTION MUST BE LIMITED AND GOVERNED BY A STRICT PROTECTIVE ORDER.

If the Court declines to quash outright, Lolcow requests that any production be subject to a strict protective order. Three independent sources of authority support this relief.

First, Rule 45 itself authorizes conditional compliance. Rule 45(d)(3)(B) provides that where a subpoena "requires disclosing a trade secret or other confidential research, development,

or commercial information" or requires disclosure of "an unretained expert's opinion," the court "may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena" or may "order appearance or production under specified conditions." Fed. R. Civ. P. 45(d)(3)(B)—(C). The identifying information of pseudonymous speakers on a platform designed for anonymity is "confidential . . . information" within the meaning of Rule 45(d)(3)(B)(i). *Cf. Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010). This authority applies regardless of whether the subpoenas are characterized as "discovery" under the Federal Rules, because Rule 45 governs all subpoenas.

Second, Rule 26(c)(1) authorizes the Court, "for good cause," to issue "an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including orders that discovery "not be had" or be conducted "only on specified terms and conditions." Fed. R. Civ. P. 26(c)(1)(A)—(B). Good cause exists where disclosure of anonymous speakers' identities may deter those speakers from exercising their First Amendment rights. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35—36 (1984) (protective orders serve to prevent discovery from being used as a vehicle for annoying or embarrassing the producing party).

Third, the Court possesses inherent authority to manage its proceedings and protect the rights of parties and nonparties, including the right to speak anonymously. *See Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011) (courts have inherent authority to allow anonymous participation where identification creates risk of retaliation). Where First Amendment interests are implicated, courts routinely impose conditions before allowing identification of anonymous speakers, regardless of the procedural vehicle.

The following conditions are warranted:

30

(a) The Court should require a post-by-post showing that a non-frivolous infringement claim survives fair use scrutiny before any identifying information is disclosed as to that user;

(b) Production should be limited to current live account identifiers actually maintained by Lolcow (email address and, if available, most recent IP address);

(c) Financial records, historical backup searches, and records of separate entities should be excluded;

(d) All produced information should be designated attorneys'-eyes-only, with disclosure to Defendant personally or to Katherine Tewson prohibited absent further order;

(e) Produced materials should be filed under seal; and

(f) Use should be limited to this action, with public dissemination prohibited and destruction or return required after the litigation.

These safeguards are necessary because the record establishes, through sworn declarations, that Fong-Jones has used identifying information obtained through KUSK investigations to publicly doxx anonymous users and to orchestrate their termination from employment. Crawley Decl. ¶¶ 11–13; Hahn Decl. ¶¶ 4–6. Fong-Jones has publicly stated that Defendant possesses additional identifications of anonymous users. Without a strict protective order, any disclosed information is likely to be used for the same retaliatory purposes documented in the declarations—not for copyright enforcement. *See Twitter*, 608 F. Supp. 3d at 878 (considering risk of retaliation in determining whether to enforce subpoena); *Doe v. 2TheMart.com Inc.*, 140 F. Supp. 2d 1088, 1097 (W.D. Wash. 2001) (imposing protective conditions where anonymity interests were at stake).

## XI.     LOLCOW LLC IS ENTITLED TO ATTORNEYS' FEES AND COSTS.

Rule 45(d)(1) provides:

31

> A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty… on a party or attorney who fails to comply.

Fed. R. Civ. P. 45(d)(1). The duty is mandatory: "The court . . . *must* enforce this duty and impose an appropriate sanction." *Id.* (emphasis added).

Defendant's conduct falls below the "reasonable steps" standard. Defendant issued three overbroad subpoenas that attempt to reach separate legal entities through definitional gamesmanship. Defendant demanded years of financial and historical data from a platform whose data-minimization architecture makes such searches extraordinarily burdensome. Defendant failed to effect proper service under either Rule 45 or § 512(h). Defendant demanded Rule 34-style compliance before Rule 26 discovery opened. And Defendant persisted after Lolcow explained in detail (with multiple rounds of written objections, a meet-and-confer, and supplemental correspondence) that the subpoenas were overbroad, improperly served, and sought information for a non-statutory purpose.

That conduct forced motion practice that reasonable narrowing and adherence to the Rules would have avoided. Lolcow should be awarded its reasonable fees and costs incurred in bringing this motion.

## XII.    LOLCOW'S OBJECTIONS ARE TIMELY, SUBSTANTIVE, AND NOT WAIVED.

Lolcow anticipates that Defendant will argue that Lolcow's objections have been waived for failure to comply with Rule 34(b)(2)(B)–(C)'s specificity requirements. This argument fails for the simple reason that Rule 34 does not apply. These are subpoenas, not party document requests. The applicable framework for objections is Rule 45(d)(2)(B), which requires only that a

person commanded to produce documents "serve on the party or attorney designated in the subpoena a written objection" within 14 days. Fed. R. Civ. P. 45(d)(2)(B). Lolcow timely served written objections to each subpoena, spanning multiple detailed letters that identified specific grounds with particularity: fair use, First Amendment protection, improper service, premature discovery, undue burden, overbreadth, and the statutory limitations of § 512(h). These are not boilerplate. They are substantive. And they are not waived. Although some courts have observed that Rule 34's specificity requirements may inform the adequacy of objections to Rule 45 subpoenas, see *Fischer v. Forrest*, 2017 WL 773694, at *3 (S.D.N.Y. Feb. 28, 2017), the *Fischer* standard addresses boilerplate, single-sentence objections that "state no specific grounds." *Id.* Lolcow's objections are the opposite: they span multiple detailed letters identifying specific grounds with particularity. Moreover, *Fischer* itself involved a party's responses to Rule 34 requests; applying its standard to Rule 45 objections would conflate two distinct procedural frameworks. *Cf.* The Sedona Conference, *Commentary on Rule 45 Subpoenas to Non-Parties, Second Edition*, 22 Sedona Conf. J. 1 (2021), at 19–20 (recommending caution in importing party-discovery standards wholesale into the Rule 45 context)

Defendant may also argue that Lolcow lacks standing to raise the users' First Amendment interests. This too is incorrect. A service provider has independent standing to resist a subpoena directed to it on grounds of undue burden, improper purpose, and overbreadth, none of which depend on the users' rights. *See* Fed. R. Civ. P. 45(d)(3)(A)(iv). Moreover, the Second Circuit has recognized that a service provider may invoke its users' anonymity interests when resisting a subpoena "designed to breach anonymity." *Arista*, 604 F.3d at 118–19. The users themselves have separately moved to quash through their own counsel (ECF No. 21), but Lolcow's motion rests on

33

independent grounds (defective service, undue burden, statutory overreach, and procedural deficiency) that do not depend on the users' participation.

**CONCLUSION**

For the foregoing reasons, Lolcow LLC respectfully requests that the Court:

(1) Quash the subpoenas appearing at ECF Nos. 13, 15, and 17;

(2) In the alternative, enter a protective order imposing the conditions set forth in Point X above;

(3) Award Lolcow LLC its reasonable attorneys' fees and costs under Fed. R. Civ. P. 45(d)(1); and

(4) Grant such other and further relief as the Court deems just and proper.

Respectfully submitted this the 8th day of June 2026,


HARDIN LAW OFFICE

By:  /s/Matthew D. Hardin
     Matthew D. Hardin
     Attorney Reg. No. 5899596
     101 Rainbow Drive # 11506
     Livingston, TX 77399
     Phone: 212-680-4938
     Email: MatthewDHardin@gmail.com

*Counsel for Lolcow LLC*

34

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1 and the Individual Rules of Practice of the Honorable Katherine Polk Failla, I hereby certify that this memorandum of law contains approximately 9,624 words, exclusive of the caption, table of contents, table of authorities, signature block, and this certificate. Plaintiff will separately move for leave to file this overlength memorandum.

<u>/s/ Matthew D. Hardin</u>
Matthew D. Hardin