**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **LOLCOW LLC,**<br>**Plaintiff**<br><br>v.<br><br>**ZHEN ELIZABETH FONG-JONES**<br>**Defendant** | Case No. 1:26-cv-02059-KPF<br><br><br>**MEMORANDUM IN SUPPORT OF OMNIBUS RESPONSE TO MOTIONS TO QUASH/MOTION FOR PRELIMINARY INJUNCTION** |

## Table of Contents

PRELIMINARY STATEMENT............................................................................................................6

STATEMENT OF FACTS ................................................................................................................2

    A.    Lolcow and Kiwi Farms.................................................................................................2

    B.    Ms. Fong-Jones owns the copyright on the Photograph. ...........................................3

    C.    The subpoenas were not issued for any improper purpose........................................3

    D.    Movants mischaracterize the purpose of the pre-motion meeting. ............................5

ARGUMENT......................................................................................................................................6

    A.    Fair use only operates to quash a subpoena where fair use is "apparent" on the record..........6

    B.    This issue is not moot; the copyrighted images are still available. ...............................8

    C.    The movants have not demonstrated transformative use..............................................9

        1.    The use of a photograph to depict its subject for purposes of commentary on the subject of the photograph is not transformative. .......................................9

        2.    Assessed post-by-post, the Doe Movants cannot demonstrate fair use...............14

        3.    Factor 2 does not favor Movants: photographs are creative works......................16

        4.    Factors 3 and 4 are genuinely contested...............................................................16

        5.    Movants cannot demonstrate fair use....................................................................16

    D.    The *Arista Records* factors favor disclosure. ...........................................................17

        1.    Ms. Fong-Jones had made the requisite *prima facie* showing...........................17

        2.    The subpoenas have sufficient specificity..............................................................17

        3.    There are no reasonable alternative means.............................................................17

        4.    Ms. Fong-Jones has significant need for the information. ...................................18

        5.    There is no reasonable expectation of privacy. ...................................................18

    E.    The subpoenas are not an improper "end-run" around Rule 26. ..............................20

    F.    Lolcow's "improper purpose / witness" argument fails. ...........................................22

    G.    Plaintiff has not established that the subpoenas are unduly burdensome. ................23

    H.    Service was proper as to the subpoenas delivered to Lolcow's DMCA agent.........24

    I.    Lolcow's remaining arguments do not support quashing the subpoenas..................25

        1.    All named entities are operated as a common enterprise. ....................................25

        2.    Any demand for fees or allegation of copyright misuse is premature, deficient, and unsupported by the record. ...................................................................................27

        3.    Lolcow's objections to the subpoenas were inadequate, but Ms Fong-Jones does not rely on waiver...............................................................................................................28

    J.    Lolcow's motion for a preliminary injunction (D.I. 34 & 35) should be denied. .....................28

4.    Lolcow cannot show a likelihood of success, and it has not even placed the challenged posts in evidence. ..............................................................................................................................29

5.    Lolcow's own "serious questions" argument defeats the bad-faith and § 512(f) premises on which the motion rests. ............................................................................................................30

6.    Lolcow shows no irreparable harm: the pending motions to quash and § 512(g) supply the remedy, and no disclosure can occur before this Court rules. ..........................................................31

7.    The balance of hardships and the public interest favor denial. ...........................................31

8.    The proposed injunction is an impermissible prior restraint on petitioning and is too vague to satisfy Rule 65(d). ..............................................................................................................32

9.    No evidentiary hearing is required. ......................................................................................33

CONCLUSION ..............................................................................................................................................33
CERTIFICATE OF SERVICE ....................................................................................................................34

Table of Authorities

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430 (2020) (*AOSI II*) .......................... 19, 20

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508
(2023) ..................................................................................................6, 10, 11, 13, 16, 29

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010)..............................................6, 7, 17, 18, 19, 21

*Barnes v. YouTube, Inc.*, (N.D. Cal. Feb. 13, 2026) ........................................................... 9, 16

*Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301 (4th Cir. 2010) .............................................11

*Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932 (4th Cir. 2013) ......................................... 11, 12

*BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395
(S.D.N.Y. 2016)........................................................ 6, 7, 8, 10, 11, 13, 14, 15, 16, 29

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ...................................................................9

*Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013)....................................................................7

*Castle Rock Entm't, Inc. v. Carol Publi'g Crp., Inc.*, 150 F.3d 132 (2d Cir. 1998)....................................7

*Chemical Bank v. Dana*, 149 F.R.D. 11 (D.Conn. 1993)...........................................................20

*CineTel Films, Inc. v. Does 1-1, 052*, 853 F.Supp.2d 545 (D.Md. 2012).........................................21

*Dendrite Int'l, Inc. v. Doe No. 3*, 342 N.J.Super.134 (App. Div. 2001)...........................................17

*Dermansky v. Hayride Media, LLC*, (E.D. La. Sept. 21, 2023)...........................................................13

*Dhillon v. Does 1-10*, No. C 13-01465 SI (N.D. Cal. 2014) ........................................ 13, 16

*DMCA § 512(h) Subpoena to YouTube*, 581 F.Supp.3d 509 (S.D.N.Y. 2022) ...................................7

*Freeman v. Complex Computing Co.*, 119 F.3d 1044 (2d Cir. 1997) ...............................................26

*Griner v. King*, 104 F.4th 1 (8th Cir. 2024) ........................................................................15

*Gross v. Lunduski*, 304 F.R.D. 136 (W.D.N.Y. 2014).........................................................23

*Jones v. Meta Platforms, Inc.* (N.D. Cal. Aug. 11, 2025) ...............................................................19

*Korman v. Free Beacon LLC*, (E.D. Va. Mar. 30, 2026) ...............................................................13

*Lally v. Catskill Airways, Inc.*, 198 A.D.2d 643, 603 N.Y.S.2d 619 (3d Dep't 1993)..............................26

*Lenz v. Universal Music Corp.*, 815 F.3d 1145 (9th Cir. 2016) .............................................. 27, 30

*Maximized Living, Inc. v. Google, Inc.*, No. C. 11-80061 MISC CRB (EDL)
(N.D.Cal. Dec. 22, 2011) .................................................................................................9

*North Jersey Media Group Inc. v. Pirro*, 74 F.Supp.3d 605 (S.D.N.Y. 2015) ....................................15

*Philpot v. Independent Journal Review*, 92 F.4th 252 (4th Cir. 2024) ............................................15

*Practice Mgmt Inf. Corp. v. American Medical Ass'n*, 121 F.3d 516 (9th Cir. 1997)............................27

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993) .........................30

*Recording Industry Ass'n of America, Inc. v. Verizon Internet Services, Inc.*, 351 F.3d 1229
(D.C. Cir. 2003) ................................................................................................................9

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010).............................................................. 29, 31

*Seescandy.com*, 185 F.Supp.2d 1051 (N.D. Cal. 2000) ....................................................17

*Sony Music Entm't Inc. v. Does 1–40*, 326 F. Supp. 2d 556 (S.D.N.Y. 2004) ......................................... 7, 18

*Strom v. Petershagen*, (W.D. Wash. Aug. 2, 2024) ...............................................................13

*Thunder Studios, Inc. v. Kazal*, 13 F.4th 736 (9th Cir. 2021) ...............................................19

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27 (2d Cir. 1995)......................................29

*Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.*, 865 F.2d 506 (2d Cir. 1989).............................22

*U.S. v. Verdugo-Urquidez*, 494 U.S. 259 (1990).........................................................................19

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131 (2d Cir. 1991)...................25, 27

## Statutes

17 U.S.C. § 410(c) .................................................................................................8
17 U.S.C. § 512 (c)(3)(A)(iii) ...............................................................................8
17 U.S.C. § 512(c)(1)(C) ........................................................................................8
17 U.S.C. § 512(c)(3).......................................................................................28, 31
17 U.S.C. § 512(f) ...........................................................................................27, 30
17 U.S.C. § 512(g)(3)(D) ......................................................................................31
17 U.S.C. § 512(h) .............................................6, 2, 6, 20, 21, 28, 30, 31, 32
17 U.S.C. § 512(h)(2)(C).....................................................................................22
17 U.S.C. § 512(h)(3) ..........................................................................................24
17 U.S.C. § 512(h)(4)-(5).....................................................................................24
17 U.S.C. § 512(h)(6) .....................................................................................20, 24
28 U.S.C. § 1651(a) ...............................................................................................32

## Rules

Fed. R. Civ. P. 34(b)(1)(E)(i) ...........................................................................23
Fed. R. Civ. P. 45(d)(3)...........................................................................................6
Fed. R. Civ. P. 65(d)(1)........................................................................................32
Fed. R. Evid. 408(a)(2) .........................................................................................22
Rule 26(f)................................................................................................2, 20, 21
Rule 45(b)(1) ...........................................................................................................24
Rule 45(d)(1) ...........................................................................................................28

## PRELIMINARY STATEMENT

Plaintiff Lolcow LLC ("Lolcow") and seven Doe movants (the "Doe Users" and, together with Plaintiff, "Movants"), each seek to quash subpoenas validly issued by the Clerk pursuant to 17 U.S.C. § 512(h). Both motions ask this Court to do on a motion to quash, and on a one-sided, pre-discovery record, what the law reserves for the merits: adjudicate a contested, fact-bound fair-use defense. They attempt to disguise that problem with an avalanche of irrelevant accusations about Ms. Fong-Jones that have nothing to do with the two narrow questions that are all that is presented on the motions to quash: First, has Ms. Fong-Jones made a prima facie showing of a copyright claim sufficient to identify the alleged infringers under 17 U.S.C. § 512(h) and *Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010)? She has. Second, is fair use so apparent on this record that no subpoena may issue? It is not. Indeed, as discussed below, Movants' central theory—that anonymous users may reproduce Ms. Fong-Jones's copyrighted photograph, add an insult, and claim transformative fair use—contradicts this Court's decision in *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395 (S.D.N.Y. 2016) (Failla, J.).

As in *BWP Media*, the subpoenaed posts at issue here use Ms. Fong-Jones's headshot for the same core purpose for which it was created—to depict and identify Ms. Fong-Jones—adding commentary directed at **Ms. Fong-Jones** (her statements, her appearance), not at the **photographic work** itself. Some do nothing to the image at all, reproducing it verbatim from Ms. Fong-Jones's own social-media posts. Under *BWP Media* and *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023), which tightened the transformation inquiry, that is not "apparent" fair use. At most it is a disputed defense for another day.

vi

Movants' remaining arguments fail on their own terms. The "mootness" argument rests on the false factual premise that the infringing material was "removed." In reality, the infringing copies remain hosted on Lolcow's servers and publicly retrievable at both their canonical URLs and on the users' individual pages. The system Moon hastily implemented to remove copyrighted material subject to DMCA claims (and created specifically after receiving Ms. Fong-Jones's takedown notices relating to these infringements) does not effectively comply with the statutory requirements. *See* Declaration of Kathryn Tewson ("Tewson Dec"). ¶¶ 8-9. The "end-run / premature discovery" argument ignores that 17 U.S.C. § 512(h) is a statutory mechanism Congress authorized to operate independently of Rule 26(f), and that Doe Users are non-parties. Lolcow's service objection is meritless as to the subpoenas delivered to its DMCA-designated agent. And the movants contradict each other on the very *Arista* factors they invoke. The motions should be denied.

## STATEMENT OF FACTS

### A.    Lolcow and Kiwi Farms

Lolcow operates Kiwi Farms, a web forum on which members create threads on topics of their own choosing and can post and comment on others' threads. Tewson Dec, ¶ 4. The thread topics are diverse; many focus on sharp cultural commentary on various public and private figures whom the Kiwi Farms community finds risible or offensive: primarily gay people, trans people, Black people, and other minorities despised by the Kiwi Farms user base. Tewson Dec, ¶ 4.

Defendant Zhen Elizabeth Fong-Jones has been the subject of such commentary on Kiwi Farms since 2017. Tewson Dec, ¶ 5. Much (most) of this commentary is offensive, vile, and bigoted, but ultimately falls squarely within the protections afforded by the First Amendment, and Ms. Fong-Jones has no legal quarrel with that commentary. *Id.* Occasionally, however, Kiwi Farms members stray from the realm of "awful-but-lawful" and into wrongful conduct such as sharing protected

information like Social Security Numbers,[1] encouraging personal harassment,[2] and defamation.[3] Tewson Dec, ¶¶ 6-7.

### B.    Ms. Fong-Jones owns the copyright on the Photograph.

The creator and author of the Photograph is Zachary Drucker. Declaration of Zhen Elizabeth Fong-Jones ("Fong-Jones De"). ¶ 2. On or about May 21, 2025, Ms. Drucker assigned the copyright in the Photographs to Ms. Fong-Jones. *Id.* Ms. Fong-Jones now holds the copyright to the Photograph under the registration number VAU001576006. *Id.* and Declaration of Lane Haygood ("Haygood Dec"), see Decl., Ex. 1 (Copyright Registration).

### C.    The subpoenas were not issued for any improper purpose.

Movants claim that Ms. Fong-Jones is utilizing the DMCA's statutory mechanisms not to protect and vindicate her intellectual property rights, but to extinguish First Amendment-protected critical speech. Complaint at ¶¶ 23–24; Doe Users' Brief (D.I. 32) at 1. As discussed below, this is false. Movants also claim that Ms. Fong-Jones has "deleted [her] posts and attempted to scrub them from the Internet." *Id.* **This is similarly false**; while Ms. Fong-Jones has locked her Twitter account, where the posts in question were originally published, given changes to the platform since its takeover by Elon Musk, she re-published those posts in their entirety on her Bluesky account years ago.[4] Fong-Jones Dec., ¶ 3. Movants' characterization of these posts as "confess[ing] to committing sexual abuse," D.I. 32 at 1, is **likewise** false, and has in fact already been adjudicated to be false by an Australian court in a ruling of which this court may take judicial notice. *Fong-Jones v*

---

[1] Ms. Fong-Jones's Social Security Number, for example, visible to logged-in users at https://kiwifarms.st/threads/liz-fong-jones-fang-li-zhen-elliot-william-fong-lizthegrey-honeycomb-io-field-cto.128419/post-12853061
[2] https://kiwifarms.st/threads/liz-fong-jones-fang-li-zhen-elliot-william-fong-lizthegrey-honeycomb-io-field-cto.128419/post-13874790
[3] https://kiwifarms.st/threads/liz-fong-jones-fang-li-zhen-elliot-william-fong-lizthegrey-honeycomb-io-field-cto.128419/post-12866010.
[4] https://bsky.app/profile/lizthegrey.com/post/3lfnncdynwk2i

*Flow Chemical Pty Ltd*, [2023] VSC 770 (available at https://www.austlii.edu.au/cgi-bin/viewdoc/au/cases/vic/VSC/2023/770.html).[5]

With respect to the core argument that Ms. Fong-Jones is not truly seeking to protect her intellectual property rights, Ms. Fong-Jones has a long and well-documented history of protecting those rights. Fong-Jones Dec,Fong-Jones Dec, ¶ 4. In keeping with that history, when she learned that the Protected Image was posted and hosted on Kiwi Farms, and after conducting a robust fair use analysis and determining that the infringement was not protected by fair use, she availed herself of the DMCA's provisions to effect the removal of the infringing images.[6] Fong-Jones Dec, ¶ 5. Under normal circumstances, a service provider receiving such a DMCA notice would remove the material such that it could no longer be accessed or distributed, provide the infringing user with the option to counterclaim, and rest. Lolcow, however, chose another path.

Contrary to the Movants' papers and the Declaration of Joshua Moon (D.I. 30-5; D.I. 30-9)**,** access to the Protected Images has **not** been disabled. Each of the actioned images is still available at and served from the Kiwi Farms website. Tewson Dec, ¶¶ 8-9. Lolcow did not remove or disable access; instead, it merely blocked it from display to the majority of users, while still displaying the Infringing Images to users with higher-level access or to users who directly input the images' URLs. Tewson Dec, ¶¶ 9-10. This parallels Lolcow's approach to other objectionable, problematic, or illegal material on the site such as non-consensual intimate images, content hosted in violation of federal law, passwords and credit card numbers, and, as previously referenced, Ms. Fong-Jones's social security number. Tewson Dec, ¶ 12**.** Lolcow also disabled access to some of the posts that contained the images in their entirety, removing not just the image but the accompanying text from

---

[5] The judgment of liability was later set aside on that defendant's application to set aside his default, but only as to that defendant's personal culpability for the defamatory content; the finding that the content was false and defamatory was not vacated, and in fact was expressly left in place as a condition of vacating the default. The parties to that action later settled.

[6] That analysis determined that many of the posted variants on the images did, in fact, fall under the protection of fair use. No action was taken against these images. Fong-Jones Dec. ¶¶ 5-6**.**

view; this action was not requested by the subpoenas, was undertaken voluntarily by Lolcow, and may be freely reversed by Lolcow at any time.

Lolcow preserves very little information associated with its members' user accounts. Lolcow MB at ¶ 3-4; D.I. 30-5 ("Moon Dec.") at 14-15. It does so expressly to assist its users in avoiding consequences for any infringements or other wrongful conduct on Kiwi Farms. Tewson Dec, ¶ 13. Since filing this action, Moon has taken steps to reduce the retained information even further because of concern that his users were too identifiable, stating:

> **Nobody is taking their privacy seriously enough.**
>
> I've discovered that people don't actually take advantage of anything we offer. I permit VPNs, we have Tor, and still people constantly bareback the site from places they really shouldn't.
>
> To help compensate for people's lack of attentiveness, I have tightened my data-retention policies and added a new perk for **basic green True & Honest \*\*OR\*\* monthly gold Premium: I no longer keep any change log or IP address history for your user account.** There's no need to. Your account is vetted through the purchase itself, and the cost of getting your account banned is the literal price of the account's premium status. This includes email-change histories.

Joshua Moon (@Null), Kiwi Farms (June 9, 2026, at 11:10 AM Central Time)

https:/archive.is/G4AHy (emphasis in original).

### D.    Movants mischaracterize the purpose of the pre-motion meeting.

Movants mischaracterize or misremember the parties' meet-and-confer held on May 14, 2026; the conversation about the necessity of calling the Doe Users as witnesses was neither a waiver nor a concession, but an explanation that Plaintiff's theory of fair use necessarily requires the testimony of the Doe users. *See* Ex. 4 (Haygood Declaration), ¶¶ 4-7; *see also* Complaint at ¶ 25 ("the individual who created the altered image **conveyed a decidedly darker and different artistic message**, juxtaposing a smile with newspeak, **implying** an ominous message of warning, and using euphemistic language in a way that criticizes **what the artist likely saw** as a casual view of sexual

5

assault on the part of Fong-Jones.") (emphasis added). The Doe Users therefore must be produced in this action for deposition and cross-examination regardless.[7]

Indeed, contrary to Movants' argument that Ms. Fong-Jones seeks Doe Users' identities for extra-juridical purposes, during the parties' meet and confer, Ms. Fong-Jones offered to take Doe Users' identities on an Attorneys' Eyes Only basis and to stipulate to a protective order confirming that their identity could only be used in legal proceedings relating to her intellectual property rights. Haygood Dec, ¶ 7. Doe Users rejected that offer. Ms. Fong-Jones remains willing to so stipulate, because the only purpose for which she is seeking their identities is to vindicate her intellectual property rights (both in actions against those users, and, given Lolcow's Complaint, herein) (see D.I. 12-1, D.I. 14-1, D.I. 16-1). In fact, contrary to the claim that Ms. Fong-Jones is looking to chill critical speech, she has already settled with a different Kiwi Farms user – N****rCaviar[8] – on terms that expressly allow him to continue to criticize Ms. Fong-Jones in whatever bigoted manner he chooses, so long as he doesn't violate Ms. Fong-Jones' copyrights. Haygood Dec, ¶ 4. Should Doe Users be interested in similar terms, after reimbursing Ms. Fong-Jones for the fees they have now caused her to incur, those remain available to them. Fong-Jones Dec, ¶ 8-10. Movants offer no evidence to the contrary beyond overheated speculation.

## ARGUMENT

### A. Fair use only operates to quash a subpoena where fair use is "apparent" on the record.

A party moving to quash a subpoena bears the burden of establishing grounds to do so. Fed. R. Civ. P. 45(d)(3). Where a § 512(h) subpoena seeks to identify anonymous online speakers, the

---

[7] Defendant offered to withdraw the Subpoenas and consent to the Doe Users' participation as witnesses pseudonymously under their Kiwi Farms user names in exchange for the Doe Users' voluntary disclosure of identity subject to an Attorneys' Eyes Only protective order, stipulation to personal jurisdiction in this District, and acceptance of service by email. These offers were rejected. Haygood Dec, ¶9.

[8] The user's name is not redacted in its original form; Ms. Fong-Jones will not include that slur in her filings.

Second Circuit balances the five *Arista* factors, the first of which asks that the copyright holder make a concrete showing that it has a prima facie claim of actionable infringement. *Arista*, 604 F.3d at 119 (adopting *Sony Music Entm't Inc. v. Does 1–40*, 326 F. Supp. 2d 556, 564–65 (S.D.N.Y. 2004)). That is a threshold inquiry satisfied by proof of ownership of a valid copyright plus plausibly actionable copying, not an occasion to resolve affirmative defenses on the merits in advance of discovery.

The applicable standard is not in dispute: a Section 512(h) subpoena must be quashed where a fair-use defense is **demonstrated** on the record. *In re DMCA § 512(h) Subpoena to YouTube*, 581 F.Supp.3d 509, 517–18 (S.D.N.Y. 2022). In conducting a fair use analysis, courts consider, *inter alia*: (1) the purpose and character of the use,; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. *Id.* These factors guide, but not do not control, the fair use analysis. *Castle Rock Entm't, Inc. v. Carol Publi'g Crp., Inc.*, 150 F.3d 132, 141 (2d Cir. 1998). The ultimate question is whether the goal of copyright law (promoting the progress of science and useful arts) is better served by allowing the use than by preventing it. *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013). And fair use is an affirmative defense on which the movants bear the burden, *BWP Media*, 196 F. Supp. 3d at 403, and a defense that is genuinely **contested** and **fact-bound** is by definition not "demonstrated" on the record. *See YouTube*, 581 F.Supp.3d at 519-23. Indeed, Lolcow concedes this very issue in their own pleadings. D.I. 1, ¶ 28 (arguing that the parties' differing positions are "indicative of a good faith dispute rather than evidence of willfulness") (emphasis added).

Ms. Fong-Jones has thus made the requisite *prima facie* showing necessary to allow issuance of a 512(h) subpoena. Her certificate of registration for the photograph is "prima facie evidence of … copyright ownership, as well as of the truth of the facts stated in the registration." *BWP Media*,

196 F.Supp.3d at 401 (citing 17 U.S.C. § 410(c)); Fong-Jones Dec, ¶ 2.[9] Movants admit each subpoenaed post reproduces that photograph—cropped, altered, embedded in social media, or verbatim. D.I. 32 §§ 2.5.1–2.5.6. Copying is therefore conceded; the only dispute is fair use.

### B.    This issue is not moot; the copyrighted images are still available.

Movants argue that certain subpoenas are moot because three users' posts were "removed" before the subpoenas issued. D.I. 30 § II; D.I. 32 § 2.2 (relying on the Fensom and Moon declarations). But the copyrighted images were never removed. What was changed was the display of the **forum post**; the image files themselves remain hosted on Lolcow's infrastructure and remain retrievable on demand at their canonical asset URLs and on the individual user pages as of June 13, 2026. Tewson Dec, ¶¶ 8-9. Mr. Moon's own declaration confirms this: he describes only post-level suppression as soft-deletion that hides a post "from non-moderator users," and a "DMCA censorship" flag under which "the post is suppressed from public display." Moon Supp. Decl. ¶ 3. He nowhere states that the image files were deleted or that the URLs serving them were disabled. Continued hosting and serving of the work is ongoing reproduction and public display; present infringement, not the "past infringement" of removed material. Indeed, Movants nowhere explain their view that allowing moderators to view the infringing posts, rather than entirely disabling access to or removing it, complies with the DMCA.

That distinction is dispositive. Section 512 reaches "material" that the provider "can remove[] or disable[] access to." 17 U.S.C. § 512(c)(1)(C) &17 U.S.C. § 512 (c)(3)(A)(iii). Hiding a post for some users but not others, while continuing to serve the underlying file to anyone who inputs the correct URL, is neither removal nor disabling access. Movants' own authority confirms the point by contrast: *Maximized Living, Inc. v. Google, Inc.*, No. C. 11-80061 MISC CRB (EDL), 2011

---

[9] *See also BWP Media*, 196 F.Supp.3d at 402 (third party infringer cannot challenge validity of assignment where parties to assignment do not dispute the transfer) (collecting cases).

WL 6749017 (N.D.Cal. Dec. 22, 2011), addressed material that had actually been taken down, and

*Recording Industry Ass'n of America, Inc. v. Verizon Internet Services, Inc.*, 351 F.3d 1229, 1235 (D.C. Cir. 2003), ties Section 512(h) to material the provider "can remove or disable," or material that, here, the provider has chosen **not** to remove or disable. The infringement these subpoenas address is ongoing, and the statutory predicate is intact.

Fensom's declaration confirms rather than cures this defect. Fensom, an intern at opposing counsel's firm, attests that on June 5 and 8, 2026 he navigated to the **thread** URLs for the three users' posts and "confirmed that the content was no longer accessible" there, capturing screenshots labelled "Proof of Post Removal." D.I. 33, ¶¶ 4–6 & Exs. 12–14. But the inaccessibility of a **post** at its forum thread URL is precisely the post-level suppression Mr. Moon described, which hides a post "from non-moderator users" and not deletion of the underlying image file or disabling access by *all* users. *See* § II *supra* (Moon Supp. Decl. ¶ 3). His declaration is therefore silent on the only fact that could render any subpoena moot. Ms. Tewson's declaration, in contrast, establishes that Lolcow continues to host, serve, and display the infringing images. Tewson Dec, ¶¶ 8-9. The mootness argument therefore fails.

Even if the material had been removed, however, compliance with the subpoena would still be required. *Barnes v. YouTube, Inc.*, 2026 WL 412470, at *5 (N.D. Cal. Feb. 13, 2026) (removal of infringing material does not moot copyright claim as rightsholder may seek damages for previous infringement, not just ongoing infringement).

## C.    The movants have not demonstrated transformative use.

1.    <u>The use of a photograph to depict its subject for purposes of commentary on the subject of the photograph is not transformative.</u>

The first fair-use factor asks whether the secondary use "merely supersede[s] the objects of the original creation, or instead adds something new, with a further purpose or different character." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). In *Warhol*, the Supreme Court clarified

that the inquiry turns on whether the secondary use has a purpose and character genuinely distinct from the original's character and purpose. 598 U.S. at 525–533. Thus, the Supreme Court explained, an added "meaning or message" does not alone make a use transformative; if the secondary use shares the original's purpose, this factor cuts against the infringer. *Warhol* preserved the familiar point that transformative criticism *targets the work itself*, "us[ing] the work to serve a distinct end." *Id.* at 528. And that is precisely what the subpoenaed posts do not do.

This Court applied this controlling principle in *BWP Media*. The defendant in *BWP Media* argued its use of photographs was transformative because it commented on the *stories* the photographs originally accompanied. This Court rejected the defense: the defendant's articles "comment[ed] on the falsity of the stories" but "[said] nothing at all about the images," and "[n]owhere … [did] Defendant comment or report on the images in question, nor [did] it critique the source websites' use of those photos." 196 F. Supp. 3d at 404. Because "[n]othing in Defendant's article[s] imbue[d] the photo with new meaning, or place[d] it in a context different from" the original, the use was "exactly the same" as the original's: "to show what it depicts." *Id.* at 406. Holding otherwise would let "an entity … take any photograph, announce the photograph's contents, and call that 'fair use,'" "promot[ing] wholesale circumvention of copyright law." *Id.*; *see also id.* at 407 ("Using a photo for the precise reason it was created does not support a finding that the … use was fair.").

The subpoenaed posts present the same defect, only more starkly. Movants describe the posts as criticizing **Ms. Fong-Jones**—her supposed "minimization of sexual assault," her "physical appearance," her "surgical status," her "past actions." D.I. 32 §§ 2.5.1–2.5.6. That is commentary on the **subject** of the photograph, deployed by using the photograph for its inherent purpose—to depict and identify that subject. It is not commentary on the photograph as a **work**, and it does not

"critique the [original's] use of th[e] photo." *BWP Media*, 196 F. Supp. 3d at 404. Under *BWP Media* and *Warhol*, that shared purpose defeats any claim to transformation.[10]

The Fourth Circuit has made the same point. Does cite *Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932 (4th Cir. 2013) ("*Bouchat V*"), but *Bouchat V* (like the earlier decisions in Bouchat's dispute over the Ravens logo) cuts against Movants. In *Bouchat IV* and *V*, after the plaintiff had successfully demonstrated in prior litigation that the Ravens' original "Flying B" logo infringed his copyright in the potential Ravens logo he had designed, the parties litigated over depictions of the infringing logo in various photographs and videos. *Bouchat V*, 737 F.3d at 949-50. *Bouchat V* was preceded by *Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301 (4th Cir. 2010) ("*Bouchat IV*"), in which Bouchat challenged the use of the Flying B logo in various highlight videos and a Ravens' history display. *Bouchat IV*, 619 F.3d at 306. Reversing the trial court's finding that the use of the logo in the highlight videos was fair, in *Bouchat IV* the Fourth Circuit held those uses of the logo were not transformative because the logo continued to perform its original identifying function: "The proper inquiry relates to whether there is a transformative purpose behind the use, and 'a taking may not be excused merely because it is insubstantial with respect to the *infringing work*.' . . . because the logo is still being used as a logo, that is, as an identifying symbol of the Ravens, the purpose behind the use is not transformative." *Bouchat IV*, 619 F.3d at 310 (internal citations omitted). Thus, the Fourth Circuit found no fair use in the highlight videos. *Id.* at 311. The Ravens' use of the logo in the historical display in their corporate lobby, however, *was* fair – because the logo

---

[10] It is worth pausing for a moment to consider the breadth of the "fair use" precedent Movants ask this Court to adopt: that any use of a photograph in connection with commentary on what it depicts is transformative. On that theory, there would be no need to license newsworthy photographs – or, indeed, any photograph accompanied by commentary on its subject. On that theory, a "Hot or Not" website could scrape photographs from Facebook pages and other websites for purpose of salacious commentary or public mockery, leaving the copyright holders unable to control the display of their photography. Far from promoting the progress of science and the useful arts, such a regime would deter public display of photographic works by, for example, requiring parents to agree that such display legally opens their children to public mockery and abuse, without any recourse as the copyright holder to control the contexts in which their depictions were used.

was not being used for its **identifying** function but to "represent the inaugural season and the team's first draft picks," and therefore was being used not for its expressive content but for its factual content. *Id.* at 314.

The application here is straightforward: The subpoenaed posts use Ms. Fong-Jones's photograph as a photograph, to depict and identify Ms. Fong-Jones, which is the original's own purpose; appending an insult or a caption does not alter that function. "[B]ecause the [picture] is still being used as a [picture], that is, as [a visual depiction of Ms. Fong-Jones], the purpose behind the use is not transformative." *Id.* at 310.

*Bouchat V* only confirms as much. In *Bouchat V*, the Fourth Circuit found the NFL's use of the infringing logo transformative where it was not used as an identifier but appeared only **incidentally** and **fleetingly**, for fractions of a second, "all but imperceptible to those viewing the videos," 737 F.3d at 940, and was used "not for its expressive content, but rather for its . . . factual content," as a mere "historical guidepost" within new narratives about Ravens history. *Id.* The transformation there depended on the work's having been stripped of the very depictive function for which it existed. Expressly distinguishing *Bouchat IV*, the Fourth Circuit then cabined *Bouchat V*'s holding in terms: its decision "provides no support for a fair use defense where the alleged infringer exploits a protected work . . . based on its intrinsic expressive value." *Id.* at 949. That is this case in mirror image. The subpoenaed users did not bury Ms. Fong-Jones's headshot in a documentary where it flickers past unrecognized; they reproduced it as the centerpiece of the post, for the precise depict-and-identify purpose for which a headshot exists. *Bouchat V* thus confirms that the use at issue here is **not** fair – and, certainly, that fair use is not sufficiently apparent to warrant quashal of the 512(h) subpoena that will allow Ms. Fong-Jones to proceed with her claims against the Does, and the Does to press that defense on the merits.

12

Finally, Movants' lead authority, *Dhillon v. Does 1-10*, No. C 13-01465 SI, 2014 WL 722592 (N.D. Cal. 2014), does not carry the weight placed on it: it is out-of-circuit, predates *Warhol*'s tightening of the purpose inquiry, and involved a photograph produced for a political campaign and distributed for the purpose of identifying the candidate in conjunction with that candidacy. The district court's finding that the use of the headshot was transformative turned on the fact that the headshot's original purpose was in association with political campaign activities by a public official and the article's use was "as a part of [the defendants'] criticism of, and commentary on, the plaintiff's politics." *Id.* at *5. Indeed, to the extent that *Dhillon* has survived *Warhol*, it does so in the significantly narrowed and highly protected context of campaign speech and criticism. *Korman v. Free Beacon LLC*, 2026 WL 867860, at *6 (E.D. Va. Mar. 30, 2026). *See also Strom v. Petershagen*, 2024 WL 3638056, at *4 (W.D. Wash. Aug. 2, 2024); *Dermansky v. Hayride Media, LLC*, 2023 WL 6160864, at *12 (E.D. La. Sept. 21, 2023).

This Court's own decision in *BWP Media*—a photograph case decided under Second Circuit law—is the better guide, and it cuts the other way. *See BWP Media*, 196 F.Supp.3d at 404-05. *See also Dermansky v. Hayride Media, LLC*, No. CV 22-3491, 2023 WL 6160864, at *9 (E.D. La. Sept. 21, 2023) (conducting extensive *Warhol* analysis and finding use of photograph of politician not fair despite argument that intent to criticize the subject was transformative where purpose of initial photograph was laudatory: "[p]ut differently, Hayride confuses its purpose in using the Groby and Chambers Photographs—illustration—with its purpose in publishing the articles about Groby and Chambers—criticism"). Not only did *Dhillon* reach the wrong result, for the reasons cogently articulated in *BWP Media* and *Dermansky*,[11] but it did so pre-*Warhol*. The Court should reject Movants' invitation to similar error.

---

[11] The analysis in *Dermansky* is instructive and straightforwardly applicable here:

2.    Assessed post-by-post, the Doe Movants cannot demonstrate fair use.

A post-by-post analysis likewise demonstrates the lack of fair use. Doe Users' posts can be divided into several categories: verbatim reposts (Does 5 and 6, "Dread First" and "The Mass Shooter Ron Soye"), tighter crops (Doe 3, "Diggus Bickus"), slight visual modification (Doe 2, "Sexy Senior Citizen"), a crop with an overlay (Does 1 and 7, "3MMA" and "GettrGrifter"), and juxtaposed with a film still (Doe 4, "Teriyakiburns"). None are protected by fair use.

The first category contains reposts of the image without alteration: the photograph as it appeared in Ms. Fong-Jones's own social-media posts, without alteration, to comment on Ms. Fong-Jones's activities. D.I. 32 §§ 2.5.5–2.5.6. This is *BWP Media* squarely: the image is used "to show what it depicts"—the subject—adding no new meaning to the **photograph**. 196 F. Supp. 3d at 406. That movants invoke *Shaykhoun* and *Whiddon* shows only that fair use here is **contested**, not "apparent"; those cases turned on news organizations reporting on the act of posting, a developed-record inquiry unsuited to a motion to quash.

Movants describe the tighter crop of the original image as critiquing "the Original Work by removing elements." D.I. 32 § 2.5.3. The record contradicts the characterization. The post makes only a trivial alteration to the image (a tighter crop) and pairs it with a racial caricature employing a mock accent. *See* D.I. 33-5. That added "expression" is not Section 107 criticism of or comment **on the work**; it is mockery of the **person**. The image is used for the original's purpose, barely altered.

---

The upshot of Hayride's argument is that whether a particular use of copyrighted material is "transformative" depends wholly on the point of view of the infringer: agree with the point of view of the original copyright holder and face an infringement lawsuit, disagree and be protected under the fair use doctrine. In the context of the Chambers and Groby Photographs, accepting Hayride's argument would lead to the absurd conclusion that had it published articles supportive of Chambers and Groby, such uses would not have been "transformative." Fair use does not and cannot depend on such considerations entirely divorced from the purpose of the uses themselves…

*Dermansky*, 2023 WL 6160864, at *11

14

This is the antithesis of apparent fair use. *See Philpot v. Independent Journal Review*, 92 F.4th 252, 258-59 (4th Cir. 2024) (merely cropping an image to remove negative space was not transformative).

The third category of post included only a slight exaggeration of the subject's expression, paired with text mocking Ms. Fong-Jones's appearance and her statements, D.I. 33-2 through 32-4. Again, this targets the **subject**, not the **work**; the original's depict-the-subject purpose is shared. At most, fair use is disputed.

The posts that included an overlay on the cropped image fare no better. As in *BWP Media*, commentary directed at the subject's words is not commentary on the photograph; the use is not transformative, let alone so clearly so as to warrant a finding of fair use as a matter of law.

The final category involves the most alteration, juxtaposing the photograph with a film still, in a recognized meme format, accompanied by additional material. D.I. 33-6. But as this Court observed in *BWP Media*, this does not imbue the photo with "new meaning" or "place[] it in a context different from that in which it was displayed" previously. *See BWP Media*, 196 F.Supp.3d at 406. In *Griner v. King*, 104 F.4th 1 (8th Cir. 2024), the 8th Circuit upheld a determination that the use of a "meme" was not transformative use sufficient to render the publication of a copyrighted work fair use. *Id.* at 9-10. Perhaps the clearest indication that such fair use questions cannot be decided on the record before this Court is *North Jersey Media Group Inc. v. Pirro*, 74 F.Supp.3d 605, 618 (S.D.N.Y. 2015), in which Judge Ramos found that a collage was only "minimally" transformative and that therefore defendants could not establish fair use "as a matter of law." *Id* at 623. Again, the question before this Court is not whether Ms. Fong-Jones or the Does are likely to ultimately succeed on the merits – only whether Does **must** succeed on the merits, as a matter of law. Ms. Fong-Jones respectfully submits that the above precedent makes clear that she, not Does, is the party likely to succeed once the copyright claims are adjudicated on the merits. But even if the Court does not share that assessment, the motion to quash must be denied because that merits decision requires its

own adjudication on a fully developed factual record, and therefore Does' assertion of a fair use defense cannot preclude enforcement of the subpoenas that will enable Ms. Fong-Jones to obtain such an adjudication.

### 3.    Factor 2 does not favor Movants: photographs are creative works.

Movants argue the photograph is "not creative" because it is a "headshot." D.I. 32 § 2.7. This Court has squarely rejected that move. *BWP Media*, 196 F. Supp. 3d at 408 (photographs involve technical skill, aesthetic judgment, and creative choices). At most, the second factor is "relatively neutral" and "rarely found to be determinative." *Id.* at 408–09. *Dhillon*'s contrary "informational" label has been rebuffed by this Court.

### 4.    Factors 3 and 4 are genuinely contested.

On Factor 3, movants assert all posts used "cropped versions." D.I. 32 § 2.8. That is not so: the verbatim reposts (Does 5–6) reproduce the entire image, and regardless, all took the core of the work, as expected for a purpose that—as shown above—overlaps the original's purpose. Where the purpose is the same as the original's, copying "the entirety" weighs against fair use. *BWP Media*, 196 F. Supp. 3d at 409. On Factor 4, the existence and scope of Ms. Fong-Jones's licensing market cannot be resolved on this record—which is itself a reason this defense is premature—and under *Warhol*, a secondary use that shares the original's depict-the-subject purpose can substitute for it. At minimum, both factors are disputed.

### 5.    Movants cannot demonstrate fair use.

Fair use here is a contested, multi-post, fact-laden affirmative defense, the opposite of the clear-cut defense that *In re YouTube* requires before a Section 512(h) subpoena may be quashed. The Court should decline movants' invitation to decide it now.

16

**D.    The *Arista Records* factors favor disclosure.**

The five- factor analysis adopted by this Court in *Arista Records*, 604 F.3d at 119, likewise favors disclosure. Indeed, each of the five factors do so individually; collectively, their weight is overwhelming.

1.    Ms. Fong-Jones had made the requisite *prima facie* showing.

This factor is not seriously contested; even the principal authority relied upon by the Movants (see the discussion of *Dhillon*, *supra*) concedes as much.

2.    The subpoenas have sufficient specificity.

The Does recast this factor as a personal-jurisdiction requirement, arguing the subpoenas fail because Ms. Fong-Jones did not show the Does are amenable to suit in New York. D.I. 32 § 2.10. That misreads *In re Seescandy.com*, 185 F.Supp.2d 1051 (N.D. Cal. 2000) and *Dendrite Int'l, Inc. v. Doe No. 3*, 342 N.J.Super.134 (App. Div. 2001): the "party subject to the court's jurisdiction" language concerns whether a real, identifiable defendant exists – not litigation of personal jurisdiction over a still-anonymous Doe, which cannot even be assessed until the Doe is identified. The requests are specific: they target identified posts and users. This factor favors disclosure.

3.    There are no reasonable alternative means.

The Does concede this factor: "Defendant likely lacks alternate means to … identify them." D.I. 32 at 24 n.9. That concession favors disclosure. It also contradicts Lolcow, which argues ordinary post-26(f) discovery is the alternative (D.I. 30 § IV). Indeed, Lolcow's proposed "alternative" is not an alternative at all: Lolcow *agrees* that Ms. Fong-Jones can only obtain the necessary information via discovery from Lolcow that pierces the Does' anonymity, it merely insists that a 512(h) subpoena is not the only vehicle for obtaining that discovery. But the alternative means analysis is focused on whether there is an alternative means to identify the relevant parties other than compelling production from the subpoena recipient, not on whether that production should be

17

compelled by 512(h) subpoena or Rule 45 subpoena or Rule 34 document request. This factor unequivocally favors disclosure.

### 4. Ms. Fong-Jones has significant need for the information.

Ms. Fong-Jones cannot pursue her infringement claims unless she can identify the Does, the statutory purpose of a 512(h) subpoena (see D.I. 12-1; D.I. 14-1; D.I. 16-1). No more is required.

### 5. There is no reasonable expectation of privacy.

Does concede that the anonymity/IP-rights balance favors the speaker only where anonymity is not used "to mask unlawful behavior." D.I. 32 § 2.12. To the extent any Doe is a non-resident foreign national (an issue movants preemptively raised), the First Amendment interest is weak as discussed below, and that question cannot be resolved until the Does are identified. Regardless, both *Arista* and *Sony Music* expressly hold that copyright infringement is sufficiently "unlawful behavior" to warrant piercing anonymity. *Arista Records*, 604 F.3d at 118; *Sony Music*, 326 F. Supp.2d at 564-65. And to the extent Movants argue Ms. Fong-Jones' "true goal" is suppression of critical commentary, and that that supposed goal should impact the analysis, that claim is empirically false. Not only did counsel expressly convey as much to Movants in a meet and confer, but Ms. Fong-Jones' settlements with other infringing Kiwi Farms users have expressly allowed such continued critical commentary so long as it did not involve infringing use of Ms. Fong-Jones' copyrighted photographs. Haygood Decl., at ¶¶ 4-6 (describing terms of settlement with Kiwi Farms user N****rCaviar). Ms. Fong-Jones' claims against the Doe Movants arise not out of the content of their criticism, but out of their infringement of her copyright. The law does not allow the Doe Users' desire to infringe anonymously to prevent her from pursuing those claims. *See Arista Records*, 604 F.3d at 118; *Sony Music*, 325 F.Supp.2d at 563. As with the other *Arista* factors, this favors disclosure.

Finally, the Does' attempt to invoke the First Amendment on behalf of potentially foreign, non-citizen users fails as a matter of constitutional law. The First Amendment protects "the people," a term that reaches only those with sufficient connection to the national community. *U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). Foreign nationals outside the United States have no First Amendment rights. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433–34 (2020) (*AOSI II*). The Does' effort to sidestep this rule by pointing to the location of Kiwi Farms' servers misunderstands *AOSI II*'s holding. The constitutional inquiry focuses on the speaker's connection to the national community, not on where the platform's hardware sits. A foreign national posting anonymously from abroad does not acquire First Amendment rights simply because the server receiving the post is located in West Virginia.

Does' reliance on *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736 (9th Cir. 2021), is likewise misplaced. *Thunder Studios* addressed whether a foreign defendant could be held liable in a U.S. court for speech directed at U.S. residents, a personal jurisdiction and choice-of-law question, not whether a foreign speaker acquires affirmative First Amendment rights to resist identification. The case says nothing about whether foreign non-citizen Doe Users can invoke the First Amendment to quash a U.S. court's subpoena, and indeed they cannot. *Jones v. Meta Platforms, Inc.*, 2025 WL 2308494, at *7 (N.D. Cal. Aug. 11, 2025), citing *In re Gliner*, 133 F.4th 927, 934 (9th Cir. 2025)

The Does' statutory fair use fallback (that Section 107 contains no territorial limitation) does nothing to rescue the First Amendment argument. That Section 107 applies without regard to the speaker's citizenship is uncontested. But the Does are making an analytically independent First Amendment argument. The absence of a territorial limitation in Section 107 says nothing about whether the First Amendment's protections extend to foreign nationals posting from abroad. Ms. Fong-Jones does not dispute that fair use is a defense available to anyone regardless of citizenship. But the First Amendment anonymity interest Does attempt to invoke to raise the bar on the *Arista*

19

factors does not apply to non-citizen users with no connection to the United States beyond their use of a U.S.-hosted platform. On that question, *AOSI II* controls and the Does' argument fails.

In any event, these are not arguments that can be resolved on the present record. The Does have appeared pseudonymously. Their citizenship, residency, and connection to the United States are unknown. To the extent the Court reaches the First Amendment question at all, it should do so only after the subpoena is enforced and their identities are established, not as a basis for quashing the subpoena before any of that information is known. Using an unverified First Amendment claim by unidentified, potentially foreign users as a ground to quash a statutory subpoena would allow the anonymity the subpoena seeks to pierce to become self-perpetuating.

### E.    The subpoenas are not an improper "end-run" around Rule 26.

Congress authorized Section 512(h) subpoenas as a mechanism that operates independently of the Rule 26(f) conference; it is governed by Rule 45 only "to the greatest extent practicable," 17 U.S.C. § 512(h)(6), and is not ordinary party discovery subject to the Rule 26(d) gate. Courts issue § 512(h) subpoenas without a Rule 26(f) conference as a matter of course – that is the design of the device. More, the Does are non-parties; as to them the subpoenas are not "party discovery" at all. And it was **Plaintiff** that elected to file this declaratory-judgment action; Ms. Fong-Jones's use of the statutory device within the forum Lolcow created is not an abuse of it. Any residual timing concern (and there should be none) could be addressed by conditions, not by quashing.

Furthermore, the Does do not have standing to complain under Rule 26(f). The subpoena under 17 U.S.C. § 512(h) is directed to Lolcow as the service provider; the Does are the subjects of the inquiry, not the recipients. The standing rule is categorical: only the person or entity to whom a subpoena is directed has standing to move to quash. *Chemical Bank v. Dana*, 149 F.R.D. 11, 13 (D.Conn. 1993). A party challenging a subpoena directed to a non-party must assert a personal right or privilege in the specific information sought. *CineTel Films, Inc. v. Does 1-1, 052*, 853 F.Supp.2d 545,

554-55 (D.Md. 2012). The Does cannot satisfy this standard through Rule 26(f) procedural objections. Rule 26(f) governs the timing of party discovery; it creates no personal right or privilege in favor of unnamed third parties whose identifying information is held by a service provider. The Does' Rule 26(f) argument is not a privilege claim; it is a timing objection that belongs, if anywhere, to Lolcow as the subpoena recipient. The Does have no standing to raise it.

More, Lolcow cannot use its own declaratory judgment suit to nullify Section 512(h). First, Section 512(h) operates entirely outside of Rule 26, as a standalone statutory mechanism. 512(h) subpoenas are issued ministerially by the clerk upon receipt of a compliant request; they are not discovery devices governed by Rule 26(d)'s timing restrictions. *See Arista Records*, 604 F.3d at 119 (authorizing pre-Rule 26 discovery in a copyright case on good cause). Section 512(h) contains its own statutory procedural prerequisites, including the sworn declaration, and imposes its own standard.

Second, a declaratory judgment plaintiff cannot weaponize its own filings against a defendant. Having chosen the forum and invoked jurisdiction, Lolcow cannot simultaneously use its own filing as a shield to block Ms. Fong-Jones's exercise of her statutory rights. To hold otherwise would allow any service provider facing DMCA notices to preemptively neuter Section 512(h) by filing a declaratory judgment action before any subpoena issues.

Finally, if a pending Rule 26(f) conference could suspend the statutory rights guaranteed by Section 512(h), the provision would be effectively nullified in any case in which litigation had commenced, and prevent copyright owners from obtaining necessary information, especially where the purported infringers are actively participating in litigation through counsel. Congress authorized Section 512(h) subpoenas specifically to enable the identification of infringers; Lolcow's reading would make this tool unavailable just as it became most necessary to employ.

21

### F.   Lolcow's "improper purpose / witness" argument fails.

Lolcow makes its account of the May 14 conferral the linchpin of its purpose, Rule 26, and Factor-4 arguments, asserting that counsel described the Doe users as "witnesses." D.I. 30 § I. This reliance is improper on its face. At the outset of the meeting, the parties expressly agreed that the discussion would be conducted on a confidential, without-prejudice basis subject to Fed. R. Evid. 408, and counsel for the Doe Users used even stronger terms. Haygood Dec., ¶ 3. Lolcow cannot invoke the substance of a confidential settlement discussion as load-bearing evidence in its motion. *See* Fed. R. Evid. 408(a)(2); *Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.*, 865 F.2d 506, 510 (2d Cir. 1989). In any event, Lolcow's characterization of the discussion is inaccurate.

In actuality, Ms. Fong-Jones proposed that, as with N****rCaviar, whose redacted declaration is described in Mr. Haygood's declaration in ¶ 4, if the Does signed similar declarations and voluntarily agreed to cease infringing then their identities would not be material and no claims would be brought against them. Lolcow's mischaracterization of the meet and confer is thus incorrect: the purpose of the subpoenas was, and is, to identify alleged infringers in order to protect Ms. Fong-Jones's intellectual property rights. Haygood Dec, ¶¶ 6-7. Ms. Fong-Jones's offer would do just that as – like most settlements on terms imposed by a litigant who, like Ms. Fong-Jones, has the stronger litigation position – it would serve Ms. Fong-Jones's purposes without need for litigation. That Ms. Fong-Jones would release her claims over past infringement in the context of a settlement that prevented future infringement does not mean that she would forfeit those otherwise valid claims in the absence of such a settlement. And that identified infringers are *also* witnesses to their own posts for purposes of Lolcow's litigation does not negate Ms. Fong-Jones's statutory purpose of protecting her intellectual property rights; § 512(h)(2)(C) asks only whether the purpose of the subpoena is to protect Title 17 rights. It is. In any event, defending against Lolcow's declaratory judgment action would itself be protecting those rights; 512(h) requires a declaration that

the infringer's identity will only be used for purposes of protecting copyright rights, *not* that such protection will take the form of an infringement lawsuit against the infringer. 17 U.S.C. § 512(h)(2)(C).

### G.    Plaintiff has not established that the subpoenas are unduly burdensome.

Lolcow also has not established that the information sought by the subpoenas is outside of Lolcow's control or that its production would be unduly burdensome. D.I. 30-1 at 31-33. As a threshold matter, Lolcow never properly raised such an objection; none of Lolcow's objections to the subpoenas gave more than "generalized objections that a discovery request is unduly burdensome," *Gross v. Lunduski*, 304 F.R.D. 136, 151 (W.D.N.Y. 2014), and therefore Ms. Fong-Jones has not previously had an opportunity to expressly[12] clarify the scope of her request. *See* D.I. 30-2, 30-3, 30-4, and 30-5. She shall do so now: Ms. Fong-Jones seeks only that information which Lolcow keeps or would have kept "in the usual course of business," Fed. R. Civ. P. 34(b)(1)(E)(i),[13] as of the time it received each subpoena.[14]  Had Lolcow produced Rule 34 compliant objections at any prior point, Ms. Fong-Jones would have communicated this then. It should not have required motion practice to accomplish. Lolcow's own proposed order concedes that current, live account identifiers (email and most-recent IP) are maintained and producible. D.I. 30 § X. Production may be limited to those live identifiers; the historical-backup and financial-records burden is a reason to narrow, not to deny identification outright. *Cf.* § 2 (the live data is, by Lolcow's own architecture, readily served).

---

[12] Requesting parties do not typically need to specify that their request encompasses only such responsive information as the receiving party maintains and which is not unduly burdensome to retrieve and produce, as those are the basic rules of document discovery.

[13] Which is what Mr. Moon expects to produce; asked by a forum member, "what exactly gets produced for TOR users regarding the IP information?" he answered, "Everything I have, are you dense?"

[14] As noted above, Lolcow has adjusted its retention policies in response to the subpoenas, expressly in order to narrow what information it will have available to produce; to the extent that "adjustment" impacts information responsive to the subpoenas, that would be spoliation Ms. Fong-Jones would need to address with the Court by separate motion.

Lolcow also protests Ms. Fong-Jones' request for transactor information. D.I. 30-5 at ¶¶ 23-30, 49, 51. But Section 512(h) does not restrict the type of information that may be sought; instead, it authorizes and orders the service provider to expeditiously disclose "information sufficient to identify the alleged infringer of the material described in the notification." 17 U.S.C § 512(h)(3). Mr. Moon's protestations to the contrary, the transactor information sought is relevant to identify the Doe Users, Tewson Dec, ¶¶ 22-26, and is undoubtedly **necessary** given Lolcow's "data-minimization architecture," D.I. 30 at pg. 3 and D.I. 30-9. That statement is even more true now than it was when Lolcow filed this action; on June 9, Mr. Moon announced to his users, in the thread created on Kiwi Farms disseminate information about this case, that "to help compensate for people's lack of attentiveness" he would "no longer keep any change log or IP address history" for paid user accounts. Tewson Dec, ¶¶ 13-21. He went on to explain "There's no need to. **Your account is vetted through the purchase itself.**" Tewson Dec, ¶ 20**.** That reliance itself explains why Ms. Fong-Jones requested the transactor information, and why she is entitled to it. Tewson Dec, ¶¶ 22-26.

**H.    Service was proper as to the subpoenas delivered to Lolcow's DMCA agent.**

Two of the three subpoenas (D.I. 13 and 15) were delivered by email to Matthew Hardin, Lolcow's **DMCA-designated agent**—the statutory recipient of Section 512 process. Section 512(h)(4)-(5) directs delivery "to the service provider," and § 512(h)(6) applies Rule 45 only "to the greatest extent practicable"; Rule 45(b)(1)'s personal-service gloss cannot be imported into the Section 512(h) regime, which supplies its own delivery mechanism. Indeed, there is no dispute the subpoenas were actually received.

**I.    Lolcow's remaining arguments do not support quashing the subpoenas.**

　　1.　　<u>All named entities are operated as a common enterprise.</u>

"Lolcow, LLC" and the other entities named in the subpoena are not distinct; they all are, for all intents and purposes, the sole operation of Joshua Moon, who routinely intermingles them. For example, Joshua Moon himself has said that the purpose of the "Mad At The Internet" podcast is to "launder [Kiwi Farms] content into something monetizable":



Further, Moon advertises Kiwi Farms content on Mad At The Internet and runs all monetization of both websites through the same payment processor. Tewson Dec, ¶¶ 22-26. Moon has also stated to his users that he will commingle funds donated to Lolcow through the GiveSendGo platform to USIPS via straw donations. Tewson Dec, ¶¶ 22-26. Moon is the head of all three organizations and makes all decisions for them. Tewson Dec, ¶¶ 22-26.

Taken together, these facts establish that the named entities are, in law as in fact, a single enterprise dominated by Moon. New York treats commonly controlled entities as alter egos of one another, and of their controlling individual, where one has "become a mere instrumentality" of the real actor, that control is used to work a wrong, and the wrong causes injury. *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991). Fraud need not be shown; the corporate form may be disregarded "where excessive control alone causes the complained of

loss." *Id.* at 141. Courts assess that control through factors including the observance of corporate formalities, the intermingling of funds, overlap in ownership and personnel, common office space and payment channels, whether the entities deal at arm's length, and whether one treats another's property as its own. *Id.* at 139. Nor does it matter whether Moon appears as a formal member or officer of each entity. An individual who "exercises sufficient control over the corporation may be deemed an 'equitable owner,' notwithstanding the fact that [he] is not a shareholder," where he wields authority over it "to the point of completely disregarding the corporate form and acting as though [its] assets [are] his alone to manage and distribute." *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1051 (2d Cir. 1997) (quoting *Lally v. Catskill Airways, Inc.*, 198 A.D.2d 643, 603 N.Y.S.2d 619, 621 (3d Dep't 1993)).

Measured against these factors, the separateness Lolcow now asserts is illusory. Moon alone directs each entity and makes every decision for it. Tewson Dec, ¶¶ 27-29. He runs the monetization of both Kiwi Farms and Mad At The Internet through a single payment processor, Tewson Dec, ¶¶ 22-26, and shifts money contributed to one entity to another at his sole discretion, routing donations through GiveSendGo and re-characterizing them as "donation[s]" between his own ventures. Tewson Dec, ¶¶ 22-26. By his own account, Mad At The Internet exists to "launder [Kiwi Farms] content into something monetizable," Fig. 1, *supra*—a candid description of two nominal entities operated as a single revenue stream. There is, in short, no separateness here that Moon himself respects: he intermingles the entities' content, funds, and proceeds, and holds each out to the public as an extension of himself. On this record, as the Second Circuit recognized on materially similar facts, to regard Moon "as anything but the ... controlling person" of each entity "would be to exalt form over substance." *Freeman*, 119 F.3d at 1052.

The consequence for Lolcow's motion is straightforward. Because the named entities are alter egos of Moon and of one another, they "are treated as one entity" for purposes of this dispute.

26

*Passalacqua*, 933 F.2d at 143. Lolcow cannot defeat the subpoenas by parsing which nominal entity purportedly operates the server, hosts the challenged posts, or holds the account at issue: each is Moon, and Moon is each. Any objection that depends on the formal distinctness of "Lolcow, LLC," Kiwi Farms, the United States Internet Preservation Society, or Mad At The Internet therefore fails at the threshold, and supplies no basis to quash.

2. <u>Any demand for fees or allegation of copyright misuse is premature, deficient, and unsupported by the record.</u>

Lolcow's demand for fees and costs under Section 512(f), the copyright misuse doctrine, and Rule 45(d)(1) are each premature, legally deficient, and unsupported by the record.

First, Section 512(f) imposes liability only where a party "knowingly or materially misrepresents" that material is infringing or that it was mistakenly removed. *See* 17 U.S.C. § 512(f). The standard is not negligence or error or disagreement about fair use: it is knowing, subjective misrepresentation. *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1153 (9th Cir. 2016). Lolcow has identified no such misrepresentation; Ms. Fong-Jones holds a registered copyright in the works at issue, submitted a compliant declaration attesting to such, and sought narrowly-tailored subpoenas within the framework of 17 U.S.C. § 512(h), precisely the conduct that the statute contemplates and protects. Lolcow's disagreement with Ms. Fong-Jones's position on fair use does not transform her position into a knowing misrepresentation, and its conclusory invocation of Section 512(f), wholly unsupported by any factual showing or scienter, must be rejected.

Likewise, copyright misuse is an affirmative defense to a claim of infringement that must be proven, not a ground to quash a subpoena. *See Practice Mgmt Inf. Corp. v. American Medical Ass'n*, 121 F.3d 516, 520 (9th Cir. 1997) (copyright misuse is an affirmative defense). Copyright misuse does not void the copyright, create affirmative relief, or provide grounds for a collateral attack on Section 512(h) subpoenas, as the subpoena does not enforce the copyright against an alleged infringer; it merely compels identification of the alleged infringers. Whether Ms. Fong-Jones ultimately prevails

27

upon a potential copyright claim against an alleged infringer is a merits question that is not to be determined at this stage of the proceedings.

Third, Rule 45(d)(1) requires a court to sanction a party or attorney responsible for issuing and serving a subpoena that imposes an undue burden; the rule is directed at abusive subpoena conduct, such as overbroad demands, harassment, or bad faith. Rule 45(d)(1) is not a fee shifting mechanism triggered because the subpoena recipient disagrees with or otherwise opposes the subpoena. Lolcow cannot convert subpoenas validly issued pursuant to a statutory scheme enacted by Congress into abusive conduct by filing challenges to them.

Finally, Lolcow's memorandum contains inflammatory accusations about Ms. Fong-Jones (that are then repeated by the Does) that are not only false (as already determined by another court) but wholly immaterial to any question presented in the pending motions. Ms. Fong-Jones has repeatedly and publicly addressed the accusations leveled against her and declines to dignify the accusations with further response in this proceeding, as they bear no relationship to the legal issues before the Court and are made solely to attempt to impose reputational costs on Ms. Fong-Jones for daring to enforce her copyright. Ms. Fong-Jones is not dissuaded by the attempt, and any fair-minded reader truly interested in her response to Movants' slanders can simply read her original posts, at the link given above, and judge for themselves.

       3.    <u>Lolcow's objections to the subpoenas were inadequate, but Ms Fong-Jones does not rely on waiver.</u>

As Ms. Fong-Jones noted in the meet and confer, Lolcow did not properly raise its objections in its counsel's rambling response to the subpoenas. But the objections' initial inadequacy is beside the point given that, as shown herein, they are also meritless.

**J.    Lolcow's motion for a preliminary injunction (D.I. 34 & 35) should be denied.**

By the same papers, Lolcow separately moves under Rule 65 to enjoin Ms. Fong-Jones from sending any further § 512(c)(3) takedown notices or seeking any further § 512(h) subpoenas directed

at the photograph "or non-substantively modified versions" of it used in "materially similar critical commentary," and to compel withdrawal of pending notices, all pending resolution of Lolcow's declaratory-judgment claim. D.I. 35 at 22–24. The motion should be denied. It asks this Court to bar a copyright owner from invoking the very federal mechanisms Congress created to address online infringement—on a record that, by Lolcow's own characterization, presents at most "serious questions" regarding fair use (see D.I. 31 at 32). A movant seeking that extraordinary relief must satisfy each *Salinger/eBay* factor. *Salinger v. Colting*, 607 F.3d 68, 79–82 (2d Cir. 2010). Lolcow satisfies none.

1.    Lolcow cannot show a likelihood of success, and it has not even placed the challenged posts in evidence.

The first and most important factor is likelihood of success on the merits. *Salinger*, 607 F.3d at 79–80. Lolcow must show that *it* is likely to obtain a declaration that the challenged uses are fair. For the reasons set out in § 3 *supra*, it cannot: the posts use Ms. Fong-Jones's headshot for the original's depict-and-identify purpose, direct their commentary at the **subject** rather than the **work**, and in two instances reproduce the photograph verbatim – none of which is "apparent," let alone clear, fair use under *BWP Media* and *Warhol*. Because Lolcow seeks in part a *mandatory* injunction – withdrawal of pending notices – it must make a "clear" or "substantial" showing of likelihood of success. *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995). It cannot meet the ordinary standard on a contested defense, much less the heightened one. The shortfall is underscored by Lolcow's own motion, which never puts the challenged posts before the Court, offering instead to "submit, if the Court wishes, a declaration reproducing the posts." D.I. 35 at 12. A movant that has not introduced the very works whose fair-use status it asks the Court to predetermine has not carried its burden on any factor.

29

2.    Lolcow's own "serious questions" argument defeats the bad-faith and § 512(f) premises on which the motion rests.

Lolcow's fallback is that, even absent a likelihood of success, it raises "serious questions going to the merits." D.I. 35 at 15. That concession is fatal to the theory underlying the injunction. Lolcow asks the Court to brand Ms. Fong-Jones's notices and subpoenas as bad-faith "sham" process stripped of *Noerr-Pennington* protection, D.I. 35 at 9–10 (invoking *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993)), and as actionable misrepresentations under § 512(f). But the sham exception reaches only petitioning that is "objectively baseless" – such that "no reasonable litigant could realistically expect success on the merits." *PRE*, 508 U.S. at 60. A party that in the same breath argues the fair-use question is a "serious question" making it "fair ground for litigation" has conceded that a reasonable litigant could expect to prevail; the two positions cannot coexist. For the same reason, § 512(f), which requires a *knowing material misrepresentation*, judged on a subjective standard, cannot be satisfied by a good-faith assertion of infringement over conceded copying where fair use is genuinely disputed. *See Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1153 (9th Cir. 2016) (Smith, J., *concurring*). Lolcow cannot convert a contested defense into bad faith by repetition.

The Crawley and Hahn[15] declarations (D.I. 30-6, 30-7), on which Lolcow's "retaliatory purpose" narrative depends, do not change this. They concern **other** individuals and, by Lolcow's own account, **noncopyrighted** commentary; they say nothing about whether **these** uses of **this**

---

[15] It is worth noting that Ms. Fong-Jones **did not** "dox" Hahn, despite having sent him a cease and desist letter; he remained publicly anonymous until he unmasked himself in this filing. That utterly belies the claim that Ms. Fong-Jones is hell-bent on doxing Kiwi Farms users as such. Crawley, in contrast, was publicly named because he was abusing Ms. Fong-Jones from within her industry and urging real-life harassment that, *in his own words*, he hoped would drive her to suicide, and therefore making others aware of that was important for Ms. Fong-Jones's personal safety. Ms. Fong-Jones has no reason to believe that any of the Doe Users are within her industry or otherwise imperil her personal safety and, regardless, Section 512(h) already bars her from using the discovered information for any exogenous purpose. For that very reason, she has repeatedly indicated her consent to entry of a protective order barring any such exogenous use. Were Movants truly concerned about such use, rather than flailing about for any excuse to avoid an infringement suit by maintaining the Doe Users' anonymity, they would have leapt at that offer. The Court can readily gather why they have refused to do so.

registered photograph infringe. Subjective motive is not a Section 107 factor, and it can neither convert an objectively infringing use into a fair one nor supply the objective baselessness the sham exception independently requires. The accusations are immaterial to the questions presented.

3. <u>Lolcow shows no irreparable harm: the pending motions to quash and § 512(g) supply the remedy, and no disclosure can occur before this Court rules.</u>

*Salinger* forecloses any presumption of irreparable harm in a copyright case and demands an actual equitable showing. 607 F.3d at 77–78, 82. Lolcow's asserted harms – removal of speech and loss of anonymity – are neither imminent nor irreparable on this record. No Section 512(h) subpoena compels disclosure of anyone's identity automatically: the subpoena's validity is the subject of the very motions to quash now before the Court, and no identifying information will issue unless and until the Court so orders. The risk Lolcow describes is thus addressed by the adversarial process Lolcow is already invoking, not by a prophylactic injunction against future filings. As for takedowns, Congress supplied the remedy: Section 512(g) lets a user file a counter-notification and obtain restoration unless the claimant sues. Lolcow protests that counter-notification requires the speaker to provide contact information and consent to suit, 17 U.S.C. § 512(g)(3)(D); D.I. 35 at 18 – but that is a feature of the statutory scheme Congress enacted, not an irreparable injury inflicted by Ms. Fong-Jones. The remaining harm Lolcow identifies – the burden of "responding to serial notices and subpoenas," D.I. 35 at 18–19 – is litigation cost, which is ordinarily not irreparable. And the posts Lolcow most wants restored are completely under its own power, having been deceptively hidden but not taken down, see § 2 *supra*; there is thus no live removal for the injunction to prevent.

4. <u>The balance of hardships and the public interest favor denial.</u>

The hardship Lolcow would impose on Ms. Fong-Jones is severe: an injunction would strip a copyright owner of the only mechanisms – the § 512(c)(3) notice and the § 512(h) subpoena – that Congress made available to confront anonymous online infringement, where the infringers cannot otherwise be identified or sued. Lolcow's claimed hardship, by contrast, is the burden of litigating in

31

a forum *it* selected by filing this declaratory-judgment action. The public interest likewise favors

denial. Lolcow's "private censorship" framing assumes the very conclusion – that the uses are fair –

that it has not established and that remains (at best for Lolcow) genuinely contested. Where copying

is conceded and fair use is disputed, the public interest lies in the orderly operation of the § 512

framework and the enforcement of valid copyrights, not in immunizing the contested conduct by

judicial fiat. The decisions Lolcow musters – *Beyond Blond*, *Amaretto Ranch*, and *Design Furnishings* – are

out-of-circuit district-court orders that enjoined takedown activity only after the copyright claims

were found **unlikely to succeed**; they presuppose the merits showing Lolcow cannot make here.

     5.    <u>The proposed injunction is an impermissible prior restraint on petitioning and is too vague to satisfy Rule 65(d).</u>

The relief requested is independently improper. Lolcow asks the Court to enjoin Ms. Fong-

Jones from **applying** for future § 512(h) subpoenas and from *sending* future DMCA notices – that is,

to bar a litigant in advance from resorting to court process and a congressionally authorized remedy.

Enjoining prospective petitioning is an extraordinary measure, and it sits in obvious tension with the

right to petition Lolcow elsewhere invokes. Worse, the order's operative terms – barring notices and

subpoenas directed at "non-substantively modified versions" of the photograph used in "materially

similar critical commentary," D.I. 35 at 22–23 – would require the Court to adjudicate, in advance

and in the abstract, the fair-use status of unidentified future posts, and would leave Ms. Fong-Jones

to guess at the boundary between permitted and forbidden enforcement on pain of contempt. An

injunction must "state its terms specifically" and "describe in reasonable detail … the act or acts

restrained." Fed. R. Civ. P. 65(d)(1). A decree keyed to whether hypothetical future uses are

"materially similar" fair use cannot meet that command. The All Writs Act, 28 U.S.C. § 1651(a),

which Lolcow invokes as a backstop, D.I. 35 at 9, supplies no greater authority; it does not empower

a court to enjoin conduct that another federal statute expressly authorizes.

6.   <u>No evidentiary hearing is required.</u>

Lolcow's request for an evidentiary hearing on Ms. Fong-Jones's "motive" should be denied. A hearing is unnecessary where the motion fails as a matter of law on facts that are undisputed or conceded – copying is admitted, D.I. 32 §§ 2.5.1–2.5.6, and the fair-use defense is contested on the face of the posts. Ms. Fong-Jones's subjective motive is legally irrelevant: it neither converts an infringing use into a fair one nor supplies the objective baselessness the sham exception requires. See subpart B *supra*. Testimony about the Crawley and Hahn episodes would shed no light on the only questions that matter – whether these uses of this photograph are fair, and whether Ms. Fong-Jones's *prima facie* showing supports identification. And a preliminary-injunction motion is not a vehicle to try collateral grievances.

**CONCLUSION**

For the foregoing reasons, the motions to quash (D.I. 30 and D.I. 32) should be denied, and Lolcow's motion for a preliminary injunction (D.I. 34 / 35) should be denied. In the alternative, the Court should order production of live identifying information subject to reasonable conditions, rather than quash.

Dated: June 22, 2026
    New York, New York

Respectfully submitted,

**KAMERMAN, UNCYK, SONIKER & KLEIN, P.C.**

By: <u>/s/ Lane A. Haygood</u>
Lane A. Haygood
1700 Broadway, 16th Floor
New York, New York 10019
Tel: (646) 845-6085
lhaygood@kusklaw.com

Counsel for Defendant Zhen Elizabeth Fong-Jones

33

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2026, I electronically filed the foregoing document with the Clerk of this Court using the District Court's CM/D.I. system. I further certify that a true and correct copy of the foregoing, together with its attachments, will be served on all parties and counsel of record through the Notices of Electronic Filing system implemented by the District Court's CM/D.I. system.

/s/ Lane Haygood
Lane A. Haygood