**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| LOLCOW LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:26-cv-02059-KPF |
| | ) | |
| ZHEN ELIZABETH FONG-JONES, | ) | |
| | ) | |
| Defendant. | ) | |

---

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF
LOLCOW LLC'S MOTION TO QUASH SUBPOENAS, OR IN THE ALTERNATIVE
FOR A PROTECTIVE ORDER, AND FOR ATTORNEYS' FEES AND COSTS**

---

Matthew D. Hardin
Attorney Reg. No. 5899596
Hardin Law Office
101 Rainbow Drive # 11506
Livingston, TX 77399
Phone: 212-680-4938
Email: MatthewDHardin@gmail.com

*Counsel for Lolcow LLC*

i

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT ................................................................................................................... 2

    I. THE COUNTERCLAIM AND THE OPPOSITION'S OWN ADMISSIONS CONFIRM THAT THE SUBPOENAS EXCEED THE PURPOSE OF § 512(h). ...................................... 2

        A. Section 512(h) authorizes identification of infringers so that rights may be enforced against them; it is not a general discovery device. ................................................... 2

        B. Fong-Jones has now sued the party alleged to be responsible for every accused display. 3

        C. The opposition admits the Does' identities are sought for their value as witnesses in this litigation. ....................................................................................................................... 4

    II. FONG-JONES TAKES IRRECONCILABLE POSITIONS ON WHAT LOLCOW IS, AND THE CONTRADICTION INDEPENDENTLY DEFEATS ENFORCEMENT. ............. 5

    III. THE SUBPOENAS' "COMMON ENTERPRISE" SCOPE RESTS ON A THEORY FONG-JONES REFUSES TO PLEAD, AND THE SWORN RECORD NOW REFUTES IT. 7

        A. The subpoenas reach entities and records that § 512(h) and Rule 45 cannot reach. .......... 7

        B. Fong-Jones had the enterprise theory fully drafted, and declined to plead it. .................... 8

        C. The sworn record refutes the theory on the merits. ............................................................. 9

    IV. THE "CONTINUED AVAILABILITY" SHOWING DEPICTS A COMPLIANT PROVIDER, NOT A CONCEALED INFRINGEMENT. ......................................................... 10

        A. The posts identified in the notices to the takedown module were suppressed in one to two days, and nothing has been restored. ...................................................................................... 10

        B. The February material is openly contested in this very action; its availability is a litigated position, not a processing failure. ............................................................................................... 11

        C. The orphaned files at unlisted URLs are an artifact of preserving users' § 512(g) rights, and the moment a notice finally identified them, they were blocked within three hours. ..... 11

        D. Barnes does not help the opposition. .................................................................................... 13

    V. TAKEN TOGETHER, THE *ARISTA* FACTORS FORBID UNMASKING ON THIS RECORD. .......................................................................................................................... 14

    VI. THE TRANSACTOR-INFORMATION DEMAND IS ASSET DISCOVERY, NOT IDENTIFICATION, AND LOLCOW DOES NOT POSSESS WHAT IT SEEKS. ................. 16

    VII. FAIR USE CAN NOW BE ASSESSED ON A RECORD THE MOVANTS COMPLETED, AND IT IS APPARENT. ................................................................................. 18

        A. The record objection is gone: every challenged post is in evidence. ............................... 18

        B. On that record, the uses are classic commentary, and several target the photograph itself. ............................................................................................................................................. 18

        C. The opposition's authorities are not to the contrary. ........................................................... 19

VIII. THE OPPOSITION'S OWN USE OF THE MAY 14 CONFERENCE DISPOSES OF ITS CONFIDENTIALITY OBJECTION. ................................................................................ 20

IX. SUBSTANTIAL PORTIONS OF THE TEWSON DECLARATION SHOULD BE DISREGARDED. ................................................................................................................ 21

X. SERVICE OF THE EMAILED SUBPOENAS REMAINS DEFECTIVE. ........................ 21

XI. THE REQUEST FOR FEES AND COSTS SHOULD BE PRESERVED. ....................... 22

CONCLUSION ........................................................................................................................ 22

## TABLE OF AUTHORITIES

**Cases**

*Arista Records LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ......................................... 7, 14, 16, 21

*Barnes v. YouTube, Inc.*, No. 25-cv-05901-VKD, 2026 WL 412470
(N.D. Cal. Feb. 13, 2026) ................................................................................................... 13

*BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395 (S.D.N.Y. 2016) .......... 19

*Dhillon v. Doe*, No. C 13-01465 SI, 2014 U.S. Dist. LEXIS 24676 (N.D. Cal. Feb. 25, 2014) .. 18

*Freeman v. Complex Computing Co.*, 119 F.3d 1044 (2d Cir. 1997) ........................................... 10

*Griner v. King*, 104 F.4th 1 (8th Cir. 2024) .................................................................................. 19

*Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34 (S.D.N.Y. 2017) ....................................................... 18

*In re Charter Commc'ns, Inc., Subpoena Enforcement Matter*, 393 F.3d 771 (8th Cir. 2005) ...... 3

*In re DMCA Section 512(h) Subpoena to YouTube (Google, Inc.)*,
581 F. Supp. 3d 509 (S.D.N.Y. 2022) ........................................................................................ 15

*In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875 (N.D. Cal. 2020) ............................ 15

*In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868 (N.D. Cal. 2022) ...... 15, 22

*Katz v. Google Inc.*, 802 F.3d 1178 (11th Cir. 2015) ................................................................... 18

*Maximized Living, Inc. v. Google, Inc.*, 2011 WL 6749017 (N.D. Cal. Dec. 22, 2011) .............. 14

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ........................................................... 15

*MCM Grp. 22 LLC v. Perry*, 818 F. Supp. 3d 623 (S.D.N.Y. 2026) ............................................ 19

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ............................................................................. 6

*North Jersey Media Group Inc. v. Pirro*, 74 F. Supp. 3d 605 (S.D.N.Y. 2015) .......................... 19

*NXIVM Corp. v. Ross Inst.*, 364 F.3d 471 (2d Cir. 2004) ............................................................. 20

*Philpot v. Independent Journal Review*, 92 F.4th 252 (4th Cir. 2024) ........................................ 20

*Romanova v. Amilus Inc.*, 138 F.4th 104 (2d Cir. 2025) ............................................................... 19

*Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229
(D.C. Cir. 2003) ............................................................................................................................ 3

*Shaykhoun v. Daily Mail*, No. 1:24-cv-09978 (ALC), 2026 U.S. Dist. LEXIS 40950 (S.D.N.Y.
Feb. 26, 2026) ............................................................................................................................. 18

*Sony Music Entm't Inc. v. Does 1–40*, 326 F. Supp. 2d 556 (S.D.N.Y. 2004) ............................ 14

*Taylor v. Sturgell*, 553 U.S. 880 (2008) ....................................................................................... 21

*PRL USA Holdings, Inc. v. U.S. Polo Ass'n*, 520 F.3d 109 (2d Cir. 2008) .................................. 20

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131 (2d Cir. 1991) 9, 10

**Statutes**

17 U.S.C. § 512(c) ............................................................................................. 5, 7, 12, 13, 22

iv

17 U.S.C. § 512(g) ...................................................................................................... 10, 11, 12

17 U.S.C. § 512(h) .......................................................................................................... passim

**Rules**

Fed. R. Civ. P. 11 ................................................................................................................ 8

Fed. R. Civ. P. 26 ............................................................................................. 1, 4, 5, 15, 16

Fed. R. Civ. P. 30 ............................................................................................................... 4

Fed. R. Civ. P. 45 ....................................................................................................... passim

Fed. R. Evid. 408 ............................................................................................................. 20

Fed. R. Evid. 602 ............................................................................................................. 21

Fed. R. Evid. 701 ............................................................................................................. 21

**PRELIMINARY STATEMENT**

Fong-Jones' opposition was supposed to explain why three clerk-issued subpoenas should be enforced. Instead, between the filing of Lolcow's motion and the completion of briefing, Fong-Jones answered three questions this Court would otherwise have had to guess at, and each answer is fatal to the subpoenas.

First, Fong-Jones sued Lolcow. The June 26 counterclaim alleges that Lolcow itself, at Joshua Moon's direction, reproduced, publicly displayed, and distributed the photograph at issue, that Moon "personally caused" that conduct, and that both are liable for it. ECF 51 ¶¶ 28–33, 34–45. Section 512(h) exists to solve one problem: a copyright owner unable to protect copyright rights because the infringer is unknown. Whatever force that premise once had here, it is gone or materially diminished: Fong-Jones has now identified the party that is alleged to be responsible for every accused display and has sued that party, in this case, before this Court. Yet somehow Fong-Jones still wants to sidestep the ordinary discovery process and make use of ex parte subpoenas.

Second, Fong-Jones' counsel swore to what the subpoenas are actually for. The fair use analysis in this litigation, he attests, "would likely require testimony or evidence from the Doe Users themselves." ECF 42-4 ¶ 6. The opposition brief repeats it: "Plaintiff's theory of fair use necessarily requires the testimony of the Doe Users," who "must be produced in this action for deposition and cross-examination regardless." ECF 42 at 5–6. That is a description of witnesses. Congress did not create the § 512(h) subpoena so that parties to pending litigation could identify and secure the other side's witnesses without a Rule 26(f) conference, without proportionality limits, and without judicial supervision.

1

Third, Fong-Jones defended the subpoenas' remarkable sweep, which reaches the webpages of two entities that appear in no pleading and demands "Transactor Information" down to cryptocurrency addresses, money orders, and cashier's checks, on a "common enterprise" theory sworn out by a paralegal. Four days after that declaration was signed, Fong-Jones filed a counterclaim that conspicuously declines to plead the factual basis or legal theory upon which the subpoenas rest. A subpoena's definitions section is not a substitute for a pleading, and the mismatch confesses the subpoenas' improper scope.

The balance of the opposition is hand-wringing. Fong-Jones asks the Court to dislike a website and its operator, and to let distaste stand in for analysis. The motion should be granted.[1]

## ARGUMENT

## I.    THE COUNTERCLAIM AND THE OPPOSITION'S OWN ADMISSIONS CONFIRM THAT THE SUBPOENAS EXCEED THE PURPOSE OF § 512(h).

### A.    *Section 512(h) authorizes identification of infringers so that rights may be enforced against them; it is not a general discovery device.*

The structure of § 512(h) is purpose-built and purpose-limited. A copyright owner may request a subpoena "to identify an alleged infringer," 17 U.S.C. § 512(h)(1); the request must be supported by a sworn declaration that the purpose for which the subpoena is sought is to obtain the identity of an alleged infringer, and that the information "will only be used for the purpose of protecting rights" under the Copyright Act, *id.* § 512(h)(2)(C); and the subpoena itself may command only "information sufficient to identify the alleged infringer of the material described in

---

[1] Lolcow has reviewed the Subpoena Subjects' reply in support of their own motion to quash, ECF 58, and, to avoid burdening the Court with duplicative briefing, joins in and adopts by reference the mootness analysis in Part 2.1 and the post-by-post fair-use analysis in Part 2.2 of that submission, to the extent consistent with the positions stated herein.

the notification." *Id.* § 512(h)(3). Because the Clerk issues the subpoena without any judicial screening, *id.* § 512(h)(4), the statutory purpose limitation is the only safeguard the scheme contains, and courts enforce it. *Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229 (D.C. Cir. 2003); *In re Charter Commc'ns, Inc., Subpoena Enforcement Matter*, 393 F.3d 771 (8th Cir. 2005). Fong-Jones swore, three times, that identification of infringers was the subpoenas' sole purpose. ECF 12-1; ECF 14-1; ECF 16-1.

### B.    *Fong-Jones has now sued the party alleged to be responsible for every accused display.*

The premise of a § 512(h) subpoena is a rights-holder who cannot act because the infringer is unknown. That premise is gone. Fong-Jones' counterclaim alleges that Lolcow itself "reproduced, publicly displayed, and distributed" the photograph, that its servers "stored and transmitted" it, that it "declined to remove" it after notice, and that Moon, as Lolcow's alter ego, is jointly and severally liable. ECF 51 ¶¶ 28–33; ECF 56 at 1–2 (so characterizing the counterclaim). The third-party complaint likewise proceeds against the Doe Users by pseudonym, ECF 54, which is itself a concession that Fong-Jones can assert and preserve every available claim without pre-discovery unmasking.

Fong-Jones is not a rights-holder locked out of court, but a litigant in the middle of an actively prosecuted case, with a named defendant alleged to be liable for the same displays the subpoenas concern, and pseudonymous third-party defendants already sued. Whatever work *ex parte* identification might once have accomplished, the counterclaim now does. What remains for the subpoenas to accomplish is the ordinary work of discovery, which Fong-Jones wishes to pursue outside the ordinary rules.

3

### C.     The opposition admits the Does' identities are sought for their value as witnesses in this litigation.

Lolcow's motion argued that the subpoenas serve a litigation-discovery purpose rather than an identification purpose. ECF 30-1, Part I. The opposition's response concedes that point. The Does' subjective intent "is directly relevant to the fair use inquiry," their testimony is "necessarily require[d]" by "Plaintiff's theory of fair use," and they "must be produced in this action for deposition and cross-examination regardless." ECF 42 at 5–6; ECF 42-4 ¶ 6. Counsel's declaration adds that Fong-Jones offered to withdraw the subpoenas in exchange for, among other things, the Does' "stipulation to personal jurisdiction in this District" and "acceptance of service by email." ECF 42 at 6 n.7. Identification of an infringer does not require a jurisdictional stipulation. Securing a witness's testimony does.

What is dispositive here is that Fong-Jones' own papers state the purpose for the subpoenas, and the purpose they state is testimony, depositions, cross-examination, jurisdictional stipulations, and service mechanics. Deposition discovery from anonymous non-parties in pending litigation is the work of Rules 26, 30, and 45, subject to proportionality, relevance, and protective orders, and supervised by a judge. It is not the work of a subpoena issued by the Clerk *ex parte* on a one-sided sworn application. The opposition's own architecture makes this worse, not better: it insists that "Section 512(h) operates entirely outside of Rule 26, as a standalone statutory mechanism" not "governed by Rule 26(d)'s timing restrictions." ECF 42 at 21. Exactly so. A device that operates entirely outside the discovery rules cannot be permitted to do the work of the discovery rules, or every declaratory-judgment defendant with a registration certificate could conduct merits discovery against a plaintiff's witnesses from the Clerk's office. The statutory purpose limitation, § 512(h)(2)(C), is what stands between the DMCA and that result.

4

None of this leaves Fong-Jones without recourse. Fong-Jones has answered the Complaint and counterclaimed, ECF 51; the case is at issue; and the Rule 26(f) conference and a case management plan are imminent. In a matter of weeks, Fong-Jones will have every discovery device the Federal Rules provide: document requests, Rule 45 subpoenas, depositions, etc. Lolcow will comply with whatever the Rules require. Fong-Jones offers no reason why this dispute should be litigated in the awkward posture of clerk-issued statutory process rather than through the ordinary, judicially supervised discovery that is about to open in any event. The subpoenas, in short, now sit in the wrong procedural box. Fong-Jones has pleaded claims in this action, including against Doe defendants. Discovery from, about, or against those persons is governed by Rule 26's sequence and supervised by this Court. Section 512(h) is not a parallel discovery track on which a litigant may obtain witness identities, jurisdictional concessions, and the like before the Rule 26(f) conference. The point is not that Fong-Jones may never learn anything; it is that the path chosen is the one path the statute does not permit, chosen at the precise moment it became least necessary.

## II.     FONG-JONES TAKES IRRECONCILABLE POSITIONS ON WHAT LOLCOW IS, AND THE CONTRADICTION INDEPENDENTLY DEFEATS ENFORCEMENT.

Every § 512 notice and every § 512(h) subpoena in this case rests on a single factual predicate: that Lolcow is a "service provider" hosting material "at the direction of a user." 17 U.S.C. § 512(c)(1), (c)(3)(A), (h)(1), (h)(4)–(5). Fong-Jones' takedown notices invoked § 512(c). Fong-Jones' subpoena applications invoked § 512(h). The service theory depends on the same premise: Fong-Jones defends emailing two subpoenas to Lolcow's DMCA-designated agent on the ground that § 512 "supplies its own delivery mechanism" to the service provider. ECF 42 at 24.

Fong-Jones' counterclaim now pleads the opposite. It alleges that Lolcow "itself reproduced, publicly displayed, and distributed the photograph," that hosting user images on Lolcow's hardware is the forum's "official policy," and that the accused conduct is Lolcow's own volitional act rather than passive, user-directed storage. ECF 56 at 1–2; ECF 51 ¶¶ 31, 36. The July 1 letter is explicit: "Every time Lolcow's servers deliver the photograph to a viewer, Lolcow—not the uploading user—performs the act of public display and distribution." ECF 56 at 1–2.

These positions are not alternative theories of the same facts; they are contradictory accounts of who causes the display. If a DMCA subpoena can be issued to Lolcow, then Lolcow cannot be a direct infringer. A litigant cannot tell the Clerk that the sole purpose of the process is to identify infringers, and then tell this Court that the same identities are needed for deposition testimony, cross-examination, and jurisdictional stipulations in pending litigation.

Judicial estoppel applies where a party's later position is "clearly inconsistent" with its earlier one, where the party succeeded in having a tribunal accept the earlier position, and where the party would derive an unfair advantage absent estoppel. *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001). Fong-Jones' positions here are flatly inconsistent. The earlier position procured three clerk-issued subpoenas on sworn applications, ECF 13, 15, 17, and the advantage sought is obvious: Fong-Jones wants the coercive benefits of the service-provider framework, automatic clerk-issued subpoenas and agent service, while simultaneously pleading, for damages purposes, that the framework's factual predicate is false. Subpoenas issued under § 512(h) rest on a sworn statement of purpose. Here, the applicant's own subsequent pleadings undermine that statement.

Fong-Jones will say that litigants may plead in the alternative. So they may. But the § 512(h) applications were not pleadings in the alternative; they were sworn declarations of fact,

made to obtain compulsory process without judicial screening. A party may not swear to one account of the facts to extract process from the Clerk and plead the contrary account to extract damages from a jury, while asking the Court to enforce both at once. At minimum, the contradiction eliminates any presumption of regularity or good faith the opposition asks this Court to indulge, and it independently supports quashing the subpoenas under the *Arista* framework.

## III.    THE SUBPOENAS' "COMMON ENTERPRISE" SCOPE RESTS ON A THEORY FONG-JONES REFUSES TO PLEAD, AND THE SWORN RECORD NOW REFUTES IT.

### A.    *The subpoenas reach entities and records that § 512(h) and Rule 45 cannot reach.*

The subpoenas define "Kiwi Farms" to include "any webpages for the United States Internet Preservation Society and/or the podcast 'Mad at the Internet,'" ECF 17 (Definition 5), and they demand "Transactor Information" embracing "credit card or debit card information," "cryptocurrency addresses," and "information from cashier's checks, money orders, certified checks," together with "any other information related to the transaction." *Id.* (Definition 15). Section 512(h) authorizes none of this. The statute reaches "the service provider" to which the notification was directed, § 512(h)(2)(A), (h)(4), and it reaches only "information sufficient to identify the alleged infringer of the material described in the notification." § 512(h)(3). USIPS is not alleged, anywhere, by anyone, to be a service provider. Neither is Mad at The Internet LLC. Neither hosts the Kiwi Farms Internet forum. Neither received a § 512(c)(3) notification. A statutory device addressed to "the service provider" cannot become a warrant to inventory the affairs of every venture its principal owns or even nonprofits to which he volunteers time.

7

Rule 45 does not fill the gap. A subpoena to Lolcow reaches documents within Lolcow's "possession, custody, or control." Fed. R. Civ. P. 45(a)(1)(A)(iii). Fong-Jones has made no showing that Lolcow possesses or controls the corporate records of two separate entities, and the sworn record is now to the contrary: each entity maintains its own separate bank account, and funds are not commingled among them. Moon Reply Decl. ¶¶ 23–25. The subpoenas' drafting choice, defining the target's name to include other companies, is a tell. Parties who have a basis to obtain discovery from an entity subpoena that entity. Parties who do not, redefine words.

### B.    *Fong-Jones had the enterprise theory fully drafted, and declined to plead it.*

The opposition defends the extraordinary sweep of the subpoenas with three paragraphs of the Tewson Declaration and a section heading announcing that "[a]ll named entities are operated as a common enterprise." ECF 42 at 25–27; ECF 42-3 ¶¶ 27–29. But claims are made in pleadings, where Rule 11 attaches, not in declarations appended to discovery briefs. The chronology here is unusually clarifying. The Tewson Declaration was executed on June 22. Four days later, on June 26, Fong-Jones filed the counterclaim. With the enterprise theory drafted, sworn, and filed on the public docket, Fong-Jones pleaded alter ego in one direction only: "Lolcow is the alter ego of Joshua Moon." ECF 51 ¶¶ 28–33. Mad at The Internet LLC appears nowhere in the counterclaim. USIPS appears nowhere in the counterclaim. When it came time to make allegations subject to Rule 11, the four-entity "enterprise" shrank to one LLC and its member.

That choice has consequences. Discovery follows claims; claims do not follow discovery. Fong-Jones cannot decline to allege a common enterprise in pleadings, and then demand that this Court enforce subpoenas whose scope only a common-enterprise finding could justify. If a good-faith pleading could allege that USIPS and MATI are alter egos of Lolcow, the counterclaim was the opportunity to make it. Fong-Jones passed on it.

8

### C.    *The sworn record refutes the theory on the merits.*

Even treated as evidence rather than as a substitute for pleading, the Tewson material fails. Under *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991), the separateness inquiry turns on factors such as intermingling of funds, common bank accounts, arm's-length dealing, and observance of corporate formalities. The record on those factors now contains specific, sworn testimony from the one person with actual knowledge: Lolcow LLC is a West Virginia limited liability company; Mad at The Internet LLC is a separate Wyoming limited liability company; USIPS is a South Dakota 501(c)(4) nonprofit governed by a three-member board and subject to the legal prohibition on the use of nonprofit resources for private enrichment; each entity maintains its own separate bank account; and funds are not commingled among the accounts. Moon Reply Decl. ¶¶ 23–25. The single blockchain transaction on which the Tewson Declaration builds its "commingling … as a matter of indisputable fact," ECF 42-3 ¶ 28, is an automatic consolidation performed by wallet software on which each entity maintains its own separate deposit addresses; it no more merges two companies than storing two firms' papers in one safe merges them. *Id.* ¶ 26. No GiveSendGo funds were transferred to USIPS. *Id.* ¶ 27. And Moon attests that he does not commingle or launder funds. *Id.* ¶ 28.

What remains is that affiliated ventures share a bank and certain vendors. If that were the test, corporate separateness would not exist in America. Uber and Lyft, head-to-head competitors, process their payments through the same payment processor.[2] JPMorgan Chase does business with more than eighty percent of the Fortune 500;[3] tens of millions of unrelated merchants run their

---

[2] See Stripe, Uber and Stripe Announce Strategic Payments Partnership (May 3, 2023), https://stripe.com/newsroom/news/stripe-and-uber;

[3] JPMorgan Chase & Co., Investor Day Presentation, Ex. 99 to Form 8-K (2019), https://www.sec.gov/Archives/edgar/data/0000019617/000001961719000055/investordaypresent ation.htm (relationships with more than 80 percent of Fortune 500 companies).

payments through PayPal alone.[4] Sharing a financial institution or a payments vendor is a fact about the vendor's market share, not about the customers' corporate governance. The *Passalacqua* factors ask whether entities share *accounts*, intermingle *funds*, and disregard formalities, and on each of those questions the sworn record answers: there are separate accounts, no commingling, no transfers. Moon Reply Decl. ¶¶ 23–25. The cases the opposition itself invokes required domination shown on a developed record, *Passalacqua*, 933 F.2d at 139–43 (jury question on extensive evidence); *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1051–53 (2d Cir. 1997) (owner went even further than dominating and controlling the company). On the record in this case, however, the entities are separate, and the subpoenas' attempt to reach non-parties and non-ISPs fails at the threshold.

## IV.    FONG-JONES' "CONTINUED AVAILABILITY" ALLEGATION DEPICTS A COMPLIANT PROVIDER, NOT A CONCEALED INFRINGEMENT.

### A.    *The posts identified in the notices to the takedown module were suppressed in one to two days, and nothing has been restored.*

The opposition's mootness response rests on what Ms. Tewson saw in a browser on June 8 and June 13. The complete timeline, drawn to the second from preserved business records, is as follows: Lolcow's agent received the March 20 DMCA notice at 4:10 p.m.; the identified posts of two users were suppressed by 10:11:55 a.m. on March 22, approximately 42 hours later, over a weekend, on a forum administered by a single person. Moon Reply Decl. ¶ 4. The March 25 DMCA notice was received at 6:28 p.m.; the identified post was suppressed at 5:27:57 p.m. the next day, approximately 23 hours later. *Id.* ¶ 5. No § 512(g) counter-notification has ever been

---

[4] Chargeflow, PayPal Statistics, https://www.chargeflow.io/blog/paypal-statistics-facts (roughly 35 million merchant accounts).

received, and no suppressed post has ever been restored. *Id.* ¶ 6. This is what compliance looks like. Material necessarily remains stored on Lolcow's own servers without public availability, but that's because the material must remain there in order for the counter-notification process to work. *Id*. ¶ 9.

> **B.      The February material is openly contested in this very action; its availability is a litigated position, not a processing failure.**

Part of what Tewson observed on June 8 is material identified not in any DMCA notice processed through the forum's takedown module but arises from a disputed February 26 letter from Fong-Jones' counsel. As to that material, Lolcow responded in writing on March 2 that the challenged uses are fair, and then brought this declaratory-judgment action to resolve exactly that dispute. *Id*. ¶ 7. A service provider that disputes an infringement claim in writing, tells the rights-holder so, and submits the question to a federal court has not concealed anything; it has done precisely what the Declaratory Judgment Act invites. Section 512's takedown-and-restore procedure is a safe-harbor condition, not a freestanding duty; a provider is entitled to litigate a contested fair-use question and accept the attendant risk. The opposition's attempt to recast the open, disclosed, litigated availability of that material as evidence of bad faith inverts the record.

> **C.      The orphaned files at unlisted URLs are an artifact of preserving users' § 512(g) rights, and the moment a notice finally identified them, they were blocked within three hours.**

Fong-Jones also complains that images remained accessible even though they had never previously been identified in *any* DMCA notice. The remainder of the material Ms. Tewson reports having observed on June 8 consists of thumbnail files residing at direct storage URLs: addresses that are displayed nowhere on the Internet forum, linked from nothing, indexed by nothing, and

retrievable only by a person who recorded the exact URL before suppression. Moon Reply Decl. ¶ 10. The files persist because § 512(g) contemplates restoration upon counter-notification, and restoration is impossible if the material has been destroyed. *Id.* ¶ 9. The statute itself resolves the question the opposition poses: a provider's obligation runs to the "material that is claimed to be infringing," as identified in the notification, with "information reasonably sufficient to permit the service provider to locate the material." 17 U.S.C. § 512(c)(3)(A)(iii). Through June 8, no notice had ever identified a direct storage URL as allegedly infringing; every notice identified posts, and those posts were suppressed. Moon Reply Decl. ¶ 8. When a notice finally did identify two storage URLs, on June 25, after the opposition was filed, Lolcow blocked them at the web-server level within approximately three hours, and they now return HTTP status 451. *Id.* When the DMCA notices finally identified the ostensibly infringing URLs, the files were blocked within hours.

More fundamentally, suppression-with-retention is not a defect in Lolcow's compliance; it is the only way § 512 can function. The statute obligates a provider to "remove[] or disable[] access to" identified material, § 512(c)(1)(C), and simultaneously guarantees the posting user a counter-notification right whose remedy is restoration. § 512(g)(2)–(3). A provider that irreversibly destroyed files on receipt of each notice would make the restoration remedy a dead letter and would hand the notice-sender a power Congress withheld: the power to obliterate contested speech before any adjudication.

In pending litigation, the point is sharper still. The suppressed files are evidence, in a case in which Fong-Jones now seeks damages over these very images. Fong-Jones' two positions on retention are at loggerheads: in one breath Fong-Jones faults Lolcow because "the image files themselves remain hosted on Lolcow's infrastructure," ECF 42 at 8, and in the next it threatens a spoliation motion over any narrowing of what Lolcow retains, ECF 42 at 23 n.14. Lolcow cannot

12

destroy and preserve the same files at once. The statute requires disabling access, not destruction: § 512(c)(1)(C). Retention of nonpublic storage objects for restoration and evidence-preservation purposes is not public display and is not noncompliance; it is compliance plus preservation, and it is exactly what Lolcow did. Moon Reply Decl. ¶ 9.

Fong-Jones also treats a single thumbnail that Ms. Tewson saw on June 13, on one user's "Latest Activity" page, as proof that suppressed material remained publicly available. ECF 42-3 ¶ 9. The explanation is innocuous and relates to software engineering. When Lolcow built its suppression system in March, the text of every suppressed post was replaced with a takedown notice wherever the post might display, but one display path was not suppressed because it consisted of thumbnails rather than original images. These are the small preview images that accompany entries in a user's activity feed. Through that one path, a reduced-size preview could still appear even though the post itself was suppressed everywhere else. The full-size image was never available this way; no one told Lolcow about the oversight before the opposition papers disclosed it; and Moon eliminated it the next day. Moon Reply Decl. ¶¶ 12–13. A promptly corrected display bug for thumbnail images in one corner of the site is not a policy of sham compliance.

### D. Barnes *does not help the opposition.*

The opposition cites *Barnes v. YouTube, Inc.*, No. 25-cv-05901-VKD, 2026 WL 412470 (N.D. Cal. Feb. 13, 2026), for the proposition that removal does not moot a subpoena because damages claims for past infringement survive. ECF 42 at 9. *Barnes* deserves a careful reading, because its facts map the boundary of legitimate § 512(h) practice. There, a *pro se* author sued the anonymous operator of a YouTube channel, the only alleged infringer, and could not serve, proceed against, or recover from that person without learning who he was; the subpoena sought

13

the identity of the account holder and nothing more; and the court denied the Doe's motion to quash because identification was the indispensable predicate to the litigation itself. Every feature that justified the subpoena there is absent here. Fong-Jones has already asserted damages claims, against Lolcow and against the Does by pseudonym. ECF 51; ECF 54. The claimed need is testimony, not the ability to proceed. And the subpoenas seek not identity but the financial anatomy of accounts across three entities. Where the material is down, nothing has been restored, and the claims are already in suit, the only work left for "identification" is the witness-procurement purpose addressed in Part I, which the statute does not countenance. The point is not mootness in any jurisdictional sense. It is that the statutory justification for these subpoenas has expired, or at minimum has materially diminished, as to the disabled posts, *cf. Maximized Living, Inc. v. Google, Inc.*, 2011 WL 6749017 (N.D. Cal. Dec. 22, 2011), and what remains is the purpose the statute does not serve.

## V.    TAKEN TOGETHER, THE *ARISTA* FACTORS FORBID MINISTERIAL UNMASKING ON THIS RECORD.

The five-factor framework of *Arista Records LLC v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010), and *Sony Music Entertainment Inc. v. Does 1–40*, 326 F. Supp. 2d 556 (S.D.N.Y. 2004), asks about the strength of the claim, the specificity and necessity of the request, the availability of alternatives, and the target's expectation of privacy. The opposition was filed before its author filed a counterclaim. The factors are different now.

*Prima facie claim.* The opposition calls this factor uncontested. ECF 42 at 17. It is not: the showing is weakened by apparent fair use, by the registration questions described below, and by the objective evidence, addressed in Part VII, that the notices were generated by a visual-similarity screen rather than by the use-by-use analysis the Fong-Jones Declaration describes. Courts

14

confronting § 512(h) subpoenas aimed at anonymous speakers have quashed them on precisely this ground, where fair use was apparent and the First Amendment interest substantial. *In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868 (N.D. Cal. 2022); *In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875 (N.D. Cal. 2020); *see In re DMCA Section 512(h) Subpoena to YouTube (Google, Inc.)*, 581 F. Supp. 3d 509 (S.D.N.Y. 2022).

*Specificity and need.* The requests are not confined to identification. They demand financial and transactional records, across entities, that could identify no poster of anything, *see* Part VI below, and the opposition's own account of its needs, testimony bearing on fair use, is a need that ordinary discovery in this action will serve under judicial supervision. A need the Rules will lawfully satisfy in weeks is not a need that justifies extraordinary process now.

*Alternative means.* The opposition treats this factor as conceded because the Does cannot otherwise be identified. ECF 42 at 17–18. That framing misstates the question. The alternative to a § 512(h) subpoena is not some other way of Googling the Does; it is the discovery machinery of this very action, in which Fong-Jones is a counterclaim-plaintiff and third-party plaintiff, after the Rule 26(f) conference. The existence of a pending action between represented parties is the paradigmatic alternative means.

*Expectation of privacy and the First Amendment.* Anonymous speech is protected by the First Amendment, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–43 (1995), and the protection extends to speakers whose commentary is caustic or offensive. The opposition's answer has two parts. First, it says infringement is not protected anonymity, ECF 42 at 18, which assumes the fair-use answer. Second, it says Fong-Jones' purposes are benign. The proof offered is a settlement narrative drawn from a conference the opposition elsewhere insists is confidential, ECF 42 at 5–6, 22; see Part VIII below. The other proof is an Attorneys' Eyes Only proposal, ECF 42

15

at 6, whose real significance is the opposite of the one urged: it concedes that measures far short of enforcement of the subpoenas as drafted would satisfy any legitimate interest Fong-Jones retains. Lolcow's motion proposed exactly such a structure. ECF 30-1, Part X. On this record, the balance the *Arista* factors strike tips decisively against enforcement.

One structural observation frames all five factors. This is not the ordinary *Arista* case in which a plaintiff has no defendant and no route into court. Fong-Jones has a named defendant, pseudonymous parties already before the Court, and ordinary discovery about to begin. In that posture, the First Amendment balance is not whether anonymity must yield so that litigation can exist; litigation already exists. The question is whether anonymity must yield now, through clerk-issued process, before Rule 26's safeguards attach. The answer is no.

## VI.    THE TRANSACTOR-INFORMATION DEMAND IS ASSET DISCOVERY, NOT IDENTIFICATION, AND LOLCOW DOES NOT POSSESS WHAT IT SEEKS.

Section 512(h)(3) authorizes "information sufficient to identify the alleged infringer." The subpoenas demand instead the financial anatomy of every transaction "related to" the targeted accounts: card numbers, cryptocurrency addresses, money orders, cashier's checks, and "any other information related to the transaction." ECF 17 (Definition 15). Fong-Jones justifies the demand with the assertion that Lolcow's data-minimization makes financial records "likely to be necessary" to identify the Does. ECF 42 at 23; ECF 42-3 ¶¶ 22–26. The sworn record now answers that assertion in detail.

Contribution checks are mailed by users' banks to a volunteer agent who transcribes only an anonymized identifier and an amount onto a deposit slip, then mails the checks to Lolcow's bank for deposit. Lolcow receives no check images and holds no payor bank information for check contributions; after deposit, the checks and the payor information they bear are held by the banks,

16

not by Lolcow. Moon Reply Decl. ¶¶ 19–20. Premium status on an account is not even evidence that the account's user paid for it, because purchased months may be gifted between users in any distribution. *Id.* ¶ 21. The remaining channels are no different in substance. Single-use tokens issued by third party software resolve to an account once, after which no one, including the forum's operator, can use them to look up any account. *Id.* ¶ 22. Cryptocurrency contributions carry no payor information at all. *Id.* And while the forum accepts European SEPA transfers to a Lolcow account whose bank statements identify the origin of deposits, such a transfer is linkable to a forum account only if the sender happened to reference a BillPay ID, and then only through a lookup in Lolcow's own account records. *Id.*

In short, across every contribution channel, either no payor information exists at Lolcow at all, or the sole identifying step is a lookup in the very account records the subpoenas separately demand. This proves the subpoenas are overbroad at a minimum, and also shows their improper discovery objective. What the sweeping financial demand would actually accomplish is an audit of the finances of Lolcow and two strangers to this case, in service of the enterprise theory Fong-Jones declined to plead. That is not "information sufficient to identify the alleged infringer"; it is discovery in aid of claims that do not exist. If any production is ordered at all, it should be confined to current, live account identifiers for the specific accounts named in the notices, under the Attorneys' Eyes Only [5]protective order described in Lolcow's motion, which the opposition concedes would be acceptable in principle. ECF 42 at 6.

---

[5] Any Attorneys' Eyes Only designation should be limited to counsel of record and should not extend to litigation staff. Kevin Crawley's declaration attests that Ms. Tewson personally participated in publicly identifying him. See ECF 30-6 ¶ 6 *et seq*. An order placing the Doe Users' identities in the hands of the person accused of the most recent harmful public identification would defeat its own purpose.

## VII.    FAIR USE CAN NOW BE ASSESSED ON A RECORD THE MOVANTS COMPLETED, AND IT IS APPARENT.

### A.    *The record objection is gone: every challenged post is in evidence.*

The opposition's master theme is that fair use is a fact-intensive defense that cannot be resolved "on the record before this Court." ECF 42 at 14–16. Whatever force that had in the abstract, the Doe movants eliminated it: they filed every challenged post, and the photograph itself, as exhibits. ECF 33-1 through 33-8. The uses are before the Court in their entirety. Photographs and posts do not require depositions to be read. Where the complete secondary use and the complete original are both in the record, the side-by-side comparison that drives factors one, three, and four can be made now, as courts routinely make it on documentary records.

### B.    *On that record, the uses are classic commentary, and several target the photograph itself.*

The posts fall into the categories the opposition itself charts: verbatim reposts within threads of critical commentary, a tighter crop, a slight visual modification, crops with textual overlays, and a juxtaposition with a film still in a recognized meme format. ECF 42 at 14–15. Courts have repeatedly found the use of a subject's photograph in critical commentary about the subject to be transformative fair use, including where the photo is reproduced wholesale. *Katz v. Google Inc.*, 802 F.3d 1178, 1182–84 (11th Cir. 2015) (unflattering photograph used in blog posts sharply criticizing its subject; fair use as a matter of law); *Dhillon v. Doe*, 2014 U.S. Dist. LEXIS 24676 (N.D. Cal. Feb. 25, 2014); *see also Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34, 39–44 (S.D.N.Y. 2017) (commentary that responds to and engages with the copied work is quintessential fair use). Two recent decisions of this District confirm the point on facts close to these: *Shaykhoun v. Daily Mail*, No. 1:24-cv-09978 (ALC), 2026 U.S. Dist. LEXIS 40950, at 15–17 (S.D.N.Y. Feb.

18

26, 2026), held that copying social-media posts, images included, to comment on and critique them is fair use; and *MCM Grp. 22 LLC v. Perry,* 818 F. Supp. 3d 623, 633 (S.D.N.Y. 2026), sustained as fair use a juxtaposition of a copyrighted image with other content precisely because no market participant would substitute the transformed use for the original.

Fong-Jones' premise that the posts comment on the person depicted rather than the photographic work is factually false as to noticed posts. See ECF 42 at 14–15, 20. The Sexy Senior Citizen post reproduced in the movants' own exhibit comments that the image looks like its subject "used some kind of a filter" or touched it up in Photoshop or with AI, and then mocks the result. ECF 33-3. That is commentary on the photograph as a photograph, the very thing whose absence decided *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 406–07 (S.D.N.Y. 2016). The opposition cannot hold the *BWP* line while its notices sweep in posts that critique the image's manufacture. Nor does the Second Circuit's most recent word change the analysis: after *Warhol*, the court asks whether the copying has a justification, *Romanova v. Amilus Inc.*, 138 F.4th 104 (2d Cir. 2025), and criticism of, or commentary on, the original and its subject is the classic justification.

### C.    *The opposition's authorities are not to the contrary.*

*BWP Media* involved a gossip site's republication of celebrity photographs to depict their subjects, with no commentary on the images; the court was explicit that commentary on the work itself would change the analysis. 196 F. Supp. 3d at 406–07. *North Jersey Media Group Inc. v. Pirro*, 74 F. Supp. 3d 605 (S.D.N.Y. 2015), denied summary judgment where a famous news photograph was reposted with a hashtag and no discernible commentary; the court's reasoning presupposed the absence of the critical engagement present here. *Griner v. King*, 104 F.4th 1 (8th Cir. 2024), concerned a politician's commercial fundraising use of a meme, a purpose nothing like

19

pseudonymous forum criticism. And *Philpot v. Independent Journal Review*, 92 F.4th 252 (4th Cir. 2024), found no transformation in a crop of "negative space", again without commentary on the work. Each of these cases turns on the feature this record supplies: the posts here criticize, mock, and in at least one noticed instance dissect the photograph itself, in noncommercial forum commentary. And to the extent the opposition equates the sting of that criticism with market harm, the Second Circuit rejected the equation long ago: criticism that suppresses demand for a work is not cognizable copyright injury. *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 481–82 (2d Cir. 2004).

## VIII.   THE OPPOSITION'S OWN USE OF THE MAY 14 CONFERENCE DISPOSES OF ITS CONFIDENTIALITY OBJECTION.

The opposition accuses Lolcow of violating a confidentiality understanding by describing the May 14 conferral, and asks the Court to disregard Lolcow's account under Rule 408. ECF 42 at 22; ECF 42-4 ¶ 3. It then devotes a sworn declaration and substantial portions of the brief to its own detailed account of the same conference: the settlement with a non-party and its terms, the offers extended to the Does, a settlement proposal, and the offers' rejection. ECF 42-4 ¶¶ 4–9; ECF 42 at 5–6, 18, 22. Rule 408 does not permit a party to deploy settlement communications as a sword while brandishing the rule as a shield, and this Circuit's cases confirm that the rule's protections can be forfeited by the proponent's own affirmative use. See *PRL USA Holdings, Inc. v. U.S. Polo Ass'n*, 520 F.3d 109, 114 (2d Cir. 2008) (Rule 408 permits use of settlement communications offered for a purpose other than proving liability). In any event, Lolcow's account was offered to show the purpose of the subpoenas, a question the statute itself makes material, not to prove liability for or invalidity of any claim, and purpose evidence falls within Rule 408(b). The Court need not even resolve the point: the operative fact Lolcow reported, that the Does' identities

20

are sought for their evidentiary value in this litigation, is now admitted on the face of the opposition. ECF 42 at 5.

## IX.    SUBSTANTIAL PORTIONS OF THE TEWSON DECLARATION SHOULD BE DISREGARDED.

The Tewson Declaration cannot bear the weight that has been placed upon it. A declarant must testify from personal knowledge, Fed. R. Evid. 602, and a lay witness's opinions must be rationally based on the witness's own perception and helpful, Fed. R. Evid. 701. Measured against those rules: the declaration's repeated professions of belief about the intentions of Mr. Moon and of anonymous users, ECF 42-3 ¶¶ 13, 15, 17, 21, are inadmissible speculation. Ms. Tewson's assertions about what forum policies are "designed" to accomplish are opinion without foundation. The declaration's characterizations of foreign judgments and of criminal statutes are legal conclusions.[6] ECF 42 at 3–4 & n.5. And its pages on thread titles, epithets, and accusations against individuals who are not movants, ¶¶ 4–7, are directed to no *Arista* factor and no element of any pending motion; their function is to make the forum unappealing, which is not a ground for enforcing a subpoena. The Court should disregard those portions of the Tewson Declaration.

## X.    SERVICE OF THE EMAILED SUBPOENAS REMAINS DEFECTIVE.

Lolcow's opening brief showed that two of the three subpoenas were never served in accordance with Rule 45(b)(1). ECF 30-1, Part III. The opposition's answer is that § 512(h)(6)

---

[6]Two points about *Fong-Jones v Flow Chemical Pty Ltd* [2023] VSC 770 bear noting. First, Lolcow was not a party to that Australian proceeding and is not bound by any finding made in it. *See Taylor v. Sturgell*, 553 U.S. 880, 884, 892–93 (2008) (a judgment does not bind nonparties). Second, by the opposition's own account, the default judgment in that case was set aside on the defaulting defendant's application, and the parties thereafter settled. ECF 42 at 4 n.5; *accord* ECF 58 at 1 n.1. A set-aside foreign default judgment, entered in a proceeding to which neither Lolcow nor any movant was a party and later resolved by settlement, establishes nothing here, and is not a proper subject of judicial notice for the truth of any finding.

21

applies Rule 45 only "to the greatest extent practicable" and that the statute "supplies its own delivery mechanism" through the DMCA agent. ECF 42 at 24. But § 512(h)(6) incorporates Rule 45. *In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 877 (N.D. Cal. 2022). It adopts Rule 45's procedures except where compliance is impracticable, and nothing made personal service impracticable here; Lolcow's registered agent for service of process is a matter of public record. Nothing in § 512(h)(6) makes a DMCA notice agent, designated to receive infringement notifications under § 512(c)(2), a registered agent for service of judicial process. And actual receipt does not by itself cure defective service.

## XI.    THE REQUEST FOR FEES AND COSTS IS PRESERVED.

The opposition devotes a page to the fee request, calling it premature, deficient, and unsupported. ECF 42 at 27–28. Each label fails. As to Rule 45(d)(1): the rule imposes a mandatory duty on the issuing party to "take reasonable steps to avoid imposing undue burden or expense," and directs that the court "must enforce this duty and impose an appropriate sanction, which may include lost earnings and reasonable attorney's fees," on a party who breaches it. Fed. R. Civ. P. 45(d)(1). The breach here is not a close question. It is apparent on the face of the subpoenas and this docket: the subpoenas contain definitions drafted to reach two entities Fong-Jones has never sued and, when the moment came, declined to plead against. The requests are overbroad to a comical extent and served only by email on an agent designated for a different statutory purpose. A Rule 45(d)(1) award remedies the burden of the subpoena itself; it does not await, and does not depend on, any merits determination.

## CONCLUSION

For the foregoing reasons and those stated in its opening memorandum, Lolcow respectfully requests that the Court quash the subpoenas at ECF 13, 15, and 17. In the alternative,

22

the Court should limit any production to current, live account identifiers for the specific accounts identified in the notifications, subject to the strict Attorneys' Eyes Only protective order described in Lolcow's motion, and should award Lolcow its reasonable fees and costs under Rule 45(d)(1).

Dated: July 6, 2026

Respectfully submitted,

/s/ Matthew D. Hardin
Matthew D. Hardin
Attorney Reg. No. 5899596
101 Rainbow Drive # 11506
Livingston, TX 77399
Phone: 212-680-4938
Email: MatthewDHardin@gmail.com

*Counsel for Plaintiff Lolcow LLC*

23

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the undersigned certifies that this memorandum contains 7,023 words, exclusive of the caption, table of contents, table of authorities, signature block, and this certificate, as counted by the word-processing program used to prepare it, and complies with the word-count limitation requested in the accompanying letter motion.

/s/ Matthew D. Hardin
Matthew D. Hardin

24