UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------:

| | |
|---|---|
| LOLCOW LLC, | : Docket No.: 26-cv-02059 |
| Plaintiff, | : |
| v. | : |
| ZHEN ELIZABETH FONG-JONES, | : New York, New York |
| | : August 27, 2026 |
| Defendant. | : |

-----------------------------:

PROCEEDINGS BEFORE
THE HONORABLE KATHERINE POLK FAILLA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff: HARDIN LAW OFFICE
BY: MATTHEW HARDIN, ESQ.
101 Rainbow Drive, Pmb 11506
Livingston, Texas 77399

For Defendant: KAMERMAN, UNCYK, SONIKER & KLEIN, P.C.
BY: LANE A. HAYGOOD, ESQ.
1700 Broadway, 16th Floor
New York, New York 10019

For Third-Party Defendant: RANDAZZA LEGAL GROUP, PLLC
BY: JAY M. WOLMAN, ESQ.
MARC J. RANDAZZA, ESQ.
100 Pearl Street, 14th Floor
Hartford, Connecticut 06103

Transcription Service: Marissa Lewandowski
Phone: (631) 813-9335
E-mail:marissamignano@gmail.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

THE DEPUTY CLERK: Your Honor, this is in the matter of Lolcow, LLC vs. Fong-Jones.

Counsel, please state your name for the record, beginning with plaintiff.

MR. HARDIN: Thank you. This is Matthew Hardin on behalf of Lolcow, LLC.

THE COURT: Good afternoon, sir. This is Judge Failla. Are you able to hear me this afternoon?

MR. HARDIN: Yes, your Honor. Thank you.

THE COURT: Thank you very much.

On behalf of Ms. Fong-Jones, do we have an appearance?

MR. HAYGOOD: Yes, your Honor. This is Lane Haygood on behalf of Ms. Fong-Jones.

THE COURT: Sir, thank you very much. Good afternoon to you.

MR. HAYGOOD: Good afternoon.

THE COURT: And then on behalf of the subpoena recipients, do we have an appearance?

MR. WOLMAN: Good afternoon, your Honor. This is Jay Wolman of Randazza Legal Group for the subpoena subject those 1 through 7. I'm joined by my colleague, Marc Randazza.

THE COURT: Thank you very much. And good

afternoon to you as well.

As I suggested, in the order that initially scheduled this conference, and it is my intention to first resolve two motions -- actually three motions.

The first is a motion by the plaintiff and by the third-party defendants, who are the subpoena recipients here, to quash certain DMCA subpoenas filed by plaintiff. There is then a motion -- I'm sorry -- filed on plaintiff and third-party defendants. There are then a motion for preliminary injunction and there is then discussions about an anticipated motion to dismiss that has been suggested.

So let me please. I'm going to read into the record, because that is the quickest way that I have to communicate this to you, my decision on the motions to quash. And what I'm going to do is I'm going to invite everyone -- I'll pause and let you do this -- invite everyone to mute themselves so that no one's breaking into the communication and interrupting me as I read the decision.

The decision is about 10 pages long, so I'll thank you in advance for your patience. And it'll address first the motion to quash, and then as a result of the motion to quash and my disposition

of it, it will as well address the motion for a preliminary injunction.

And just so that you're attuned to what it is I'm going to be doing, in these decisions, I am going to be granting the motions to quash, and I am going to be denying the motion for preliminary injunction. So just want to manage your expectations.

I'll let you mute yourselves and then I will begin.

Thank you very much, by the way, for everyone's briefing on these issues. There were a lot of really interesting legal issues that were explored very well by the parties, and I do very much appreciate that. But because the parties have done such a good job in explaining the factual and the procedural backgrounds, I'm really going to limit my discussion of these areas and I'll try and be as streamlined as I can.

I do want to get some nomenclature issues out of the way first. I'm going to refer to Plaintiff Lolcow as simply "plaintiff" and to Defendant Ms. Fong-Jones as "defendant". And for ease of reference, when I'm discussing one of the third-party defendants, I'm very likely to refer to

them by their Doe number, even though the parties have identified the screen names. And if I refer to them collectively, I'll be referring to them as the third-party defendants.

So let me just give some brief background. At defendant's request, I signed three DMCA subpoenas addressed to plaintiff in late March and early April of this year. And the first two subpoenas sought information about accounts linked to the third-party defendants. The third sought information about nonparties to the case, and these are the subpoenas that are the primary focus of the briefing before me.

There was a recommendation from the third-party defendants that I analyzed the nonparties' posts coextensively with third-party defendants' posts. I am declining that recommendation.

But talking a little bit more about the subpoena -- the subpoenas, they were issued under 17 U.S.C. Section 512(h), which authorizes a subpoena to issue to a service provider for identification of an alleged, in this case, copyright infringer. And so, cutting to the chase, the parties agree that where, as here, a Section

512(h) subpoena seeks to identify anonymous online speakers, courts in the Second Circuit are required to balance the five factors set forth in *Arista Records LLC v. Doe 3*. That's a Second Circuit decision from 2010 reported at 604 F.3d 110.

And that's decided to -- excuse me -- that's in order to determine whether to quash the subpoena. So the first of the *Arista* factors -- and I'm fully aware that the parties are likely -- can repeat this back to me, but I do want the record to be clear. The first of the factors is the concreteness of the plaintiff showing of a prima facie case of actionable harm, in this case, copyright infringement. That's from the *Arista* decision, 604 F.3d at 119. That in turn is quoting *Sony Music Entertainment Inc. v. Does 1-40*, a Southern District decision from 2004 reported at 326 F. Supp. 2d 556.

Now here the parties do not dispute that the defendant has a copyright in what I'll call her professional headshot, which is the image that is docketed at docket entry 33-8. There's no dispute that the third-party defendants reproduced the headshot in several of the contested images. And instead the parties debate whether the subpoenas

should be quashed because the reproductions constitute fair use, which is an affirmative defense that can defeat a prima facie showing of infringement. Discussions about that concept are found in cases including In Re: DMCA Section 512(h) Subpoena to YouTube, Google Incorporated, a Southern District decision from 2022 reported at 581 F. Supp. 3d 509.

So for me, the motions to quash boil down to whether each of the challenged reproductions constitutes fair use, and for reasons I'm about to explain, I find that each does, and that's why I'm quashing the subpoenas. That's also why I'm not engaging with the parties' many, many other arguments on this issue.

So as the parties' briefing makes clear, they are familiar with the standard for fair use defense. Section 107 of Title 17 of the U.S. Code provides four nonexclusive factors that inform whether a use is fair, and they are number one, the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes. Number two, the nature of the copyrighted work. Number three, the amount and substantiality of the portion used in

relation to the copyrighted work as a whole. And number four, the effect of the use upon the potential market for or value of the copyrighted work.

Now, I'll break that down a little bit more, but this discussion that I'm about to give you is taken largely from the Second Circuit's recent decision in *Richardson vs. Townsquare Media Incorporated*, 174 F.4th 299.

So beginning with Section 107.1, which is purpose and character, the courts consider two sub-factors. Number one, the extent to which the secondary use is transformative, and number two, whether the secondary use is commercial in nature. That's discussed in cases including *Hachette Book Group, Inc. v. Internet Archive*, 115 F.4, 163, a Second Circuit decision from 2024. And in this setting, a secondary use is transformative where it does not merely supplant the original, but instead adds something new with a further purpose or different character, altering the original with a new expression, meaning or message. That's discussed in *Hachette* and it's also discussed in *Campbell vs. Acuff-Rose Music, Incorporated*, 510 U.S. 569, a Supreme Court decision from 1994.

Typically, this factor distills to the issue of substitution. A secondary use will not be transformative where it merely offers a substitute for the original work, and instead a use may be transformative where it was made for and objectively realizes a purpose distinct from that of the original work. That's discussed at length in the Supreme Court's 2023 decision in *Andy Warhol Foundation for the Visual Arts Incorporated vs. Goldsmith*, 598 U.S. 508.

Now, in addition, the new purpose must supply a sufficient justification for copying, such as providing a critique or commentary on the original or supplying information to the public about the copied work that is not otherwise available. That's discussed in the Supreme Court's decision of last year in *Romanova vs. Amilus, Inc.*, 138 F.4th 104, again, Second Circuit decision from 2025.

Now, most copying has some further purpose, and many secondary works add something new. And so the *Warhol* Court recognized that the inquiry will not always be clear cut. Instead, what they asked, or what the Court directed, is that lower courts assess transformativeness as a matter of degree and

weigh it against other considerations like commercialism.

Turning to the second factor, that considers the nature of the copyrighted work in recognition of the fact that some works are closer to the core of intended copyright protection than others. I'm quoting from the *Campbell* decision. And so what the *Warhol* case -- the Supreme Court's *Warhol* case asked or indicated was that the inquiry was whether the copyrighted work is more expressive or factual because fair use is more likely to be found where the work is fact or informational.

We also asked whether the copyrighted work has been previously published because the scope of fair use involving unpublished works is far more limited. I have to say, though, of the four factors, this one probably plays the least of a role in the fair use assessment.

On the third factor, a finding of fair use is more likely when small amounts or less important passages of the work are copied than when the copying is extensive or encompasses the most important part of the original. That's the *Hachette* decision I mentioned earlier, and it is in turn quoting a Second Circuit decision from 2015, *Authors*

*Guild vs. Google Incorporated*, 804 F.3d 202.

Once again, however, the inquiry remains context specific, and a fair use defense may be available even where a secondary work uses the entirety of the original. One case for that proposition is *Bill Graham Archives v. Dorling Kindersley Ltd*. 448 F.3d 605, a Second Circuit decision from 2006. The crux of the inquiry is whether no more was taken than necessary. That is a quote from the Second Circuit's 2014 decision in *Authors Guild, Inc. v. HathiTrust, 755 F.3d 87*.

On the fourth factor, the Second Circuit has repeatedly recognized this as the most important. The *Hachette* case I mentioned, the *Authors Guild* case I mentioned, and the *Richardson* case that I mentioned all speak to this issue.

And in this setting, courts consider primarily whether the secondary work usurps the market for the first work by offering a competing substitute, that is from the Second Circuit's decision in the *Warhol* case that then went to the Supreme Court.

So in doing so, courts weigh not only the market harm caused by the particular actions of the alleged infringer, but also the market harm that

would result from unrestricted and widespread conduct of the same sort. That is a quote from *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, a Second Circuit decision from 2018. This particular factor subsumes much of the content of the other factors whose force lies in evidencing the market effect of the use. For example, the fourth factor relates to the third factor because the greater the amount and substantiality of the use, the greater the likelihood that the secondary work might serve as an effectively competing substitute for the original. It is also relevant to the first factor because the more transformative a secondary use is, the less likely it is to serve as a mere substitute for the original.

Now, having outlined the relevant considerations for the fair use defense, I'll now apply them to each of the asserted copyright infringements here. I want to note at the outset though, that in describing why each of these reproductions is protected by fair use, I am not meaning to suggest anything about the appropriateness of the messages that they communicate. I think anyone looking at them would consider many of these messages to be cruel,

offensive, racist, and transphobic. But the fact remains that the fair use defense is rooted in the First Amendment, and that protects even the speech that we might find to be odious. One example of that is found in the Second Circuit's decision in *SARL Louis Faraud International v. Viewfinder, Incorporated*, 489 F.3d 474, a Second Circuit decision from 2007.

So let me first address Doe 1 and Doe 7's posts together because they are substantively identical. They appear at docket entries 33-1, 33-2, and docket entry 32 at page 10. And they both reproduce a cropped version of the headshot overlaid with meme-like text reading consent accidents do occasionally happen and accompanied by some commentary within the form posts.

Going under the first factor, I find that the meme-like text alone is sufficiently transformative to constitute fair use. It adds something new, altering the original with new expression, meaning or message. It's clearly criticism of the defendant and commentary on her tweet describing what she characterized as a consent accident. And there's nothing about this post or any of the posts at issue that is commercial in

nature.

And I want to pause for a moment and step back because, particularly with respect to this headshot, it is important to consider how it's being juxtaposed with the text. What I mean to say is, it is the defendant's portrait and expression, which are calm if not beatific, and the authors here have deliberately juxtaposed that with statements that she made that one can fairly say downplay or recharacterize allegations of sexual assault. And so my point is that image was selected precisely because the commentary is so at odds with the vision or the visage in the image.

I also don't find that the second factor in the fair use analysis is much help to the analysis. The reproductions are expressive and not informational, but the headshot was previously published, and I'm therefore not according the factor much weight.

For the third factor I don't find particularly helpful because the reproductions do crop out some background from the original headshot, but that cropping does little to inform the fair use analysis. This is not a situation, for example, where a few pages of a book were excerpted.

On the fourth factor, I think that it is helpful in demonstrating that Doe 1 and Doe 7 can avail themselves of the fair use defense. The defendant here suffered no market harm from the posts because they are not commercial in nature. They cannot usurp the headshots market in the first instance, and in any event, it is not clear to the Court what commercial market exists for the headshot. But the foregoing analysis obviates any need to wade into those particular waters.

Turning next to Doe 2's post, which appears at docket entry 33-3 and page 11 of Docket Entry 32, the Doe in this -- Doe 2 comments that the headshot appears to have been touched up in Photoshop or with AI and notes that he can do that too, and so he does, reproducing the headshot in a clearly altered way, transforming the defendant's face with a caricaturized smile, and then including critical commentary, writing nightmare fuel and again echoing the defendant's own prior comments, have a happy consent accident.

So, as an initial matter, this court can consider the language outside of the headshot itself under cases including Yang v. Mic Network, Inc., 405 F. Supp. 3d 537, a Southern District decision from

2019. Others include *Clark v. Transportation Alternatives, Inc*, 2019 Westlaw 1448448 and *Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570.

In other words, the fact that Doe 2's criticism and commentary appear in text surrounding the headshot rather than superimposed onto it like a more traditional meme, does not alter the Court's ability to consider that text for purposes of the fair use analysis. Here, too, the first factor of the fair use analysis is dispositive. Doe 2's altering of the headshot materially transforms it into something new, particularly when contextualized by his commentary that the original headshot appears photoshopped. It is clear that Doe 2 is offering criticism and communicating a new meaning and there is nothing commercial about the post.

For factors 2 and 3, I don't find them especially informative, and I'm not discussing them.

The fourth factor is again useful in demonstrating Doe 2's fair use. Doe 2 made this post and the others at issue here on an internet forum without any commercial considerations. There is no risk that the reproduction would affect any market substitution. So the use is also fair.

I turn now to Doe 3's post, which appears

at docket entry 33-4 and in part at page 13 of docket entry 32. This is a reproduction of the headshot. It zooms in to isolate the defendant's face. It is accompanied by text on the top and bottom, just outside the image itself in the margins of the forum post, but otherwise functioning just like the meme posted by Doe 1 and Doe 7.

The commentary contains racist invective that I will not repeat as well as the clause it was just consent accident. And for the reasons I've outlined above, this post also constitutes fair use. It is transformative under the first factor because it reflects criticism and commentary and is not commercial in nature. And under the fourth factor, there is no risk of market substitution.

Turning to Doe 4's post, which is found at docket number 33-5 at page 7 and at page 14 of docket entry 32. Now Doe 4 explicitly calls his reproduction a meme, and the Court agrees. It is a four-panel grid that juxtaposes the headshot and an image from the movie -- the 1985 movie Brazil, which is described by the third-party defendants as a haggard woman with stretched out skin and superimposed onto the meme are the phrases "DLSS 5 off" and "DLSS 5 on", which the third-party

defendants explain, are phrases popularly used online and memes to portray exaggerated before and after pictures. This meme is transformative, it is noncommercial, and I find that the use of the headshot in it is fair. Specifically, placing the headshot beside the Brazil image offers transformative criticism and commentary, as do the DLSS 5 off and on phrases.

The commentary itself appears rather offensive, but as the Court mentioned at the outset, this is what the First Amendment by way of the fair use defense protects. And again, nothing about this reproduction is commercial. So Doe 4 presents no threat of usurping defendant's market for the headshot.

Now I'm going to analyze Doe 5 and Doe 6 posts together. Doe 5's post appeared in docket entry 3-6 at pages 2 and 3 and at docket entry 32 at 16. It is a screenshot of a LinkedIn post advertising a podcast episode featuring defendant and the underlying LinkedIn post contains the headshot with the background removed and only defendant's body remaining pasted on a yellow background with text that appears to be the title of the podcast episode, and it appears to the Court to

be standard podcast promotional material.

Doe 6's post appears at docket number 32 at page 17 and then in partial form at docket number 33-7 at pages 2 and 3. And this version is cut off, which is why I'm using the version at docket entry 32. So it's a screenshot of defendant's own social media post announcing that she will use the headshot as her new profile picture. Doe 6 adds some commentary criticizing defendant's appearance in the headshot. Here, the Court's fair use analysis is not entirely or does not proceed entirely like its earlier analyses, but comes up with the same result. There is hardly anything transformative about a direct reproduction of the headshot without much accompanying commentary or criticism, Doe 6's brief criticism notwithstanding. But Section 107.2 guides that where a use is factual or informational rather than expressive, and the copyrighted work has been previously published, fair use is more likely to be found. I'm quoting from the *Richardson* decision 174 F.4th, page 308. And that's what's going on here.

There's very little expressive about Doe 5's and Doe 6's reproductions. Rather, these Does reproduce the headshot for factual purposes.

The fact of the headshot's existence was the point. That justification alone might cause issues, but Section 107.2 generally plays a minimal role in the fair use assessment anyway.

So buttressing this factor is a familiar justification, the entirely noncommercial nature of Doe 5's and Doe 6's posts. There is no risk that their posts might compete with the headshots as substitutes in the market, whatever that market may be, and therefore I find that the uses of the headshot were fair.

Now moving on to another request of plaintiff. Plaintiff is seeking attorneys' fees and costs under Federal Rule of Civil Procedure 45(d)(1). And in that setting, a defendant must take -- it provides that a defendant must take reasonable steps to avoid imposing undue burden or expense on a person subject to subpoenas and that the court must enforce this duty and impose an appropriate sanction which may include reasonable attorneys' fees on a party or attorney who fails to comply. The plaintiff argues that defendant failed to take reasonable steps to avoid imposing an undue burden on it via her subpoenas and plaintiff further emphasizes the mandatory nature of the rule.

Nonetheless, the Court declines to award plaintiff fees and costs because it finds that defendant took reasonable steps to avoid imposing an undue burden on plaintiff. That determination requires the Court to weigh the burden to the subpoenaed party against the value of the information to the serving party. Whether a subpoena imposes an undue burden depends on such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed. Quoting from my own 2021 decision in *Breaking Media Incorporated vs. Jowers*, 2021 Westlaw 1299108.

Here, the Court finds the defendant had a good faith belief that plaintiff via third-party defendants was infringing her copyright with no alternative mean to identify the third-party defendants. Defendant pursued the only route then available to her seeking subpoenas from this court. The Court need not engage with the parties' arguments about the overbreadth of the subpoenas to determine the defendant's good faith attempt to identify the infringers amounted to reasonable steps

taken to avoid imposing an undue burden. It is true that the Court is quashing defendant's subpoenas, but that does not necessarily mean that defendant's arguments or efforts were unreasonable or undue.

Other cases in which this same result is obtained include *Molefi vs. Oppenheimer Trust*, 2007 Westlaw 538547. And it, in turn, is citing *Builders Association of Greater Chicago vs. City of Chicago*, 2002 Westlaw 1008455.

So put somewhat differently, the uses of the headshots, this court ultimately concludes, were fair. But defendant's attempts to curtail them were not so unreasonable or so undue as to require fee shifting.

So for all of these reasons, I am granting plaintiff's and third-party defendants' motions to quash defendant's DMCA subpoenas.

That leaves plaintiff's preliminary injunction motion. And in that regard, plaintiff asks this Court to preliminarily enjoin defendant from issuing DMCA takedown notices pursuant to Section 512(c)(3) and DMCA subpoenas pursuant to Section 512(h), against the users of plaintiff's platform who use the headshot for commentary, criticism, parody, news reporting, or discussion of

defendant.

The Court declines to issue such blanket prospective relief. In granting the motions to quash, this Court carefully reviewed each individual post at issue. At this stage in the litigation, this court cannot ex ante determine that all uses of the headshot to discuss defendant made now or in the future are fair use or that all uses henceforth will be immune from DMCA takedown requests and subpoenas. And it is for this reason that the Court denies plaintiff's preliminary injunction motion.

That said, and to preview final discussion topic today, the parties should give careful consideration to how today's rulings bear on this case moving forward. This Court has certainly not resolved the merits of plaintiff's underlying case, but I trust that the parties will, as any good lawyers would in this circumstance, think about what these decisions on these motions mean for the case going forward and whether, for example, that might suggest an ability to resolve this case without additional motion practice or without a trial.

Let me also just offer another thought. If defendant, excuse me, did not understand this Court's views on the fair use doctrine, she does

now. And so I imagine that I will have the same views were there to be future subpoenas or takedown notices. And at that point, I might entertain an application for attorneys' fees or costs because at that point I don't know that I could find that the defendant's efforts were reasonable and not undue. But point being, for today, I am not comfortable ex ante preventing the defendant from issuing subpoenas. I just trust that she and her attorney will give careful consideration to the rulings today.

So finally, and as suggested by my July 6th endorsement of defendant's opposition to plaintiff's premotion letter seeking leave to move to dismiss defendant's copyright infringement counterclaim, and I repeated it in my July 23rd endorsement adjourning defendant's answer deadline, I am aware that the defendant has not yet filed an answer to plaintiff's first amended complaint or counterclaims, but I wanted to understand the plaintiff's contemplated motion.

And what I'm suggesting is now that the parties understand my views on fair use in this context, it may be that the parties want to think further about deciding on the need or advisability

of motion practice.

So with that, Mr. Hardin, let me please turn to you, sir. What would you like to do?

MR. HARDIN: I think it probably makes sense to give us a couple weeks, and we can submit a status report either suggesting that there's not a need for further proceedings, or if there is a need for an amended answering counterclaim and further proceedings, establishing a schedule for that. So that's what I would suggest is a status report in two weeks, and we'll figure out where we stand then.

THE COURT: All right. Now, sir, I'm very happy to get that from you in two weeks. If your colleagues are out vacationing, we might need a little bit more time. But you think two weeks is sufficient?

MR. HARDIN: I'm happy to make it 30 days if the defense feels like 30 days is more appropriate. I just threw that out as an option.

THE COURT: Well, you know, I'm feeling generous today, which I'm not usually, so I'll go with 30 days.

Mr. Haygood, does that make sense to you, sir?

MR. HAYGOOD: It does, your Honor.

THE COURT: Okay, much appreciated. And I know you've been dealing with Mr. Hardin, and I'm sure you've been dealing with the Randazza Group as well, so you can interact with them.

And Mr. Wolman, does that work for you, sir?

MR. WOLMAN: Your Honor, I don't believe our clients were served with anything at this point relative to any third-party claim or whatnot. But yes, 30 days is fine to the extent we have any future role.

THE COURT: You've identified it exactly the right way, sir. I didn't want to exclude you to the extent that you might be brought back into this case through some other method.

All right. I thank you all for participating in this conference this afternoon. We've gotten a lot done, even if it may not have appeared that way at first.

I will issue a minute entry that resolves these motions, and I will look forward to hearing from everyone in 30 days. That may get us -- you know what, that's going to end up being a Saturday. So let's do whatever that Friday is. Excuse me for a second while I try and try and get a calendar up.

Let's, please, make it September 25th, and we'll write that into the minute entry as well.

So, on or before September 25th, I will receive a letter, a joint letter, from whoever wishes to submit it, letting me know what the parties' intentions are going forward.

With that, I wish you all great rest of your summers. I thank you again. We are adjourned. Take care, everyone.

C E R T I F I C A T E

I, Marissa Lewandowski, certify that the foregoing transcript of proceedings in the case of Lolcow LLC v. Fong-Jones, Docket #1:26-cv-02059-KPF, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature Marissa Lewandowski ____________________________

Marissa Lewandowski

Date: August 31, 2026